MARTIN J. BRILL (State Bar No. 53220)
TODD M. ARNOLD (State Bar No. 221868)
LINDSEY L. SMITH (State Bar No. 265401)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone:  (310) 229-1234
Facsimile:  (310) 229-1244
Email: mjb@lnbyb.com, tma@lnbyb.com, lls@lnbyb.com

Attorneys for Debtor and Debtor in Possession

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## NORTHERN DIVISION

| | |
|---|---|
| In re: | Case No.: 9:17-bk-10489-PC |
| BRITISH MOTORCARS VENTURA, INC. d/b/a Land Rover Jaguar Ventura, | Chapter 11 Case |
| Debtor and Debtor in Possession. | **DISCLOSURE STATEMENT DESCRIBING DEBTOR'S PLAN OF REORGANIZATION DATED JUNE 28, 2017; DECLARATION IN SUPPORT THEREOF** |

**Disclosure Statement Hearing:**
Date:   August 9, 2017
Time:   10:00 a.m.
Place:  Courtroom "201"
           1415 State Street
            Santa Barbara, CA 93101-2511

**Plan Confirmation Hearing:**
Date:   **[TBD]**
Time:   **[TBD]**
Place:  Courtroom "201"
           1415 State Street
            Santa Barbara, CA 93101-2511

# **TABLE OF CONTENTS**

I. INTRODUCTION ................................................................................................ 2

    A.    PURPOSE OF THIS DOCUMENT. ...................................................... 4

    B.    DEADLINES FOR VOTING AND OBJECTING; DATE OF PLAN CONFIRMATION HEARING. .......................................................... 5

        1.    Time and Place of the Confirmation Hearing. ............................ 5

        2.    Deadline For Voting For or Against the Plan. ........................... 5

        3.    Deadline for Objecting to the Confirmation of the Plan. ........... 6

        4.    Identity of Persons to Contact for More Information Regarding the Plan. ........................................................................................ 6

    C.    DISCLAIMER. .................................................................................. 6

II. BACKGROUND ............................................................................................... 7

    A.    DESCRIPTION AND HISTORY OF THE DEBTOR'S BUSINESS AND THE DEBTOR'S CURRENT EQUITY HOLDERS AND THEIR EQUITY CONTRIBUTIONS AND CLAIMS ..................................... 7

    B.    EVENTS LEADING TO CHAPTER 11 FILING. ............................... 9

    C.    SIGNIFICANT EVENTS DURING THE BANKRUPTCY ............... 11

        1.    Cash Collateral and the New Financing ................................... 11

        2.    Other First Day Motions. ......................................................... 13

        3.    The Debtor's Schedules and the Claims Bar Date. ................... 13

        4.    341(a) Meeting of Creditors ..................................................... 14

        5.    Appointment of the Committee. ............................................... 14

        6.    Employment of Professionals at the Expense of the Estate. ...... 14

    D.    PREPETITION LITIGATION AND/OR ADMINISTRATIVE PROCEEDINGS. ........................................................................... 14

    E.    POSTPETITION LITIGATION AND/OR ADMINISTRATIVE PROCEEDINGS. ........................................................................... 15

    F.    POTENTIAL LITIGATION ............................................................. 15

III. SUMMARY OF THE PLAN OF REORGANIZATION ..................................... 16

    A.    FUNDING OF THE PLAN. .............................................................. 16

    B.    WHAT CREDITORS AND INTEREST HOLDERS WILL RECEIVE UNDER THE PLAN ...................................................................... 18

        1.    Unclassified Claims. ............................................................... 18

i

2.      Classified Claims and Interests. ................................................................. 21

C.      MEANS OF EFFECTUATING THE PLAN AND
        IMPLEMENTATION OF THE PLAN. ................................................................ 30

        1.      Funding for the Plan. .......................................................................... 30

        2.      Post-Effective Date Management and Conversion of the Debtor from a
                Subchapter S Corporation to a Subchapter C Corporation. ...................... 30

        3.      Post-Effective Date Employment and Payment of Counsel. .................... 31

        4.      Post-Effective Date Dissolution of the Committee. ................................ 31

        5.      Estimation of Claims and Review and Objections to Claims. .................. 31

        6.      Disbursing Agent. ............................................................................... 32

        7.      Distributions to be Made Pursuant to the Plan. ...................................... 32

        8.      Exculpations and Releases. .................................................................. 33

        9.      Injunctions. ....................................................................................... 34

D.      OTHER PROVISIONS OF THE PLAN. ............................................................. 35

        1.      Approval of the Sterling Exit Loan, Exit Financing Note, and Exit Loan
                Security Interest. ................................................................................ 35

        2.      Assumption and Rejection of Executory Contracts and Unexpired
                Leases. .............................................................................................. 35

        3.      Effect of Claims Bar Date. ................................................................... 37

        4.      Deadline for Filing Administrative Claims. ............................................ 38

        5.      Changes in Rates Subject to Regulatory Commission Approval. .............. 38

        6.      Retention of Jurisdiction. ..................................................................... 38

E.      RISK FACTORS. .......................................................................................... 40

F.      TAX CONSEQUENCES OF PLAN. ................................................................. 41

IV. CONFIRMATION REQUIREMENTS AND PROCEDURES ............................................. 42

A.      WHO MAY VOTE OR OBJECT. ..................................................................... 43

        1.      Who May Object to Confirmation of the Plan. ....................................... 43

        2.      Who May Vote to Accept/Reject the Plan. ............................................. 43

        3.      Who is Not Entitled to Vote. ................................................................ 44

        4.      Who Can Vote in More Than One Class. ................................................ 45

        5.      Votes Necessary to Confirm the Plan. ................................................... 45

        6.      Votes Necessary for a Class to Accept the Plan. .................................... 45

        7.      Treatment of Nonaccepting Classes. ..................................................... 45

8.    Request for Confirmation Despite Non-acceptance by Impaired
Class(es). ................................................................................................... 45

B.    LIQUIDATION ANALYSIS. .................................................................... 46

C.    FEASIBILITY. ........................................................................................... 51

V. EFFECT OF CONFIRMATION OF PLAN ................................................................ 52

A.    DISCHARGE. ............................................................................................. 52

B.    REVESTING OF PROPERTY IN THE REORGANIZED DEBTOR. ........ 52

C.    STAY/INJUNCTION. ................................................................................. 52

D.    MODIFICATION OF PLAN. ...................................................................... 53

E.    POST-CONFIRMATION CONVERSION/DISMISSAL. ............................ 53

F.    POST-CONFIRMATION STATUS REPORT. ........................................... 54

G.    POST-CONFIRMATION U.S. TRUSTEE FEES. ...................................... 54

H.    FINAL DECREE ........................................................................................ 54

DECLARATION OF PHILIP D. VASS ........................................................................... 55

# I.

# **INTRODUCTION**

British Motorcars Ventura, Inc. d/b/a Land Rover Jaguar Ventura, the debtor and debtor in possession in the above-captioned Chapter 11 bankruptcy case (the "Debtor"), commenced its bankruptcy case (the "Bankruptcy Case") by filing a voluntary petition for relief under Chapter 11 of Title 11, United States Code, 11 U.S.C. § 101, et seq. (the "Bankruptcy Code")[1] on March 22, 2017 (the "Petition Date").  The Debtor continues to manage its financial affairs as a debtor in possession pursuant to Sections 1107 and 1108.

On May 2, 2017, the Office of the United States Trustee (the "UST") formed an Official Committee of Unsecured Creditors (the "Committee").

Chapter 11 allows the Debtor, and, under some circumstances, creditors and other parties in interest, to propose a plan.  A plan may provide for the Debtor to reorganize by continuing to operate, to liquidate by selling the assets of its bankruptcy estate (the "Estate"), or a combination of both.  The Debtor is the proponent of the *Plan of Reorganization Dated June 28, 2017* (the "Plan") described herein and sent to you in the same envelope as this document, the *Disclosure Statement Describing Debtor's Plan of Reorganization Dated June 28, 2017* (the "Disclosure Statement").

The Plan is a reorganization plan, which provides for, among other things, **(1)** secured creditors to retain their liens and continue to be paid on contract terms from the Debtor's revenue, **(2)** a new value cash contribution (the "NV Cash Contribution") in the amount of $2.750 million and a subordinated secured loan (the "Sterling Exit Loan") in the amount of $2,526,958.59 million (subject to adjustment as set forth herein) from Sterling Motors, Ltd. ("Sterling") for a total of $5,276,958.59 million sufficient to (a) pay in full, or fund payment in full, without interest, all allowed administrative, priority, and general unsecured claims (including cure claims to be paid in connection with the assumption of certain unexpired leases and executory contracts), with the exception of the (i) the general unsecured claim of the party

---

[1] Unless otherwise stated, all Section references herein are to the Bankruptcy Code.

that sold the business to the Debtor and took carryback financing, whose claim will be cured and reinstated on the Effective Date (as defined below) of the Plan and who, thereafter, will receive payments on contract terms from the Debtor's revenue, and (ii) the claim (the "Vass Claim") of Philip D. Vass ("Vass"), the Debtor's majority shareholder, President, Chief Executive Officer, and General Manager, who will waive $940,412 of the $1,665,412 Vass Claim, as well as any right to payment on his $400,000 equity contribution, as his new value contribution (the "Vass NV Contribution"), but receive $725,000 in payments for the balance of the Vass Claim and (b) make a $1 million distribution to the Debtor's minority shareholders, which equals their principal capital contributions to the Debtor - $250,000 on the Effective Date and $250,000 on the first, second, and third anniversaries of the Effective Date, **(3)** with the exceptions in item (2), on the Effective Date, payment in full, or funding for payment in full, without interest, of all allowed administrative, priority, and general unsecured claims, **(4)** the Debtor's current equity interests being cancelled and Sterling receiving 80% of the Debtor's new equity interests in exchange for the NV Cash Contribution and Vass receiving 20% of the Debtor's new equity interests in exchange for the Vass NV Contribution, and **(5)** the continuation of the Debtor's business under the new ownership structure.

The effective date of the Plan (the "Effective Date") will be the first business day which is at least fifteen (15) days following the date of the entry of an order by the Court confirming the Plan (the "Confirmation Order") and when all of the following conditions to the effectiveness of the Plan have been satisfied or waived by the Debtor, Vass, and Sterling: **(1)** Sterling has transferred into a segregated account maintained by the Debtor's counsel, Levene, Neale, Bender, Yoo & Brill L.L.P. ("LNBYB"), the Sterling Exit Loan funds and the portion of the Sterling NV Cash Contribution required, with the exceptions set forth above, to pay in full, or fund payment in full, without interest, all allowed administrative, priority, and general unsecured claims required to be paid on or near the Effective Date of the Plan from the Sterling Exit Loan funds and the NV Cash Contribution, plus the initial $250,000 distribution to the Debtor's minority shareholders (collectively, the "Initial Plan Funds"), which, as set forth in the claims chart (the "Claims Chart") attached hereto as **Exhibit "1,"** is estimated to total

$4,526,958.59;[2] (2) there is no stay in effect with respect to the Confirmation Order; and (3) the Plan and all documents, instruments and agreements to be executed in connection with the Plan have been approved by the Bankruptcy Court (to the extent necessary) and executed and delivered by all parties to such documents, instruments and agreements.   The Debtor, following the Effective Date, will be referred to herein as the "Reorganized Debtor."  Where necessary, the term Debtor and Reorganized Debtor shall be interchanged.

**A.**  **PURPOSE OF THIS DOCUMENT.**

This Disclosure Statement summarizes what is in the Plan and tells you certain information relating to the Plan and the process the Court follows in determining whether or not to confirm the Plan.

**READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU WANT TO KNOW ABOUT:**

**(1)  WHO CAN VOTE ON AND/OR OBJECT TO THE PLAN,**

**(2)  WHAT THE TREATMENT OF YOUR CLAIM IS (i.e., what your claim will receive if the Plan is confirmed) AND HOW THIS TREATMENT COMPARES TO WHAT YOUR CLAIM WOULD RECEIVE IN A CHAPTER 7 LIQUIDATION,**

**(3)  THE HISTORY OF THE DEBTOR AND SIGNIFICANT EVENTS DURING ITS BANKRUPTCY,**

**(4)  WHAT THINGS THE COURT WILL LOOK AT TO DECIDE WHETHER OR NOT TO CONFIRM THE PLAN,**

**(5)  WHAT IS THE EFFECT OF CONFIRMATION OF THE PLAN, AND**

**(6)  WHETHER THE PLAN IS FEASIBLE.**

This Disclosure Statement cannot tell you everything about your rights.  You are strongly encouraged to consult your own lawyer to obtain more specific advice on how the Plan will affect you and what is the best course of action for you.

---

[2] Sterling purchased and had assigned to it the claims of Fox Capital Group Inc., Loan Me, Inc., Land Rover Cerritos, Reliable Fast Cash, LLC, and Jaguar Pasadena.  These claims are in the amount Sterling paid to purchase the claims and are included in the claims to be paid with the Initial Plan Funds.

4

Be sure to read the Plan as well as this Disclosure Statement.  If there are any inconsistencies between the Plan and this Disclosure Statement, the Plan provisions shall govern.

The Bankruptcy Code requires a Disclosure Statement to contain "adequate information" concerning the Plan.  The Court has approved this document as an adequate Disclosure Statement containing enough information to enable parties affected by the Plan to make an informed judgment about the Plan.   Any party can now solicit votes for or against the Plan.

**B.**     **DEADLINES FOR VOTING AND OBJECTING; DATE OF PLAN CONFIRMATION HEARING.**

THE COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT.  IN OTHER WORDS, THE TERMS OF THE PLAN ARE NOT YET BINDING ON ANYONE.   HOWEVER, IF THE COURT LATER CONFIRMS THE PLAN, THEN THE PLAN WILL BE BINDING ON ALL CREDITORS AND INTEREST HOLDERS IN THIS BANKRUPTCY CASE.

**1.**     **Time and Place of the Confirmation Hearing.**

The hearing where the Court will determine whether or not to confirm the Plan (the "Plan Confirmation Hearing") will take place on _____, 2017, at ____: ____.m., before the Honorable Peter H. Carroll, United States Bankruptcy Judge, in Courtroom "201," located at 1415 State Street, Santa Barbara, CA 93101-2511.

**2.**     **Deadline For Voting For or Against the Plan.**

If you are entitled to vote, it is in your best interest to timely vote on the enclosed ballot and return the ballot to:

COUNSEL TO THE DEBTOR<br>
Levene, Neale, Bender, Yoo & Brill L.L.P.<br>
Attention: Todd M. Arnold<br>
10250 Constellation Blvd., Suite 1700<br>
Los Angeles, California 90067<br>
Fax: (310) 229-1244<br>
Email: tma@lnbyb.com

Your ballot must be received by 5:00 p.m. (Pacific) on _____, 2017 or it will not be counted.

3. **Deadline for Objecting to the Confirmation of the Plan.**

Objections to the confirmation of the Plan must be filed with the Court and served upon the following attorney by _____, 2017:

COUNSEL TO THE DEBTOR
Levene, Neale, Bender, Yoo & Brill L.L.P.
Attention: Todd M. Arnold
10250 Constellation Blvd., Suite 1700
Los Angeles, California 90067
Fax: (310) 229-1244
Email: tma@lnbyb.com

4. **Identity of Persons to Contact for More Information Regarding the Plan.**

Any interested party desiring further information about the Plan should contact the following attorney:

COUNSEL TO THE DEBTOR
Levene, Neale, Bender, Yoo & Brill L.L.P.
Attention: Todd M. Arnold
10250 Constellation Blvd., Suite 1700
Los Angeles, California 90067
Telephone: (310) 229-1234
Fax: (310) 229-1244
Email: tma@lnbyb.com

C. **DISCLAIMER.**

The financial data relied upon in formulating the Plan is based on the Debtor's books and records which, unless otherwise indicated, are unaudited. The information contained in this Disclosure Statement is provided by the Debtor. The Debtor represents that everything stated in this Disclosure Statement is true to the best of the Debtor's knowledge. The Court has not yet determined whether or not the Plan is confirmable and makes no recommendation as to whether or not you should support or oppose the Plan.

## II.

## BACKGROUND

**A.    DESCRIPTION AND HISTORY OF THE DEBTOR'S BUSINESS AND THE DEBTOR'S CURRENT EQUITY HOLDERS AND THEIR EQUITY CONTRIBUTIONS AND CLAIMS.**

The Debtor, which is a California subchapter S corporation and has been in business since October 2010, sells new Jaguar and Land Rover vehicles and various previously owned vehicles; the Debtor also has a service and parts department (collectively, the "Business").

In connection with the acquisition of the Business from David Peterson ("Peterson"), the Debtor executed a promissory note in favor of Peterson (the "Peterson Note"), which was in the original principal amount of $1 million and now has a current balance of approximately $445,712.32 (the "Unsecured Peterson Note Claim").  The Peterson Note provides for a maturity date of October 2020 and requires payments of $11,310.13 per month.

In connection with, and as a necessity to the operation of its Business, the Debtor is party to various agreements (collectively, the "Dealer Agreement") with Jaguar Land Rover North America, LLC ("JLRNA").  Under the terms of the Dealer Agreement, among other things, (1) JLRNA sells new Jaguar and Land Rover vehicles to the Debtor (the "New Vehicles"), which the Debtor then sells to its customers, and (2) JLRNA provides certain business builder programs, pursuant to which JLRNA is required to make payments to the Debtor based primarily on sales of New Vehicles as long as certain conditions are met (the "Business Builder Payments"). The Business Builder Payments represent the Debtor's largest source of profits.

As set forth in the Debtor's Schedules of Assets and Liabilities (the "Schedules"), as amended, and the Claims Chart attached hereto as Exhibit "1," which lists the Debtor's creditors and is based on the Schedules and other post-Petition Date considerations, including the filing of Proofs of Claim (each a "Proof of Claim"), as of the Petition Date, the Debtor's equity (the "Current Equity") was, and currently is, owned by the following five (5) equity holders (the "Current Equity Holders"):

1.      60% by Vass, the Debtor's President, Chief Executive Officer and General Manager and a member of the Debtor's Board of Directors, who made an equity contribution of $400,000 to the Debtor and who has a claim in the amount of $1,665,412 against the Debtor for loans made to the Debtor pursuant to various notes;

2.      10% by Theodore Bently ("<u>Bently</u>") who made an equity contribution of $250,000 to the Debtor (the "<u>Bently Equity Contribution</u>") and who has a claim in the amount of $1,376,213.70 against the Debtor for loans made to the Debtor by Bently directly and through his entities, Bently Financial Development and Spider Investments LLC, pursuant to various notes (the "<u>Unsecured Bently Note Claim</u>");

3.      10% by Ian Gardner ("<u>Gardner</u>") who made an equity contribution of $250,000 to the Debtor (the "<u>Gardner Equity Contribution</u>");

4.      10% by Clifton Simonson ("<u>Simonson</u>") who made an equity contribution of $250,000 to the Debtor (the "<u>Simonson Equity Contribution</u>") and who has a claim in the amount of $902,100 against the Debtor for loans made to the Debtor by Simonson directly and through his entity, CESON FH LLC, pursuant to various notes (the "<u>Unsecured Simonson Note Claim</u>"); and

5.      10% by Alan ("<u>Young</u>" and, together with Bently, Gardner, and Simonson, the "<u>Current Minority Equity Holders</u>") who made an equity contribution of $250,000 to the Debtor (together with the Bently Equity Contribution, the Gardner Equity Contribution, and the Simonson Equity Contribution, the "<u>Minority Equity Contributions</u>") and who has a claim in the amount of $100,000 against the Debtor for loans made to the Debtor by Young pursuant to a note (together with the Unsecured Bently Note Claim and the Unsecured Simonson Note Claim, the "<u>Unsecured Minority Equity Note Claims</u>")

**B.**      <u>**EVENTS LEADING TO CHAPTER 11 FILING.**</u>

A brief summary of the circumstances that led to the filing of this Chapter 11 Bankruptcy Case is as follows:

Prior to the Petition Date (and for a period after the Petition Date before it was re-financed out pursuant to the New Financing as defined and discussed below) the Debtor financed its inventory through various loan agreements (the "<u>Loan Agreements</u>") with JPMorgan Chase Bank, N.A. ("<u>JPM</u>"), which provided for a credit limit of $7.75 million dollars (the "<u>Credit Limit</u>").  More specifically, by way of the Loan Agreements, JPM provided what are commonly referred to as "flooring" loans (the "<u>JPM Loans</u>") to the Debtor.  That is, when the Debtor bought New Vehicles from JLRNA and used vehicles from other-third parties, JPM paid for the vehicles, which increased the Debtor's obligations to JPM.  The JPM Loans were secured by a first priority security interest in substantially all of the Debtor's assets. The Debtor finances operations with, among other things, profits on sales, including the Business Builder Payments and profits from the Debtor's service and parts department.

In or about August 2016, due to various circumstances, JLRNA increased the amount of New Vehicle inventory available to dealers, including the Debtor, and sought to have dealers, including the Debtor, purchase additional inventory. Based on the foregoing and because the Debtor was interested in increasing its New Vehicle inventory, which the Debtor believed would increase sales and profits, between in or around August and September 2016, the Debtor increased its purchases of New Vehicle from JLRNA, which caused the Debtor to exceed its Credit Limit by approximately $7 million, such that, in or about late September 2016, the Debtor owed JPM over $14 million on the JPM Loans. At around the same time, JLRNA changed the way profits were paid to the Debtor on new vehicle sales by decreasing the profits paid at or near the date vehicles were sold and paying a larger amount of profits long after sales were made through Business Builder Payments. Also at around the same time, the overall market for new vehicles went down as did the Debtor's sales of its New Vehicles.

As a result of the Debtor being over the Credit Limit and other breaches of the Loan Agreements, (1) in late-September 2016 JPM placed extreme limits on the flooring loans it

would provide: JPM would no longer provide flooring loans so that the Debtor could maintain its inventory of vehicles; instead, JPM would only floor sold vehicles; as a result of the limits on the flooring loans, JLRNA would no longer allow the Debtor to purchase New Vehicles and pick them up at the port, which caused further reductions in sales and profits, and (2) in October 2016, the Debtor and JPM entered into a Forbearance Agreement (the "Forbearance Agreement"), whereby, among other things, (a) JPM agreed to forebear from enforcing its rights and remedies under the Loan Agreements until the earlier of January 15, 2017 and the occurrence of any additional breaches of the Loan Agreements or any breaches of the Forbearance Agreement and (b) the parties agreed to work on a plan for selling down the Debtor's inventory and paying down the JPM Loans.

The Debtor was able to reduce the balance of the JPM Loans by selling off inventory, making a $1 million payment to JPM funded by additional loans to the Debtor by third parties, and paying JPM the Debtor's Business Builder Payments received from JLRNA. As the Debtor sold down its inventory and paid down the balance on the JPM Loans, the Debtor was getting assurances from JPM that the limitations on the flooring line would be removed so that the Debtor could again purchase and maintain a customary amount of New Vehicle inventory. That never happened. Instead, the Debtor's inventory continued to be depleted. By December 2016, the Debtor's inventory of New Vehicles was extremely low, which caused the Debtor to have underperforming sales in December, which is traditionally the Debtor's best month of sales. As a result of all of the foregoing, particularly paying over Business Builder Payments to JPM, the Debtor could not maintain sales and profits, and the Debtor's did not have sufficient funds to pay ongoing operating expenses. The Debtor tried to obtain bridge financing from hard money lenders to get through the downturn in sales and profits. However, without full access to its flooring loans, the Debtor was unable to reverse the downturn in business.

Early on March 22, 2017, due to additional alleged breaches of the Loan Agreements and breaches of the Forbearance Agreement, (1) JPM began exercising its remedies by having representatives go to the Debtor's business and taking possession of keys, title documents, and owner manuals for the Debtor's vehicles and (2) JPM presented the Debtor with, and requested

1   that the Debtor sign, an Agreement for Voluntary Turnover of Collateral (the "<u>Turnover</u>

2   <u>Agreement</u>") pursuant to which the Debtor would turnover all of its assets to JPM.

3         The Debtor did not sign the Turnover Agreement because doing so and turning over all of

4   the Debtor's assets would have caused the Debtor to have to cease operations. This would have

5   been devastating to the Debtor. The Debtor's business has little value if it is not operating and

6   non-operation could cause the termination of the Debtor's Dealership Agreements with JLRNA,

7   which is essential to the operation of the Debtor's business.  Believing that JPM would soon take

8   additional action to take control of and foreclose on its collateral due to the Debtor's refusal to

9   sign the Turnover Agreement, later in the evening on the Petition Date of March 22, 2017, the

10  Debtor filed for bankruptcy protection under Chapter 11 in order to prevent foreclosure and to

11  preserve the going concern value of the Debtor's business.

12        After the Petition Date, due to the fact that the Debtor had insufficient operating capital to

13  pay ongoing expenses as they came due and, therefore, to maintain and continue operations,

14  except for a very short time, the Debtor originally contemplated seeking expedited approval of a

15  sale (the "<u>Asset Sale</u>") of substantially all of the Debtor's assets, without any auction or

16  overbidding, pursuant to an asset purchase agreement (the "<u>APA</u>") presented to the Debtor soon

17  after this Bankruptcy Case was filed. However, upon review of the APA, the Debtor did not

18  believe that the APA purchase price represented a maximization of the Debtor's going concern

19  value. Further, as it turns out, the APA would not have provided enough proceeds to pay claims

20  in full, which will be accomplished under the Plan.  However, given the exigent circumstances,

21  the Debtor was initially prepared to seek approval of the Asset Sale under the APA until the

22  Debtor was able to secure the New Financing discussed below.

23  **C.    <u>SIGNIFICANT EVENTS DURING THE BANKRUPTCY.</u>**

24        The following is a list of significant events which have occurred <u>during</u> this Bankruptcy

25  Case:

26        **1.    Cash Collateral and the New Financing.**

27        Soon after the Petition Date, the Debtor filed a motion to use JPM and other purported

28  secured creditor's cash collateral (the "<u>Cash Collateral Motion</u>").  The Cash Collateral Motion

1    was granted on an interim basis pending a final hearing.  Prior to the final hearing on the Cash

2    Collateral Motion, the Debtor reached agreement with JPM on a stipulation whereby JPM would

3    again provide the Debtor with flooring loans and consent to the Debtor's use of cash collateral

4    (the "Cash Collateral Stipulation").    Unfortunately, the Cash Collateral Stipulation did not

5    provide for any additional working capital loans from JPM, which the Debtor was in need of in

6    order to stabilize operations and maintain going concern value.  The Debtor filed a motion to

7    approve the Cash Collateral Stipulation (the "Cash Collateral Stip. Motion").    The Cash

8    Collateral Stip. Motion was granted on an interim basis pending a final hearing and was later

9    approved on a final basis.

10        In a fortunate turn of events, in the period between the interim and final hearing on the

11    Cash Collateral Stip. Motion, the Debtor was able to secure new financing, which consisted of

12    the following group of three loans (the "New Financing"):

13            1.    A secured loan in an amount of up to $8 million for a flooring line

14        of credit (the "Flooring Loan") provided by Comerica Bank ("Comerica") and

15        secured by the assets of the Debtor and Sterling, which is owned by Wayne Minor

16        ("Minor"), as a co-borrower, and guaranteed by Minor;

17            2.    A secured loan in an amount of up to $1.5 million for a working

18        capital line of credit (the "Working Capital Loan") provided by Comerica and

19        secured by the assets of the Debtor and Sterling, as a co-borrower, and guaranteed

20        by Minor; and

21            3.    A secured loan in the amount of $2.6 million for a loan (the

22        "Sterling DIP Loan") provided by Sterling and used by the Debtor to re-finance

23        various secured claims.

24        On April 10, 2017, the Debtor filed its motion to approve the New Financing (the

25    "Financing Motion").  On April 17, 2017, the Court entered an order granting the Financing

26    Motion on an interim basis.  On May, 2017, the Court entered an order (the "Final Financing

27    Order") granting the Financing Motion on a final basis.

28        The New Financing was used to (1) pay JPM in full and provide future floor financing for

1    the Debtor for New Vehicles, (2) provide a $1.5 million working capital line of credit, and (3)

2    pay all other allowed secured claims in full, such that, after the New Financing closed, Comerica

3    and Sterling were the Debtor's only secured creditors (other than an insurance premium

4    financing company that is only secured by unearned premiums on the underlying policy),

5    provided that, pursuant to an agreement between the parties, Comerica's liens and claims under

6    the Flooring Loan and Working Capital Loan are senior to the Sterling DIP Loan.

7          Pursuant to the New Financing, the Debtor was able to, among other things, (1) stabilize

8    operations, (2) dramatically reduce interest on secured obligations, (3) increase profitability, and

9    (4) maintain and increase the going concern value of the Business.

10          The agreement for the Sterling DIP Loan requires the Debtor to use its "commercially

11    reasonable best efforts" to propose and obtain an order confirming a Plan pursuant to which,

12    *inter alia*, the Debtor's Current Equity is cancelled and new equity is issued with the majority of

13    the new equity going to Sterling.  As further discussed herein, this will be accomplished by the

14    Plan.

15          **2.    Other First Day Motions.**

16          In addition to the Cash Collateral Motion, soon after the Petition Date, the Debtor filed a

17    number of other emergency motions, including (1) *Debtor's Emergency Motion For Authority*

18    *To [A] Pay Prepetition Priority Wages; And [B] Honor Accrued Vacation And Leave Benefits*,

19    (2) *Debtor's Emergency Motion For Authority To Pay Certain  Prepetition DMV Fees And*

20    *Priority Tax Claims*, and (3) *Debtor's Emergency Motion For Entry Of An Order Authorizing*

21    *Debtor To Provide Adequate Assurance Of Payment To Utility Companies Pursuant To Section*

22    *366(c) Of The Bankruptcy Code* (collectively, the "Other First Day Motions").  The Other First

23    Day Motions were all granted.

24          **3.    The Debtor's Schedules and the Claims Bar Date.**

25          On April 19, 2017, the Debtor filed its Schedules. On May 31, 2017, the Debtor filed its

26    first amendment to the Schedules.  On June 22, 2017, the Debtor filed its second amendment to

27    the Schedules.

28

On April 27, 2017, the Debtor filed a motion to set a claims bar date (the "Claims Bar Date"). On April 28, 2017, the Court entered an order setting June 30, 2017 as the Claims Bar Date, and the Debtor provided notice of the Claims Bar Date.

### 4.    341(a) Meeting of Creditors.

On April 27, 2017, the UST held the Debtor's Section 341(a) Meeting of Creditors. On that date, the Debtor attended the 341(a) Meeting of Creditors and it was concluded.

### 5.    Appointment of the Committee.

On May 2, 2017, the Office of the UST formed the Official Committee of Unsecured Creditors (i.e., the Committee).

### 6.    Employment of Professionals at the Expense of the Estate.

On March 29, 2017, the Debtor filed an application to employ McQueen & Ashman LLP ("M&A"), as the Debtor's special corporate and litigation counsel. On April 28, 2017, the Court entered an order approving the foregoing application.

On April 5, 2017, the Debtor filed an application to employ LNBYB as the Debtor's bankruptcy counsel. On April 25, 2017, the Court entered an order approving the foregoing application. On May 11, 2017, the Debtor filed an amendment to the LNBYB employment application. On May 31, 2017, the Court entered an order approving the foregoing amendment.

On May 18, 2017, the Committee filed an application to employ Winthrop Couchot Golubow Hollander, LLP ("WCGH") as bankruptcy counsel. On June 12, 2017, the Court entered an order approving the foregoing application, with modifications.

### D.    PREPETITION LITIGATION AND/OR ADMINISTRATIVE PROCEEDINGS.

As of the Petition Date, the Debtor was a party to the following litigation and administrative proceedings:

| CASE TITLE AND NUMBER | NATURE OF CASE | STATUS |
|---|---|---|
| *Internal Revenue Service v. British Motorcars Ventura, Inc.*<br><br>620-0002 | Federal Tax Return Audit for 2014 - 2015 | Pending |

| CASE TITLE AND NUMBER | NATURE OF CASE | STATUS |
|---|---|---|
| *Veronica Fernandez-Bustamante and Alexandra Gallardo v. British Motorcars Ventura, Inc. et al.*<br><br>56-2017-00493637-CU-BC-VTA | Breach of implied and express warranty | Pending (but stayed) |

**E.      POSTPETITION LITIGATION AND/OR ADMINISTRATIVE PROCEEDINGS.**

After the Petition Date, the Debtor initiated the following collection action.  Other than the following collection action, after the Petition Date, the Debtor did not initiate, and was not named as a party to, any litigation or administrative proceedings.

| CASE TITLE AND NUMBER | NATURE OF CASE | STATUS |
|---|---|---|
| *British Motorcars Ventura, Inc. v. Allan B. Zeller et al.*<br><br>56-2017-00497383-CU-BC-VTA | Breach of contract, money due on dishonor of check, goods and services delivered seeking the recovery of a $25,000 down payment, plus statutory damages of $1,500, plus attorneys' fees and costs and interest | Pending |

**F.      POTENTIAL LITIGATION.**

While, (1) as set forth in the Debtor's Statement of Financial Affairs (the "SOFA"), the Debtor made various transfers to non-insiders within 90 days of the Petition Date and to insiders within 1 year of the Petition Date, which may be avoidable as preferential transfers under Section 547, and (2) there may be fraudulent transfers or obligations made or incurred within 4 years of the Petition Date that may be avoidable as fraudulent transfers under Section 544 and/or 548, since the Plan provides for the payment of all allowed claims in full, without interest (except on secured claims and the Unsecured Peterson Note Claim), plus a distribution to the Current Minority Equity Holders equal to their principal Minority Equity Contributions, the Debtor does not intend to pursue any avoidance action claims under Chapter 5 of the

1    Bankruptcy Code ("Avoidance Claims"), provided however, that the Debtor shall retain all, and

2    does not waive any, Avoidance Claims.

3                                                    **III.**

4                           **SUMMARY OF THE PLAN OF REORGANIZATION**

5

6    A.    **FUNDING OF THE PLAN.**

7            The Plan will be funded from the following sources: (1) funds from the Sterling NV

8    Cash Contribution in the amount of $2,750,000, (2) funds from the Sterling Exit Loan to be

9    provided by Sterling to the Debtor pursuant to the terms of the Secured Promissory Note (the

10   "Exit Financing Note") in the approximate amount $2,275,000 (subject to adjustment as set

11   forth below) and which the Debtor is seeking to obtain approval for pursuant to the Plan and the

12   Confirmation Order, and (3) funds from the Debtor's operating revenue ("Operating Revenue").

13           The $2,750,000 Sterling NV Cash Contribution is comprised of (1) $2 million that shall

14   be transferred by Sterling into a segregated trust account maintained by LNBYB no later than

15   seven (7) days before the Plan Confirmation Hearing to assist the Debtor in proving the

16   feasibility of the Plan and (2) $750,000 that shall be paid in increments of $250,000 on each of

17   the first, second, and third anniversaries of the Effective Date in order to make distributions to

18   the Current Minority Equity Holders and, which, together with the initial $250,000 distribution

19   to the Current Minority Equity Holders, will result in a total of $1 million to repay the Current

20   Minority Equity Holders in full for their capital contributions.

21           The Exit Financing Note, substantially in the form attached hereto as **Exhibit "2,"**

22   pursuant to which Sterling will provide the Exit Loan, which is in addition to the Sterling DIP

23   Loan, includes the following principal terms: (1) amount – $2,526,958.59[3] (subject to

24   adjustment as set forth below), (2) interest rate – 3% per annum, (3) term – the later of (a) sixty

25   (60) months, commencing on the first day after all of the Conditions (as defined and set forth in

26   _____

27   [3] The form of the Exit Financing Note attached hereto provides for a loan in the amount of $2.275 million.
     However, as noted below, the Exit Financing Note provides for an increase in the Exit Loan amount as necessary
     to pay, or fund payments, required to be made on or near the Effective Date.  The Exit Financing Note, including

28   the amount thereof, will be finalized when the foregoing amount is ascertained.

the Exit Financing Note) have been satisfied and (b) 91 days after payment in full of the Comerica Flooring Loan and Working Capital Loan (the "Term"), (4) payment terms – paid interest only monthly with a balloon payment due at the end of the Term, (5) events of default – failure to make payments when due, (6) fees – none, (7) security interest – secured by a lien upon, and security interest in, substantially all of the Debtor's assets (the "Exit Loan Security Interest"), (8) subordination – Exit Loan and Exit Loan Security Interest subordinated to Comerica's Flooring Loan and Working Capital Loan.  Sterling shall transfer the $2,526,958.59 in funding for the Sterling Exit Loan into a segregated trust account maintained by LNBYB no later than seven (7) days before the Plan Confirmation Hearing to assist the Debtor in proving the feasibility of the Plan.

Attached hereto as **Exhibit "3"** are projections (the "Projections") starting from an expected Effective Date of October 2, 2017 and ending three years after that upon payment of the Unsecured Peterson Note Claim in full, which is the latest Plan payment (other than payments on the New Financing and Exit Loan, which will be made on contract terms over time).

The Initial Plan Funds (*i.e.*, the initial $2,000,000 of the Sterling NV Cash Contribution and the $2,526,958.59 Sterling Exit Loan) are sufficient to pay in full, or fund payment in full, without interest, all allowed administrative, priority, and general unsecured claims (including cure claims), with the exception of (1) the Unsecured Peterson Note Claim, which is based on carryback financing provided by Peterson in connection with the Debtor's purchase of the Business, and which Peterson Note Claim will be cured with funds from the Debtor's Operating Revenue and reinstated on the Effective Date, and, thereafter, will be paid on contract terms with funds from the Debtor's Operating Revenue, and (2) the Vass Claim held by Vass, who will waive $940,412 of the $1,665,412 Vass Claim, as well as any right to payment on the Vass NV Contribution, but who will receive $725,000 in payments for the balance of the Vass Claim (the "Initial Plan Payments").

As discussed herein and as set forth in the Claims Chart, the funds required from the Sterling NV Cash Contribution and Sterling Exit Loan are currently estimated to total

$5,276,958.59, with the Initial Plan Funds currently estimated to total $4,526,958.59.[4] However, due to the fact that, among other things, the Bar Date has not yet passed, the foregoing estimate of required Initial Plan Funds represents the Debtor's best estimate of the required Initial Plan Funds to make the Initial Plan Payments, but the ultimate total of required Initial Plan Payments is subject to revision as additional claims are filed.  As a result, the Exit Financing Note provides that (1) to the extent the actual Initial Plan Payments are *less* than current estimated Initial Plan Funds, the Exit Loan shall be *reduced* by the difference and (2) to the extent the actual Initial Plan Payments are *greater* than current estimated Initial Plan Funds, the Exit Loan shall be *increased* by the difference.

**B.**    **WHAT CREDITORS AND INTEREST HOLDERS WILL RECEIVE UNDER THE PLAN.**

As required by the Bankruptcy Code, the Plan classifies claims and interests in various classes according to their right to priority.  The Plan states whether each class of claims or interests is impaired or unimpaired.  The Plan provides the treatment each class will receive.

**1.    Unclassified Claims.**

Certain types of claims are not placed into voting classes.  Instead, they are unclassified.  They are not considered impaired and they do not vote on the Plan because they are automatically entitled to specific treatment provided for them in the Bankruptcy Code.  As such, the Debtor has *not* placed the following claims in a class.

**a.    Administrative Expenses.**

Administrative expenses are claims for costs or expenses of administering the Bankruptcy Case that are allowed under Section 507(a)(2).  The Bankruptcy Code requires that all administrative claims be paid on the Effective Date unless a particular claimant agrees to a different treatment.

---

[4] As noted above, the Initial Plan Funds are comprised of the Sterling Exit Loan funds and the portion of the NV Cash Contribution required, with the exceptions set forth herein, to pay in full, or fund payment in full, without interest, on all allowed administrative, priority, and general unsecured claims required to be paid on or near the Effective Date of the Plan from the NV Cash Contribution, plus the initial $250,000 distribution to the Debtor's minority shareholders.

The following chart lists **all** of the Debtor's Section 507(a)(2) administrative claims (the "Administrative Claims") and their treatment under the Plan:

| Name | Claim Amount | Treatment |
|---|---|---|
| Clerk's Office Fees | $0 (estimated amount owed as of the Effective Date) | Any outstanding amount to be paid in full on the Effective Date from the Initial Plan Funds. |
| UST Quarterly Fees | $0 (estimated amount owed as of the Effective Date) | Any outstanding amount to be paid in full on the Effective Date from the Initial Plan Funds. |
| LNBYB, bankruptcy counsel to the Debtor | $150,000 (estimated amount owed as of the Effective Date, net of retainer and any other payments) | Paid in full from the Initial Plan Funds on the later of (1) the Effective Date and (2) entry of an order approving LNBYB's final application for fees and expenses. |
| M&A, special litigation and corporate counsel to the Debtor | $75,000 (estimated amount owed as of the Effective Date, net of retainer and any other payments) | Paid in full from the Initial Plan Funds on the later of (1) the Effective Date and (2) entry of an order approving M&A's final application for fees and expenses. |
| WCGH, bankruptcy counsel to the Committee | $25,000 (estimated amount owed as of the Effective Date, net of any payments) | Paid in full from the Initial Plan Funds on the later of (1) the Effective Date and (2) entry of an order approving WCGH's final application for fees and expenses. |
| **TOTAL** | **$250,000 Administrative Claims (estimated)** | |

**Court Approval of Fees Required**:

Except for Clerk's Office fees and UST Quarterly Fees, the Court must rule on all fees listed in the foregoing chart before the fees will be owed. For all fees except Clerk's Office fees

and UST Quarterly Fees, the professional in question must file and serve a properly noticed fee application, and the Court must rule on the application.  Only the amount of fees allowed by the Court will be owed and required to be paid under the Plan.

The Administrative Claim amounts set forth above simply represent the Debtor's best estimate as to the amount of allowed Administrative Claims estimated to be incurred by professionals prior to the Effective Date and that will be paid under the Plan to the extent allowed by the Court.  The actual Administrative Claims may be higher or lower.  The Debtor expressly reserves his right to object to any of the foregoing Administrative Claims.  Similarly, by voting to accept the Plan (to the extent any creditor is entitled to vote on the Plan and the Debtor believes there are none), creditors are not acknowledging the validity of, or consenting to the amount of, any of these Administrative Claims, and creditors are not waiving any of their rights to object to the allowance of any of these Administrative Claims.

**b.    Priority Tax Claims.**

Priority tax claims include certain unsecured income, employment and other taxes described by Section 507(a)(8) of the Bankruptcy Code.  The Bankruptcy Code requires that each holder of such a Section 507(a)(8) priority tax claim receive the present value of such claim in regular installment payments in cash (i) of a total value, as of the Effective Date of the Plan, equal to the allowed amount of such claim; (ii) over a period ending not later than five (5) years after the Petition Date; and (iii) in a manner not less favorable than the most favored nonpriority unsecured claim provided for under the Plan.

The following charts list all of the Debtor's Section 507(a)(8) priority tax claims (the "Priority Tax Claims") and their treatment under the Plan:

| Description | Claim Amount | Treatment |
|---|---|---|
| • State Board of Equalization (Proof of Claim 16)<br><br>• Employment Development Department | $723.00<br><br><br><br>$2,735.12 | All allowed Priority Tax Claims paid in full from the Initial Plan Funds on the later of (1) the Effective Date and (2) entry of an order allowing any Priority Tax Claim subject to objection. |

| **Description** | **Claim Amount** | **Treatment** |
|---|---|---|
| (Scheduled for Priority Tax Claim in the amount of $2,735.12)<br><br>• Internal Revenue Service (Proof of Claim 6 – as amended) | $28,030.44 | The treatment set forth herein shall be in full settlement and satisfaction of these claims. |
| **TOTAL** | **$31,488.56  Priority Tax Claims (estimated)** | |

2.    **Classified Claims and Interests.**

a.    **Classes of Secured Claims.**

Secured claims are claims secured by liens on property of the Estate.  The following chart lists the classes containing the Debtor's secured claims and their treatment under the Plan:

| **CLASS #** | **DESCRIPTION** | **INSIDER (Y/N)** | **IMPAIRED (Y/N)** | **TREATMENT** |
|---|---|---|---|---|
| 1 | Secured claim of: Comerica for the Flooring Loan<br><br>Collateral description = Substantially all assets of the Debtor and the Debtor's Estate as provided in the documents underlying the New Financing and the Final Financing Order<br><br>Lien Priority = First<br><br>Claim Amount = Up to $8 million<br><br>Monthly Payment = Varies based on amount outstanding on the Flooring Loan | N | N<br><br>(Creditor in this class is **not** entitled to vote on the Plan) | The Class 1 claimant shall retain its lien on the assets of the Debtor and the Debtor's Estate as provided in the documents underlying the New Financing and the Final Financing Order until the claimant's claim is paid in full.<br><br>The Debtor will continue paying this claim per contract terms from the Operating Revenue.<br><br>The Class 1 claimant is unimpaired and shall retain unaltered its legal, equitable and contractual rights with respect to its allowed secured claim. |

21

| CLASS # | DESCRIPTION | INSIDER (Y/N) | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|---|
| | | | | The treatment set forth herein shall be in full settlement and satisfaction of this claim.

Class 1 is conclusively presumed to have voted to accept the Plan under Section 1126(f). |
| 2 | Secured claim of: Comerica for the Working Capital Loan

Collateral description = Substantially all assets of the Debtor and the Debtor's Estate as provided in the documents underlying the New Financing and the Final Financing Order

Lien Priority = First

Claim Amount = Up to $1.5 million

Monthly Payment = Varies based on amount outstanding on the Working Capital Loan | N | N

(Creditor in this class is **not** entitled to vote on the Plan) | The Class 2 claimant shall retain its lien on the assets of the Debtor and the Debtor's Estate as provided in the documents underlying the New Financing and the Final Financing Order until the claimant's claim is paid in full.

The Debtor will continue paying this claim per contract terms from the Operating Revenue.

The Class 2 claimant is unimpaired and shall retain unaltered its legal, equitable and contractual rights with respect to its allowed secured claim.

The treatment set forth herein shall be in full settlement and satisfaction of this claim.

Class 2 is conclusively presumed to have voted to accept the Plan under Section 1126(f). |

| CLASS # | DESCRIPTION | INSIDER (Y/N) | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|---|
| 3 | Secured claim of: Sterling for the Sterling DIP Loan<br><br>Collateral description = Substantially all assets of the Debtor and the Debtor's Estate as provided in the documents underlying the New Financing and the Final Financing Order<br><br>Lien Priority = Second<br><br>Claim Amount = $2.6 million<br><br>Monthly Payment = $10,833.33 (approx. varies based on days in months) | N | N<br><br>(Creditor in this class is **not** entitled to vote on the Plan) | The Class 3 claimant shall retain its lien on the assets of the Debtor and the Debtor's Estate as provided in the documents underlying the New Financing and the Final Financing Order until the claimant's claim is paid in full.<br><br>The Debtor will continue paying this claim per contract terms from the Operating Revenue.<br><br>The Class 3 claimant is unimpaired and shall retain unaltered its legal, equitable and contractual rights with respect to its allowed secured claim.<br><br>The treatment set forth herein shall be in full settlement and satisfaction of this claim.<br><br>Class 3 is conclusively presumed to have voted to accept the Plan under Section 1126(f). |
| 4 | Secured claim of: IPFS Corporation<br><br>Collateral description = Unearned premiums on financed insurance<br><br>Lien Priority = First (on subject asset)<br><br>Claim Amount = | N | N<br><br>(Creditor in this class is **not** entitled to vote on the Plan) | The Class 4 claimant shall retain its lien its subject asset until the claimant's claim is paid in full.<br><br>The Debtor will continue paying this claim per contract terms from the Operating Revenue. |

| CLASS # | DESCRIPTION | INSIDER (Y/N) | IMPAIRED (Y/N) | TREATMENT |
|---------|-------------|---------------|----------------|-----------|
| | $1,987.52 (as of Petition Date)<br><br>Monthly Payment = Varies based on outstanding premium owed | | | The Class 4 claimant is unimpaired and shall retain unaltered its legal, equitable and contractual rights with respect to its allowed secured claim.<br><br>The treatment set forth herein shall be in full settlement and satisfaction of this claim.<br><br>Class 4 is conclusively presumed to have voted to accept the Plan under Section 1126(f). |

**b.      Classes of Priority Unsecured Claims.**

Certain allowed priority claims (the "Non-Tax Priority Claims") that are referred to in Bankruptcy Code Sections 507(a) (1), (4), (5), (6) and (7) are required to be placed in classes. Non-Tax Priority Claims are entitled to priority treatment as follows:  The Bankruptcy Code requires that each holder of a Non-Tax Priority Claims receive cash on the Effective Date equal to the allowed amount of such claim.  However, a class of unsecured Non-Tax Priority Claims holders may vote to accept deferred cash payments of a value, as of the Effective Date, equal to the allowed amount of such claims.

The following chart lists ***all*** of the Debtor's Non-Tax Priority Claims and their treatment under the Plan:

| CLASS # | DESCRIPTION | INSIDER (Y/N) | IMPAIRED (Y/N) | TREATMENT |
|---------|-------------|---------------|----------------|-----------|
| 5 | Section 507(a)(4) Wage Claims:<br><br>• Richard Zankin (Proof of Claim 18 | N | N<br><br>(Creditor in this class is **not** entitled to vote on the | All allowed Class 5 Wage Claims paid in full up to priority cap amount from the Initial Plan Funds on the later of (1) the |

| CLASS # | DESCRIPTION | INSIDER (Y/N) | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|---|
| | ($1,624.00 priority) – The Debtor disputes that this claim qualifies as a Wage Claim because Zankin is not an employee of the Debtor.  However, the treatment of this claim is the same as for general unsecured claims, so the Debtor will likely not spend resources objecting to and seeking to reclassify this claim.<br><br>• Auto Purchase Consulting (Proof of Claim 24 ($500.00 priority) – The Debtor disputes that this claim qualifies as a Wage Claim because Auto Purchase Consulting is not an employee of the Debtor. However, the treatment of this claim is the same as for general unsecured claims, so the Debtor will likely not spend resources objecting to and seeking to reclassify this claim. | | Plan) | Effective Date and (2) entry of an order allowing any Non-Tax Priority Claims subject to objection.<br><br>The balance of any allowed Class 5 Wage Claims will be treated as Class 8 general unsecured claims.<br><br>The treatment set forth herein shall be in full settlement and satisfaction of the priority portions of these claims.<br><br>Class 5 is conclusively presumed to have voted to accept the Plan under Section 1126(f). |
| 6 | Section 507(a)(7) Deposit Claims:<br><br>• Mark Pierce (Scheduled ($0 priority / $0 general unsecured) | N | N<br><br>(Creditor in this class is **not** entitled to vote on the Plan) | All allowed Class 6 Deposit Claims paid in full up to priority cap amount from the Initial Plan Funds on the later of (1) the Effective Date and (2) entry of an order |

| CLASS # | DESCRIPTION | INSIDER (Y/N) | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|---|
| | (Amounts above are per amended Schedules. Original amounts were ($2,850 priority / $2,150 general unsecured. Creditor may file proof of claim) | | | allowing any Non-Tax Priority Claims subject to objection.<br><br>The balance of any allowed Class 6 Deposit Claims will be treated as class 8 general unsecured claims.<br><br>The treatment set forth herein shall be in full settlement and satisfaction of the priority portions of these claims.<br><br>Class 6 is conclusively presumed to have voted to accept the Plan under Section 1126(f). |
| TOTAL | | **$2,124.00 Non-Tax Priority Claims (estimated)** | | |

c.      **Classes of General Unsecured Claims.**

General unsecured claims ("General Unsecured Claims") are unsecured claims not entitled to priority under Bankruptcy Code Section 507(a).  The following chart identifies the Plan's treatment of the classes containing **all** of the Debtor's General Unsecured Claims:

| CLASS # | DESCRIPTION | INSIDER (Y/N) | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|---|
| 7 | Unsecured Peterson Note Claim based on the Unsecured Peterson Note, which (1) is based on carryback financing in the original principal amount of $1 million provided by Peterson in connection with the Debtor's purchase of the Business and (2) provides for a | N | N<br><br>(Creditors in this class are **not** entitled to vote on the Plan) | On the Effective Date, the Debtor will cure arrearages on the Unsecured Peterson Note, which are estimated to total approximately $90,481.04 through an expected Effective Date of October 2, 2017 ($11,310.13 * 8 months – March – October 2017). The arrearage cure payment |

26

| CLASS # | DESCRIPTION | INSIDER (Y/N) | IMPAIRED (Y/N) | TREATMENT |
|---------|-------------|---------------|----------------|-----------|
|  | maturity date of October 2020 and requires payments of $11,310.13 per month.<br><br>Amount of Unsecured Peterson Note Claim = Approximately $445,712.32 |  |  | will be made from the Operating Revenue.  Upon payment of the arrearage cure amount, the Unsecured Peterson Note shall be deemed to be fully cured and reinstated.<br><br>After payment of the arrearage cure amount, the Debtor will continue paying the Unsecured Peterson Note per contract terms from the Operating Revenue.<br><br>The Class 7 claimant is unimpaired and shall retain unaltered his legal, equitable and contractual rights with respect to his allowed claim.<br><br>The treatment set forth herein shall be in full settlement and satisfaction of this claim.<br><br>Class 7 is conclusively presumed to have voted to accept the Plan under Section 1126(f). |
| 8 | All General Unsecured Claims other than the Unsecured Peterson Note Claim (the "Other General Unsecured Claims"), which the Debtor estimates to total **$3,993,346.03**.  *See* Claims Chart (Ex. 1 hereto) (Unsecured Claims – Unsecured Peterson | N (other than Vass, whose claim will not be counted when determining whether Class 8 | Y (Creditors in this class are entitled to vote on the Plan) | All allowed Other General Unsecured Claims paid in full from the Initial Plan Funds on the later of (1) the Effective Date and (2) entry of an order allowing any Other General Unsecured Claims subject to objection, provided, however that as part of the Vass NV Contribution, on |

| CLASS # | DESCRIPTION | INSIDER (Y/N) | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|---|
| | Note Claim). | accepted the Plan) | | the Effective Date, Vass shall be deemed to have waived $940,412 of the $1,665,412 Vass Claim and will only receive payment on $725,000 of the Vass Claim, which is included and part of the Other General Unsecured Claims.<br><br>The treatment set forth herein shall be in full settlement and satisfaction of these claims. |

### d.     Class of Interest Holders.

Interest holders are the parties who hold an ownership interest (*i.e.,* equity interest) in the Debtor.  The Debtor's interest holders are comprised of the Current Equity Holders who hold the Debtor's Current Equity.  The following chart identifies this Plan's treatment of the class of interest holders:

| CLASS # | DESCRIPTION | INSIDER (Y/N) | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|---|
| 9 | Current Equity Holders | N<br>(other than Vass, whose Current Equity will not be counted when determining whether Class 9 accepted the Plan) | Y<br>(Creditors in this class are entitled to vote on the Plan) | On the Effective Date, (1) the Current Equity will be deemed to be cancelled and (2) new equity (the "New Equity") will be deemed to be issued as follows: (a) 80% to Sterling in exchange for the Sterling NV Cash Contribution and (b) 20% to Vass in exchange for the Vass NV Contribution.  Sterling will be required to forfeit its New Equity in the event Sterling does not timely |

| | | | | | make all of the NV Cash Contribution payments.

In **addition** to any distributions the Current Minority Equity Holders are entitled to under the Plan as holders of Class 8 Other General Unsecured Claims pursuant to the Unsecured Minority Equity Note Claims, (1) on the Effective Date, as part of the Sterling NV Cash Contribution, $250,000 shall be distributed to the Current Minority Equity Holders on a *pro rata* basis on account of their Minority Equity Contributions totaling $1 million and (2) on each of the first, second, and third anniversaries of the Effective Date, as part of the Sterling NV Cash Contribution, Sterling shall pay the Debtor $250,000 and such funds shall be distributed to the Current Minority Equity Holders on a *pro rata* basis on account of their Minority Equity Contributions totaling $1 million.  Thus, total payments to the Current Minority Equity Holders will total their Minority Equity Contributions totaling $1 million.

As part of the Vass NV Contribution, on the Effective Date, Vass shall be deemed to have waived the right to any cash |

| | | | | payment on account of the Current Equity he owned, provided, however, that, as set forth above, Vass will receive 20% of the New Equity.<br><br>The treatment set forth herein shall be in full settlement and satisfaction of any claims arising from, or based on, the Current Equity. |
|---|---|---|---|---|

## C.  MEANS OF EFFECTUATING THE PLAN AND IMPLEMENTATION OF THE PLAN.

### 1.  Funding for the Plan.

*See* Section III.A, *supra*.

### 2.  Post-Effective Date Management and Conversion of the Debtor from a Subchapter S Corporation to a Subchapter C Corporation.

On the Effective Date, (a) the Debtor's Board of Directors shall be deemed to be comprised of Minor and Vass, with each Director entitled to vote in proportion to their direct and indirect ownership of New Equity, (b) Minor shall be deemed to be the Debtor's Chief Executive Officer and Chief Financial Officer and will not receive any compensation but will be entitled to reimbursement for business expenses, and (c) Vass shall be deemed to be the Debtor's President and General Manager responsible for managing day to day operations as well as bankruptcy related decisions and shall be entitled to monthly compensation in the amount of $25,000, plus a quarterly performance bonus in an amount to be determined based on performance, plus, commensurate with pre-Effective Date compensation, use of demo cars, reimbursement for medical insurance (approx. $1,060.34 per month), reimbursement for life insurance (approx. $5,110.54 per quarter), and reimbursement for business expenses.

As soon as practicable after the Effective Date, the Debtor shall (a) file papers with the California Secretary of State or other appropriate California governmental unit providing for the foregoing changes in the Debtor's Board of Directors and Officers and (b) convert from a Subchapter S corporation to a Subchapter C corporation.

**3.      Post-Effective Date Employment and Payment of Counsel.**

After the Effective Date, (a) the Reorganized Debtor will be deemed to have continued to retain and employ LNBYB as the Debtor's bankruptcy counsel and M&A as the Debtor's special corporate counsel in the Bankruptcy Case pending the close of the Bankruptcy Case and the entry of a final decree therein for the purposes of, among other things, implementing and consummating the Plan, prosecuting any litigation claims and claim objections, and performing such other professional services as required by the Debtor to perform its duties and to implement and consummate the Plan, and (b) the Debtor will have the authority to employ such other professionals as the Debtor deems necessary for the foregoing purposes.

The post-Effective Date employment of professionals and the payment of the fees and expenses incurred by them after the Effective Date shall not require any further Court approval and shall be paid from the Debtor's Operating Revenue.

**4.      Post-Effective Date Dissolution of the Committee.**

On the Effective Date, (a) the Committee will be deemed to have been dissolved, (b) counsel to the Committee's retention will be deemed to have ended, and (c) the members of the Committee shall have no further responsibilities as Committee members.

**5.      Estimation of Claims and Review and Objections to Claims.**

The Reorganized Debtor shall review all claims filed or deemed filed and may object to or seek subordination of any claim filed or scheduled in this Bankruptcy Case (unless the Court has already entered an order allowing a claim).  The Reorganized Debtor and any other party in interest shall file any objections to claims no later than 120 days following the Effective Date, which period may be extended for cause shown pursuant to a motion filed before the expiration of the 120-day period.  As provided by Section 502(c), the Court may estimate any contingent or unliquidated disputed claim for purposes of confirmation of the Plan. The Court shall retain

1    jurisdiction over the Reorganized Debtor and the Bankruptcy Case to resolve such objections to

2    claims following the confirmation of the Plan.

3        Nothing contained in this Disclosure Statement or the Plan shall constitute a waiver or

4    release by the Debtor or Reorganized Debtor of any rights of setoff or recoupment, or of any

5    defense, that they may have with respect to any claim (including, without limitation, rights under

6    Section 502(d)).

7        **6.**    **Disbursing Agent.**

8        LNBYB shall act as the disbursing agent (the "<u>Disbursing Agent</u>") under the Plan for the

9    purposes of making all disbursements under the Plan to administrative creditors, priority

10   creditors, general unsecured creditors and to the Current Minority Equity Holders other than (a)

11   the post-confirmation monthly note payments on the Unsecured Peterson Note Claim, which will

12   be paid directly by the Reorganized Debtor and (b) the $750,000 to be disbursed to the Current

13   Minority Equity Holders from payments in the amount of $250,000 to be made from Sterling on

14   the first, second, and third anniversaries of the Effective Date, which will be paid directly by the

15   Reorganized Debtor.  The Disbursing Agent, and the Reorganized Debtor to the extent it makes

16   Plan payments, shall serve without bond and without compensation for distribution services

17   rendered in connection with the Plan.

18       **7.**    **Distributions to be Made Pursuant to the Plan.**

19       **a.**    **Timing of Distributions.**

20       Distributions to be made by the Disbursing Agent on account of any claim shall

21   be made as set forth in the Plan, or as promptly thereafter as practicable.

22       **b.**    **Method of Distributions.**

23       The Disbursing Agent, and the Reorganized Debtor to the extent it makes Plan

24   payments, shall make all distributions by check drawn on a domestic bank or by wire transfer, at

25   the sole election of the Disbursing Agent and the Reorganized Debtor to the extent it makes Plan

26   payments.

27       Except as otherwise agreed to in writing by the Disbursing Agent or the Reorganized

28   Debtor to the extent it makes Plan payments, distributions to be made to holders of allowed

1    claims pursuant to the Plan may be delivered by regular mail, postage prepaid, to the address

2    shown in the Debtor's Schedules, as they may from time to time be amended in accordance with

3    Bankruptcy Rule 1009, or, if a different address is stated in a Proof of Claim duly filed with the

4    Court, to such address.

5              **c.**       **Unclaimed Property.**

6          Checks issued by the Disbursing Agent or the Reorganized Debtor to the extent it makes

7    Plan payments to pay allowed claims shall be null and void if not negotiated within ninety (90)

8    days after the date of issuance thereof (the "Claiming Period").  Requests for reissuance of any

9    check shall be made to the Disbursing Agent or the Reorganized Debtor to the extent it makes

10    Plan payments by the holder of the allowed claim to whom such check originally was issued,

11    prior to the expiration of the Claiming Period.  After the Claiming Period, the claim sought to

12    be paid pursuant to a check that is not negotiated during the Claiming Period shall be deemed

13    disallowed and the funds otherwise payable on account of such claim shall be retained by and

14    revest in the Reorganized Debtor and shall not be subject to redistribution to the creditor that

15    failed to timely negotiate the check.

16              **d.**     *Di Minimis* **Distributions.**

17          The Disbursing Agent and the Reorganized Debtor to the extent it makes Plan payments

18    shall not be required to make any distributions of less than $10.00.  Any distribution of less than

19    $10.00 shall be retained by and revest in the Reorganized Debtor and shall not be subject to

20    redistribution to the subject creditor.

21              **e.**       **Compliance with Governmental Regulations**

22          In connection with the Plan and any instruments issued in connection therewith, the

23    Reorganized Debtor shall comply with all applicable withholding and reporting requirements

24    imposed by any federal, state or local taxing authority, and all distributions under the Plan shall

25    be subject to, and may be conditioned upon, any such withholding or reporting requirements.

26          **8.**     **Exculpations and Releases.**

27          To the maximum extent permitted by law, the Debtor, the Estate, Sterling, and Minor, as

28    well as any of their employees, agents, representatives, or the professionals employed or retained

by any of them, whether or not by Court order (each, a "Released Person"), shall not have or incur liability to any person or entity for an act taken or omission made in good faith in connection with or related to the formulation of the Plan, the Disclosure Statement, or a contract, instrument, release, or other agreement or document created in connection therewith, any solicitation of acceptances for or confirmation of the Plan, or the consummation and implementation of the Plan and the transactions contemplated therein. Each Released Person shall in all respects be entitled to reasonably rely on the advice of counsel with respect to its duties and responsibilities under the Plan.

9.    **Injunctions.**

**As of the Effective Date, the Confirmation Order shall enjoin the prosecution, whether directly, derivatively or otherwise, of any claim, obligation, suit, judgment, damage, demand, debt, right, cause of action, liability or interest released, treated in the Plan, discharged or to be discharged or terminated or to be terminated pursuant to the Plan (each an "Enjoined Claim").  Except as provided in the Plan or the Confirmation Order, as of the Effective Date, all entities and individuals that have held, currently hold, or may hold an Enjoined Claim are permanently enjoined from taking any of the following actions against the Debtor, the Reorganized Debtor, the Revested Assets (as defined below), the Estate, or property of the Estate on account of any Enjoined Claim: (1) commencing or continuing, in any manner or in any place, any action or other proceeding; (2) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (3) creating, perfecting or enforcing any lien or encumbrance; (4) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to the Debtor; and (5) commencing or continuing any action in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan.**

By accepting distribution pursuant to the Plan, each holder of an allowed claim receiving distributions pursuant to the Plan will be deemed to have specifically consented to the injunctions set forth in this section.

## D.    OTHER PROVISIONS OF THE PLAN.

### 1.    Approval of the Sterling Exit Loan, Exit Financing Note, and Exit Loan Security Interest.

On the Effective Date, the Sterling Exit Loan, Exit Financing Note, and Exit Loan Security Interest will be deemed to be approved.

### 2.    Assumption and Rejection of Executory Contracts and Unexpired Leases.

On the Effective Date, subject to the payment of the Cure Amount set forth below, the Debtor will be deemed (a) to have cured each of the following executory contracts and unexpired leases, (b) to have provided adequate assurance of future performance to each of the parties to each of the following executory contracts and unexpired leases, and (c) to have assumed each of the following executory contracts and unexpired leases Sections 365:

| Name | Description | Cure Amount | Notes |
|------|-------------|-------------|-------|
| ATT-Fiber Optics | Internet provider agreement dated 12/31/2015, with a 3 year term. | $1,931.55 | |
| Auto Advisory | Agreement date 2/1/2011, for a term of 12 months with an automatic renewal year to year. | $530.00 | |
| Auto Uplink | 12 month agreement, signed 6/27/16 | $200.00 | |
| Automotive Warranty | Signed dealer agreement on 9/3/2013 | $5,368.00 | |
| Byline Financial | 60 month lease on 2015 Ford F650 - monthly payments $1,803.33 | $0.00 | |
| Car Fax | Agreement signed 12/3/10, with an automatic year to year renewal. | $890.00 | |
| CDK Global LLC | Renewal Addendum Signed May 26, 2016 for 14 months | $11,392.77 | |
| Coast Self Storage | Lease of storage unit | $304.50 | |
| Dealer Socket | CRM Agreement signed on 6/21/16, with an effective date of 10/1/16 term is 12 months, with an automatic renewal for the same term. | $4,947.00 | |
| Dealer Track | Agreement signed on 11/1/11 for a 36 month term, with automatic 12 month renewal. | $5,000.00 | |

| Name | Description | Cure Amount | Notes |
|---|---|---|---|
| Dial Security | Agreement signed on 8/20/13 for a 12 month term, with additional subsequent one year terms. | $498.00 | |
| Hofer Properties | Lease of real property located at 3190 Perkin Avenue, Ventura, CA. Lease ends 1-1-2025. | $16,893.86 | |
| IPFS Corporation | Financed liability Insurance | $1,987.52 | Less amounts paid prior to Effective Date on this ongoing secured obligation |
| Jaguar Land Rover North America LLC | Dealer Agreement which consists of (i) the Dealer Agreement and exhibits thereto dated 10/15/10, (ii) the Land Rover Dealer Agreement Standard Terms and Conditions and (iii) the Performance Agreement dated 6/2/10 including its amendment dated 3/23/16.  Agreement through 11/29/19. | $188,298.31 | Total is for both contracts.  JLRNA also owes the Debtor certain amounts.  Cure amount increased over Scheduled claim amount per assertion of claimant that amount exceeds scheduled amount; amount subject to review, reconciliation and adjustment by agreement of the parties.  Cure amount potentially subject to discount based on setoff against amounts owed to the Debtor. |
| Jaguar Land Rover North America LLC | Dealer Agreement which consists of (i) the Dealer Agreement Grant of the Franchise and exhibits thereto dated 11/30/16, (ii) the Land Rover Dealer Agreement Standard Terms and Conditions, and (iii) the Performance Agreement dated 6/1/10 including its amendment dated 3/3/16.  Agreement through 11/29/19. | | |
| Orkin Services | Agreement date 8/13/14, for 1 year term, renews on a month to month basis. | $159.57 | |

36

| Name | Description | Cure Amount | Notes |
|------|-------------|-------------|-------|
| PNC Equipment Finance LLC (successor to Panasonic Finance Solutions) | Leasing Panasonic CF-53 Toughbooks for service. | $935.16 | Cure Amount Per POC |
| Prudential Overall Supply | 36 month agreement, signed on 2/15/2017 | $4,146.07 | |
| Safety Kleen | Agreement dated 8/11/11, for a 12 month term, with automatic 12 month renewal. | $810.21 | |
| **TOTAL CURE AMOUNT** | | **$244,292.52** | |

Any executory contracts and unexpired leases that are not listed in the chart immediately above and/or assumed and/or assigned prior to the Effective Date, shall be deemed to have been rejected as of the Effective Date. **THE LAST DAY FOR CLAIMANTS TO FILE PROOFS OF CLAIM FOR ANY DAMAGES RELATED TO ANY EXECUTORY CONTRACTS AND UNEXPIRED LEASES DEEMED TO BE REJECTED PURSUANT TO THE PLAN AS OF THE EFFECTIVE DATE (EACH A "REJECTION CLAIM") SHALL BE THIRTY (30) DAYS AFTER THE EFFECTIVE DATE. ANY REJECTION CLAIM THAT IS NOT FILED IN A TIMELY MANNER, SHALL BE DEEMED TO BE DISALLOWED IN ITS ENTIRETY.**

3.      **Effect of Claims Bar Date.**

Unless a later time is provided for under the Plan, any creditor filing a Proof of Claim after the Claims Bar Date, which is not otherwise an allowed claim, shall have no right to participate with other claimants or receive any distributions under the Plan by virtue of such late-filed Proof of Claim, unless treatment for the specifically identified creditor is expressly provided for in the Plan.

    4.     **Deadline for Filing Administrative Claims.**

**EXCEPT AS OTHERWISE PROVIDED BY THE PLAN, THE DEADLINE ("ADMIN. CLAIM BAR DATE") BY WHICH PARTIES, OTHER THAN PROFESSIONALS EMPLOYED AT THE EXPENSE OF THE ESTATE HEREIN, MUST FILE AND SERVE REQUESTS FOR THE PAYMENT OF ADMINISTRATIVE EXPENSE PRIORITY CLAIMS OF THE KIND DESCRIBED IN 11 U.S.C. § 503(b) AND ENTITLED TO PRIORITY UNDER 11 U.S.C. § 507(a)(2) ("ADMIN. CLAIM REQUESTS") IS 30 DAYS AFTER THE EFFECTIVE DATE. ADMIN. CLAIM REQUESTS FILED AFTER THE ADMIN. CLAIM BAR DATE SHALL BE DEEMED DISALLOWED AND THE HOLDER OF SUCH CLAIM WILL NOT BE ENTITLED TO ANY PAYMENT OR DISTRIBUTION ON ACCOUNT OF SUCH LATE-FILED ADMIN. CLAIM REQUEST.**

    5.     **Changes in Rates Subject to Regulatory Commission Approval.**

To the best of the Debtor's knowledge, the Debtor is not subject to governmental regulatory commission approval of its rates.

    6.     **Retention of Jurisdiction.**

Notwithstanding confirmation of the Plan, the Court shall retain jurisdiction for all of the following purposes, plus such other purposes as may be provided by the Bankruptcy Code and by other orders of the Court:

        a.     To resolve any and all disputes regarding the operation and interpretation of the Plan and the Confirmation Order;

        b.     To determine the allowability, classification, or priority of claims arising prior to the Effective Date;

        c.     To determine the extent, validity and priority of any lien asserted against any assets of the Debtor's bankruptcy Estate arising prior to the Effective Date;

        d.     To construe and take any action to enforce the Plan, the Confirmation Order, and any other order of the Bankruptcy Court issued in this

Bankruptcy Case; to issue such orders as may be necessary for the implementation, execution, performance, and consummation of the Plan, the Confirmation Order, and all matters referred to in the Plan, the Confirmation Order; and to determine all matters that may be pending before the Bankruptcy Court in this Bankruptcy Case on or before the Effective Date with respect to any person or entity related thereto;

e.      To resolve any dispute regarding the implementation, execution, performance, consummation, or interpretation of the Plan, the Confirmation Order, and the Exit Financing Note;;

f.      To determine, to the extent necessary, any and all professional fee applications;

g.      To determine any and all administrative claims;

h.      To determine motions, filed before the Effective Date, for the rejection, assumption, or assignment of any executory contracts or unexpired leases not otherwise assumed or rejected under the Plan, as well as the allowance of any claims resulting therefrom;

i.      To determine all applications, motions, adversary proceedings, contested matters, and any other litigated matters relating to this Bankruptcy Case and instituted during the pendency of this Bankruptcy Case, whether before, on, or after the Effective Date, including, but not limited to avoidance causes of action under 11 U.S.C. §§ 544 through 550;

j.      To determine such other matters and for such other purposes as may be provided in the Confirmation Order.

k.      To modify the Plan under Section 1127 of the Bankruptcy Code in order to remedy any apparent defect or omission in the Plan or to reconcile any inconsistency in the Plan such as may be necessary to effectuate its expressed intent and purpose;

l.    Except as otherwise provided in the Plan or the Confirmation Order, to issue injunctions or to take such other actions or make such other orders as may be necessary or appropriate to restrain interference with the Plan or the Confirmation Order, or to facilitate the execution or implementation by any person or entity of the Plan or the Confirmation Order;

m.    To issue such orders in aid of consummation of the Plan or the Confirmation Order, notwithstanding any otherwise applicable non-bankruptcy law, with respect to any person or entity, to the fullest extent authorized by the Bankruptcy Code or the Bankruptcy Rules; and

n.    To enter a final decree closing this Bankruptcy Case.

**E.    RISK FACTORS.**

There are three primary potential risk factors.  First, there is a risk that the Debtor does not receive the initial Sterling NV Cash Contribution of $2 million and funds for the Sterling Exit Loan, which will be used to fund the majority of payments on allowed administrative, priority, and general unsecured claims on or near the Effective Date.  However, as noted above, Sterling shall deposit the initial Sterling NV Cash Contribution and funds for the Sterling Exit Loan into a segregated trust account maintained by LNBYB no later than seven (7) days before the Plan Confirmation Hearing.  Thus, at the Confirmation Hearing, creditors will know whether this is an issue and the funding of the initial Sterling NV Cash Contribution and the Sterling Exit Loan are conditions to the Plan becoming effective.  Therefore, this is really not a plausible risk.

Second, there is a risk that the Debtor has insufficient Operating Revenue to pay ongoing business expenses, as well as the Plan payments to be paid from the Operating Revenue, such as payments on the New Financing from Comerica and Sterling, the IPFS secured claim, the Unsecured Peterson Note Claim, and the Sterling Exit Loan.  However, the Projections attached hereto as Exhibit "3" show that the Debtor expects to have sufficient Operating Revenue to make all such payments while accumulating a cash surplus.  Therefore, the Debtor believes this risk is nominal.

Third, there is a risk that Sterling has insufficient funds or fails to pay the final $750,000 of the Sterling NV Cash Contribution ($250,000 on each of the first, second, and third anniversaries).   However, based on the financial information obtained by the Debtor in connection with the Debtor obtaining the New Financing from Comerica and Sterling, the Debtor believes that Sterling is willing and able to make the required $750,000 in payments and such payments are a condition to Sterling retaining New Equity.   Based on the foregoing, the Debtor believes this risk is nominal.

**F.      TAX CONSEQUENCES OF PLAN.**

CREDITORS AND INTEREST HOLDERS CONCERNED WITH HOW THE PLAN MAY AFFECT THEIR TAX LIABILITY ARE URGED TO CONSULT WITH THEIR OWN ACCOUNTANTS, ATTORNEYS, AND/OR ADVISORS.  The following disclosure of possible federal income tax consequences is informational only and is intended solely for the purpose of alerting readers about possible, but not all, tax issues the Plan may present to the holder of a claim.  The Debtor CANNOT and DOES NOT represent that the tax consequences contained below are the only tax consequences of the Plan because the Tax Code, as well as Treasury Regulations, judicial and administrative authorities or interpretations, embodies many complicated rules which make it difficult to state completely and accurately all the tax implications of any action.  No opinion of counsel has been sought or obtained with respect to any tax consequences of the Plan.  No rulings or determinations of the Internal Revenue Service have been requested.   No representations are being made regarding the particular tax consequences of the Plan.

The Debtor does not believe that the Plan, in and of itself, will have any material tax consequences for the Debtor.  However, there will be tax consequences resulting from the conversion of the Debtor from a Subchapter S corporation to a Subchapter C corporation largely due to the fact that, after conversion, the Debtor will be taxed at the corporate level instead of having tax liabilities flow through to members.

The tax consequences of the Plan to a holder of a claim will depend, in part, on the type of consideration received for the claim, whether the holder is a resident of the United States for

tax purposes, whether the holder has taken a bad debt deduction with respect to the claim (or a portion thereof), and whether the holder reports income on the accrual or cash basis method. Holders of claims likely will recognize gain or loss, as the case may be, equal to the difference between the amount realized under the Plan in respect of their claims and their respective adjusted tax basis in their claims. The amount realized for this purpose generally will equal the sum of cash and the fair market value of any other consideration received under the Plan in respect of their claims. Any gain or loss recognized in the exchange will be capital or ordinary depending on the status of the claim in the holder's hands.

THE ABOVE DISCUSSION IS INTENDED AS A SUMMARY OF CERTAIN INCOME TAX CONSEQUENCES OF THE PLAN, IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES OF THE PLAN ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON THE INDIVIDUAL CIRCUMSTANCES OF THE HOLDERS OF CLAIMS AND INTERESTS. ACCORDINGLY, HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE FEDERAL, STATE, LOCAL, AND, IF APPLICABLE, FOREIGN TAX CONSEQUENCES OF THE PLAN.

## IV.

## CONFIRMATION REQUIREMENTS AND PROCEDURES

PERSONS OR ENTITIES CONCERNED WITH CONFIRMATION OR THE PLAN SHOULD CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW ON CONFIRMING A PLAN OF REORGANIZATION IS VERY COMPLEX. The following discussion is intended solely for the purpose of alerting readers about basic confirmation issues, which they may wish to consider, as well as certain deadlines for filing claims. The Debtor CANNOT and DOES NOT represent that the discussion contained below is a complete summary of the law on this topic.

Many requirements must be met before the Court can confirm the Plan. Some of the requirements include that the Plan must be proposed in good faith, acceptance of the Plan,

whether the Plan pays creditors at least as much as creditors would receive in a Chapter 7 liquidation, and whether the Plan is feasible.  These requirements are *not* the only requirements for confirmation.

## A.    WHO MAY VOTE OR OBJECT.

1.    Who May Object to Confirmation of the Plan.

Any party in interest may object to the confirmation of the Plan, but, as explained below, not everyone is entitled to vote to accept or reject the Plan.

2.    Who May Vote to Accept/Reject the Plan.

A creditor or interest holder has a right to vote for or against the Plan if that creditor or interest holder has a claim which is both (1) allowed or allowed for voting purposes, and (2) classified in an impaired class.

### a.    What Is an Allowed Claim/Interest.

As noted above, a creditor or interest holder must first have an allowed claim or interest to have the right to vote.  Generally, any Proof of Claim or interest will be allowed, unless a party in interest brings a motion objecting to the claim.  When an objection to a claim or interest is filed, the creditor or interest holder holding the claim or interest cannot vote unless the Court, after notice and hearing, either overrules the objection or allows the claim or interest for voting purposes.

The Claims Bar Date for filing a Proof of Claim in this Bankruptcy Case for non-governmental entities is June 30, 2017.  A creditor or interest holder may have an allowed claim or interest even if a Proof of Claim or interest was not timely filed.  A claim is deemed allowed if (1) it is scheduled on the Debtor's Schedules and such claim is not scheduled as disputed, contingent, or unliquidated, and (2) no party in interest has objected to the claim.  An interest is deemed allowed if it is scheduled and no party in interest has objected to the interest. Consult the Debtor's Schedules to see how the Debtor has characterized your claim or interest.

### b.    What Is an Impaired Claim/Interest.

As noted above, an allowed claim or interest only has the right to vote if it is in a class that is impaired under the Plan.  A class is impaired if the Plan alters the legal, equitable, or

1   contractual rights of the members of that class. For example, a class comprised of general

2   unsecured claims is impaired if the Plan fails to pay the members of that class 100% of what they

3   are owed.

4        In this Bankruptcy Case, the Debtor believes that Classes 8 (Other General Unsecured

5   Claims) and 9 (Current Equity Holders) are impaired and that holders of claims and interests in

6   those two Classes are, therefore, entitled to vote to accept or reject the Plan. Parties who dispute

7   the Debtor's characterization of their claim or interest as being impaired or unimpaired may file

8   an objection to the Plan contending that the Debtor has incorrectly characterized the Class.

9      **3.**     **Who is Not Entitled to Vote.**

10        The following four types of claims are not entitled to vote: (1) claims that have been

11   disallowed; (2) claims in unimpaired classes; (3) claims entitled to priority pursuant to

12   Bankruptcy Code Sections 507(a)(2), (a)(3), and (a)(8); and (4) claims in classes that do not

13   receive or retain any value under the Plan. Claims in unimpaired classes are not entitled to vote

14   because such classes are deemed to have accepted the Plan. Claims entitled to priority pursuant

15   to Bankruptcy Code Sections 507(a)(2), (a)(3), and (a)(8) are not entitled to vote because such

16   claims are not placed in classes and they are required to receive certain treatment specified by the

17   Bankruptcy Code. Claims in classes that do not receive or retain any value under the Plan do not

18   vote because such classes are deemed to have rejected the Plan. Unimpaired Classes under the

19   Plan are therefore not entitled to vote on the Plan. In this Bankruptcy Case, Class 1 (Secured

20   Comerica Flooring Loan), Class 2 (Secured Comerica Working Capital Loan), Class 3 (Secured

21   Sterling DIP Loan), Class 4 (Secured IPFS Claim), Class 5 (Section 507(a)(4) Priority Wage

22   Claims), Class 6 (Section 507(a)(7) Priority Deposit Claims), and Class 7 (Unsecured Peterson

23   Note Claim) are unimpaired and, therefore, not entitled to vote. EVEN IF YOUR CLAIM IS OF

24   THE TYPE DESCRIBED ABOVE, YOU MAY STILL HAVE A RIGHT TO OBJECT TO THE

25   CONFIRMATION OF THE PLAN.

26

27

28

### 4. Who Can Vote in More Than One Class.

A creditor whose claim has been allowed in part as a secured claim and in part as an unsecured claim is entitled to accept or reject the Plan in both capacities by casting one ballot for the secured part of the claim and another ballot for the unsecured claim.

### 5. Votes Necessary to Confirm the Plan.

If impaired classes exist, the Court cannot confirm the Plan unless (1) at least one impaired class has accepted the Plan without counting the votes of any insiders within that class, and (2) all impaired classes have voted to accept the Plan, unless the Plan is eligible to be confirmed by "cramdown" on non-accepting classes, as discussed later in Section IV.A.8.

### 6. Votes Necessary for a Class to Accept the Plan.

A class of claims is considered to have accepted the Plan when more than one-half (1/2) in number and at least two-thirds (2/3) in dollar amount of the claims which actually voted, voted in favor of the Plan.  A class of interests is considered to have accepted the Plan when at least two-thirds (2/3) in amount of the interest-holders of such class which actually voted, voted to accept the Plan.

### 7. Treatment of Nonaccepting Classes.

As noted above, even if all impaired classes do not accept the Plan, the Court may nonetheless confirm the Plan if the nonaccepting classes are treated in the manner required by the Bankruptcy Code.  The process by which nonaccepting classes are forced to be bound by the terms of the Plan is commonly referred to as "cramdown."  The Bankruptcy Code allows the Plan to be "crammed down" on nonaccepting classes of claims or interests if it meets all consensual requirements except the voting requirements of 1129(a)(8) and if the Plan does not "discriminate unfairly" and is "fair and equitable" toward each impaired class that has not voted to accept the Plan as referred to in 11 U.S.C. § 1129(b) and applicable case law.

### 8. Request for Confirmation Despite Non-acceptance by Impaired Class(es).

The Debtor will ask the Court to confirm the Plan by cramdown on impaired classes if such classes do not vote to accept the Plan.

## B.    LIQUIDATION ANALYSIS.

Another confirmation requirement is the "Best Interest Test," which requires a liquidation analysis.  Under the Best Interest Test, if a claimant or interest holder is in an impaired class and that claimant or interest holder does not vote to accept the Plan, then that claimant or interest holder must receive or retain under the Plan property of a value not less than the amount that such holder would receive or retain if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code.

In a Chapter 7 case, the Debtor's assets are usually sold by a Chapter 7 trustee.  Secured creditors are paid first from the sales proceeds of properties on which the secured creditor has a lien.  Administrative claims are paid next.  Next, unsecured creditors are paid from any remaining sales proceeds, according to such creditors' rights to priority.  Unsecured creditors with the same priority share in proportion to the amount of their allowed claim in relationship to the amount of total allowed unsecured claims.  Finally, interest holders receive the balance that remains after all creditors are paid, if any.

For the Court to be able to confirm the Plan, the Court must find that all creditors and interest holders who do not accept the Plan will receive at least as much under the Plan as such holders would receive under a Chapter 7 liquidation.  The Debtor maintains that this requirement is clearly met here.

Below is a demonstration, in balance sheet format, that all creditors and interest holders will receive at least as much under the Plan as such creditor or interest holder would receive under a Chapter 7 liquidation.

| **ASSETS**<br>**(as of projected Effective Date of 10-2-17, liquidation value used for all non-cash assets, other than Vehicle Inventory, which is at acquisition price)** | | | |
|---|---|---|---|
| | **Chapter 7** | **Chapter 11 Plan** | **Notes** |
| Cash | $500,000.00 | $500,000.00 | |
| Deposits | $15,500.00 | $15,500.00 | |
| Accounts Receivable | $743,000.00 | $743,000.00 | |
| Vehicle Inventory | $8,000,000.00 | $8,000,000.00 | |

| | | | |
|---|---|---|---|
| Office Furniture | $99,811.00 | $99,811.00 | |
| Fixtures and Improvements | $861,978.44 | $861,978.44 | |
| Non-Inventory Vehicles | $10,944.72 | $10,944.72 | |
| Parts Inventory | $261,750.00 | $261,750.00 | |
| Goodwill | $0.00 | $5,250,000.00 | Chapter 7 = $0, because, in Chapter 7, the Chapter 7 Trustee would likely have had to cease operations immediately because (1) he/she would not hold the necessary resale and other licenses and (2) he/she would not be a qualified general manager under the Debtor's agreements with JLRNA, likely leading to the termination of the agreements, which would result in the Debtor's Goodwill having no value. |
| Recoveries on Litigation Claims | $500,000.00 | $0.00 | Chapter 7 = the amount represents the best case scenario estimated gross recoveries on avoidance actions and other litigation claims, as the Debtor does not believe that there are many (if any) viable avoidance or other litigation claims.<br><br>Chapter 11 = $0, because, due to the payment in full of claims and because the Debtor does not believe that there are many (if any) viable avoidance actions or other litigation claims, the Debtor does not intend to pursue avoidance actions or other litigation claims. |
| Sterling NV Cash Contribution and Exit Loan | $0.00 | $5,276,958.59 | Chapter 11 only and only under contemplated Plan. |
| **Total** | **$10,992,984.16** | **$21,019,942.75** | |
| **LIABILITIES** | | | |
| Secured Claims (other than Exit Loan) | ($11,100,000.00) | ($11,100,000.00) | Estimated amounts owed under New Financing on projected Effective Date of 10-2-17, plus IPFS secured claim for unearned premiums; as noted in the Disclosure Statement and Plan, all of the Secured Claims will be paid over time from the Operating Revenue, which the |

| | | | |
|---|---|---|---|
| | | | Plan Projections (Ex. 3) show is sufficient to make such payments. |
| Secured Exit Loan | | ($2,526,958.59) | Chapter 11 only;  paid over time from the Operating Revenue, which the Plan Projections (Ex. 3) show is sufficient to make such payments. |
| Chapter 11 Administrative Claims for (1) professional fees and expenses in excess of retainers and payments made prior to the Effective Date and (2) Hoffer Properties post-petition stub rent for March | ($250,000.00) | ($250,000.00) | Chapter 7 = allowed claims paid from liquidation of assets and any net recoveries on Litigation Claims.<br><br>Chapter 11 = allowed claims paid in full from the Sterling NV Cash Contribution and Exit Loan. |
| Chapter 11 Administrative Claims for post-Effective Date professional fees and expenses in excess of retainers and payments made prior to the Effective Date | $0.00 | ($50,000.00) | Chapter 11 only, paid over time from Operating Revenue, which the Plan Projections (Ex. 3) show is sufficient to make such payments. |
| Chapter 7 Administrative Claims for 3% Costs of Sale on A/R, FF&E, Non-Inventory Vehicles, and Parts and to account for losses on New Vehicle Inventory returned to JLRNA | ($299,324.52) | $0.00 | Chapter 7 only. |
| Chapter 7 Administrative Claims for fees payable under Section 326(a) on approximately $9,766,716.93 | ($353,039.52) | $0.00 | Chapter 7 only |
| Chapter 7 Administrative Claims for professional fees and expenses incurred by professionals retained by the Chapter 7 Trustee to familiarize themselves with case facts, liquidation of assets, other motion work, and to analyze and pursue Litigation Claims and advise the Trustee with | ($125,000.00) | $0.00 | Chapter 7 only. |

| | | | |
|---|---|---|---|
| respect to the foregoing | | | |
| Priority Tax Claims | ($31,488.56) | ($31,488.56) | Chapter 7 = allowed claims paid from liquidation of assets and any net recoveries on Litigation Claims.<br><br>Chapter 11 = allowed claims paid in full from the Sterling NV Cash Contribution and Exit Loan. |
| Non-Tax Priority Claims | ($5,524.00) | ($2,124.00) | Chapter 7 = allowed claims paid from liquidation of assets and any net recoveries on Litigation Claims.<br><br>Chapter 11 = allowed claims paid in full from the Sterling NV Cash Contribution and Exit Loan. |
| **Total** | **($12,164,376.61)** | **($13,960,571.15)** | |
| | | | |
| **Balance Available for Allowed General Unsecured Claims** | **($1,171,392.45)** | **$7,059,371.60** | |
| | | | |
| **Estimated Allowed General Unsecured Claims** | | | |
| Unsecured Peterson Note Claim | $445,712.32 | $445,712.32 | Chapter 11 = Paid over time, in full, with interest, from Operating Revenue, which the Plan Projections (Ex. 3) show is sufficient to make such payments. |
| Other General Unsecured Claims | $3,993,346.03 | $3,993,346.03 | Chapter 7 = $254,783.76 higher for lease rejection claim of Hofer Properties ($21,231.98 monthly base rent * 12).<br><br>Chapter 11 = allowed claims paid in full from the Sterling NV |

49

|  |  |  | Cash Contribution and Exit Loan. |
|---|---|---|---|
|  | **$4,439,058.35** | **$4,439,058.35** |  |
|  |  |  |  |
| **Estimated Percent Paid on Allowed General Unsecured Claims** | **0%** | **100%** |  |

**% OF ITS CLAIMS WHICH GENERAL UNSECURED CREDITORS WOULD RECEIVE OR RETAIN IN A CH. 7 LIQUIDATION: = 0%**

**% OF ITS CLAIMS WHICH GENERAL UNSECURED CREDITORS WILL RECEIVE OR RETAIN UNDER THE PLAN: = 100%**

Below is a demonstration, in tabular format, that all creditors and interest holders will receive at least as much under the Plan as such creditor or holder would receive under a Chapter 7 liquidation.

| **CLAIMS & CLASSES** | **PAYOUT PERCENTAGE UNDER THE PLAN** | **PAYOUT PERCENTAGE IN CHAPTER 7 LIQUIDATION** |
|---|---|---|
| Class 1 (Secured Comerica Flooring Loan) | 100% | 100% |
| Class 2 (Secured Comerica Working Capital Loan) | 100% | 100% |
| Class 3 (Secured Sterling DIP Loan) | 100% | 76.6% (assumes $7.5 million owed on Flooring Line, $1.5 million owed on Working Capital Line, and $1,987.52 owed to IPFS)) |
| Class 4 (Secured IPFS Claim) | 100% | 0% |
| Chapter 11 Administrative Claims | 100% | 0% |
| Chapter 7 Administrative Claims (Chapter 7 Only) | 100% | 0% |
| Class 5 (Section 507(a)(4) Priority Wage Claims) | 100% | 0% |
| Class 6 (Section 507(a)(7) Priority Deposit Claims) | 100% | 0% |

50

| Class 7 (Unsecured Peterson Note Claim) | 100% | 0% |
| Class 8 (Other General Unsecured Claims) | 100% | 0% |
| Class 9 (Current Equity Holders) | 100% | 0% |

## C.    FEASIBILITY.

Another requirement for confirmation involves the feasibility of the Plan, which means that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan.

There are at least two important aspects of a feasibility analysis. The first aspect considers whether the Debtor will have enough cash on hand on the Effective Date to pay all the claims and expenses which are entitled to be paid on or near such date. As noted herein and in the Claims Chart attached hereto as Exhibit "1," on or near the Effective Date, the Debtor will make approximately $4,526,958.59 in payments on allowed claims. The foregoing funds are part of the Sterling NV Cash Contribution and Sterling Exit Loan. As noted above, Sterling shall deposit this portion of the NV Cash Contribution and Sterling Exit Loan into a segregated trust account maintained by LNBYB no later than seven (7) days before the Plan Confirmation Hearing. LNBYB will confirm receipt of the foregoing amount into a segregated trust account maintained by LNBYB, which will satisfy this aspect of the feasibility test.

The second aspect of the feasibility test considers whether the Debtor will have enough cash over the life of the Plan to make the required Plan payments. As noted above and in the Projections attached hereto as Exhibit "3," certain Plan payments will be made by the Debtor over time from the Debtor's Operating Revenue. The Projections attached hereto as Exhibit "3" show that the Debtor expects to have sufficient Operating Revenue to make all such payments while accumulating a cash surplus.

As also noted above, certain Plan payments – *i.e.*, the $750,000 in payments to be made by Sterling to the Current Minority Equity Holders ($250,000 on each of the first, second, and third anniversaries), will be made by Sterling. As discussed herein, based on the financial

information obtained by the Debtor in connection with the Debtor obtaining the New Financing from Comerica and Sterling, the Debtor believes that Sterling is willing and able to make the required $750,000 in payments and such payments are a condition to Sterling retaining its New Equity.  Based on the foregoing, the Debtor submits that the second aspect of the feasibility test is satisfied.

YOU ARE ADVISED TO CONSULT WITH YOUR ACCOUNTANT OR FINANCIAL ADVISOR IF YOU HAVE ANY QUESTIONS PERTAINING TO THE DEBTOR'S FINANCIAL STATEMENTS.


**V.**

**EFFECT OF CONFIRMATION OF PLAN**

**A.    DISCHARGE.**

On the Effective Date of the Plan, the Debtor shall be deemed to have been granted a discharge of liabilities for debts to the extent provided in Section § 1141.  However, pursuant to Section 1141, confirmation of the Plan shall bind the Debtor, all creditors, and other parties in interest to the provisions of the Plan whether or not the claim of such creditor is impaired under the Plan and whether or not such creditor has accepted the Plan.

**B.    REVESTING OF PROPERTY IN THE REORGANIZED DEBTOR.**

On the Effective Date, all of the property of the bankruptcy Estate (the "Revested Assets") shall be deemed to have revested in the Reorganized Debtor.  While, for the reasons set in the Disclosure Statement, the Debtor does not anticipate pursuing Avoidance Claims arising under Chapter 5 of the Bankruptcy Code, the Avoidance Claims are not included in the Revested Assets and will not revest in the Reorganized Debtor on the Effective Date.  Instead, the Avoidance Claims shall remain vested in the Debtor, with any recoveries to be paid over to the Reorganized Debtor.

**C.    STAY/INJUNCTION.**

The automatic stay is lifted upon the Effective Date and the concurrent grant of a discharge as to property of the bankruptcy Estate.  However, pursuant to the Plan injunction, as

of the Effective Date, all entities and individuals that have held, currently hold, or may hold an Enjoined Claim are permanently enjoined from taking any of the following actions against the Debtor, the Reorganized Debtor, the Revested Assets, the Estate, or property of the Estate on account of any Enjoined Claim: (1) commencing or continuing, in any manner or in any place, any action or other proceeding; (2) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (3) creating, perfecting or enforcing any lien or encumbrance; (4) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to the Debtor; and (5) commencing or continuing any action in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan.

**D.    MODIFICATION OF PLAN.**

The Debtor may modify the Plan at any time before confirmation.  However, the Court may require a new disclosure statement and/or re-voting on the Plan, unless the modification is non-material or relates only to the extension of the Effective Date, which modification shall not require a new disclosure statement and/or re-voting on the Plan.

The Debtor may also seek to modify the Plan at any time after confirmation only if (1) the Plan has not been substantially consummated and (2) the Court authorizes the proposed modifications after notice and a hearing.

**E.    POST-CONFIRMATION CONVERSION/DISMISSAL.**

A creditor or party in interest may bring a motion to convert or dismiss the Bankruptcy Case under 11 U.S.C. § 1112(b) after the Plan is confirmed if there is a default in performing the Plan.  If the Court orders the Bankruptcy Case converted to Chapter 7 after the Plan is confirmed, then all property that had been property of the Chapter 11 Estate, and that has not been disbursed pursuant to the Plan, will revest in the Chapter 7 Estate.

The order confirming the Plan may also be revoked under very limited circumstances. The Court may revoke the order if the order of confirmation was procured by fraud and if the party in interest brings an adversary proceeding to revoke confirmation within 180 days after the entry of the order of confirmation.

**F.      POST-CONFIRMATION STATUS REPORT.**

Within 120 days of the entry of the order confirming the Plan, the Reorganized Debtor shall file a status report with the Court explaining what progress has been made toward consummation of the confirmed Plan.  The status report shall be served on the United States Trustee, the twenty largest unsecured creditors and those parties who have requested special notice.  Further status reports shall be filed every 120 days and served on the same parties.

**G.      POST-CONFIRMATION U.S. TRUSTEE FEES.**

All fees incurred after the Effective Date pursuant to 28 U.S.C. Section 1930(a)(6) shall be paid by the Reorganized Debtor.

**H.      FINAL DECREE**

Once the Estate has been fully administered as referred to in Bankruptcy Rule 3022, the Reorganized Debtor shall file a motion with the Court to obtain a final decree to close the Bankruptcy Case.

Dated: June 28, 2017

BRITISH MOTORCARS VENTURA, INC.
d/b/a Land Rover Jaguar Ventura

PHILIP D. VASS, President

PRESENTED BY:

LEVENE, NEALE, BENDER, YOO
  & BRILL L.L.P.


By:___*/s/ Martin J. Brill*_____
        MARTIN J. BRILL
        TODD M. ARNOLD
        LINDSEY L. SMITH
Attorneys for Debtor and Debtor in Possession

54

## DECLARATION OF PHILIP D. VASS

I, Philip D. Vass, hereby declare as follows:

1.    I am over 18 years of age.  Except where otherwise stated, I have personal knowledge of the facts set forth below and, if called to testify, I could and would testify competently thereto.

2.    I make this declaration in support of the Disclosure Statement to which this declaration is attached.  Unless otherwise stated, all capitalized terms herein have the same meanings as in the Disclosure Statement.

3.    The Debtor is principally owned and operated by me.  I own 60% of the Debtor. The Debtor also currently has four minority owners that each own 10% of the Debtor. The Debtor, which has been in business since October 2010, sells new Jaguar and Land Rover vehicles and various previously owned vehicles. The Debtor also has a service and parts department.  Additional information regarding the Debtor and its business operations can be found at http://landroverjaguarventura.com/.

4.    I have reviewed the information contained within the Disclosure Statement and the exhibits thereto, including all financial information.  To the best of my knowledge, information and belief, I believe that all of the information contained in this Disclosure Statement is truthful and accurate.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 28th day of June 2017, at Ventura, California.

_____

PHILIP D. VASS

1                  **DECLARATION OF PHILIP D. VASS**

2        I, Philip D. Vass, hereby declare as follows:

3        1.      I am over 18 years of age.  Except where otherwise stated, I have personal

4 knowledge of the facts set forth below and, if called to testify, I could and would testify

5 competently thereto.

6        2.      I make this declaration in support of the Disclosure Statement to which this

7 declaration is attached.  Unless otherwise stated, all capitalized terms herein have the same

8 meanings as in the Disclosure Statement.

9        3.      The Debtor is principally owned and operated by me.  I own 60% of the Debtor.

10 The Debtor also currently has four minority owners that each own 10% of the Debtor. The

11 Debtor, which has been in business since October 2010, sells new Jaguar and Land Rover

12 vehicles and various previously owned vehicles. The Debtor also has a service and parts

13 department.  Additional information regarding the Debtor and its business operations can be

14 found at http://landroverjaguarventura.com/.

15        4.      I have reviewed the information contained within the Disclosure Statement and

16 the exhibits thereto, including all financial information.  To the best of my knowledge,

17 information and belief, I believe that all of the information contained in this Disclosure

18 Statement is truthful and accurate.

19        I declare under penalty of perjury under the laws of the United States of America that the

20 foregoing is true and correct.

21        Executed this 28th day of June 2017, at Ventura, California.

22

23                             _____

                              PHILIP D. VASS

24

25

26

27

28

# EXHIBIT "1"

| Name | C U D | SCHEDULED CLAIMS | | | FILED CLAIMS | | | | ESTIMATED / ALLOWED CLAIMS | | | | Notes |
| | | Secured | Priority | Unsecured | POC | Secured | Priority | Unsecured | Secured | Admin | Priority | Unsecured | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ACE FUNDING SOURCE LLC | D | $0.00 | | | | | | | $0.00 | | | | Paid in Full Post-petition in Connection with Comerica/Sterling Re-Fi |
| ADP COMMERCIAL LEASING, LLC | | $0.00 | | | | | | | $0.00 | | | | |
| APP GROUP INTERNATIONAL LLC | | $0.00 | | | 1 | $0.00 | | | $0.00 | | | | Paid in Full Post-petition in Connection with Comerica/Sterling Re-Fi, **$119,520 POC, Withdrawal of POC filed 4/25/17 [Dkt. 84]** |
| BFG CORPORATION aka Susquehanna Commercial Finance, Inc. | | $0.00 | | | 5 | $0.00 | | | $0.00 | | | | Paid in Full Post-petition in Connection with Comerica/Sterling Re-Fi, **$66,723.21 POC, Withdrawal of POC filed 4/25/17 [Dkt. 83]** |
| HOP Capital, LLC | D | $0.00 | | | | | | | $0.00 | | | | |
| JPMORGAN CHASE BANK, N.A. | | $0.00 | | | | | | | $0.00 | | | | Paid in Full Post-petition in Connection with Comerica/Sterling Re-Fi |
| Pearl Gamma Funding, LLC | D | $0.00 | | | | | | | $0.00 | | | | Paid in Full Post-petition in Connection with Comerica/Sterling Re-Fi |
| Swift Financial Corporation | D | $0.00 | | | | | | | $0.00 | | | | Paid in Full Post-petition in Connection with Comerica/Sterling Re-Fi |
| Yellowstone Capital West, LLC | D | $0.00 | | | | | | | $0.00 | | | | Paid in Full Post-petition in Connection with Comerica/Sterling Re-Fi |
| IPFS CORPORATION | | | | $0.00 | 17 | $1,987.52 | | | $1,987.52 | | | | Unearned Premium on Financed Insurance |
| Comerica Bank | | | | | | | | | $1,500,000.00 | | | | Per Floor Planning Loan and Security Agreement and Master Revolving Note (up to $1.5 million) |
| Sterling Motors, Ltd. | | | | | | | | | $2,600,000.00 | | | | Per Secured Promissory Note |
| Comerica Bank | | | | | | | | | $8,000,000.00 | | | | Per Floor Planning Loan and Security |
| Mark Pierce | | | $0.00 | $0.00 | | | | | | | $0.00 | $0.00 | 507(a)(7) Deposit Claim $0 per Third Amended Schedules b/c charge for deposit reversed. |
| Adrian Gonzalez | | | $0.00 | | | | | | | | $0.00 | | |
| Albert Cuellar | | | $0.00 | | | | | | | | $0.00 | | |
| Alexander Andrew Davis | | | $0.00 | | | | | | | | $0.00 | | |
| Alfonso R. Valdez | | | $0.00 | | | | | | | | $0.00 | | |
| Andriy Ishuninov | | | $0.00 | | | | | | | | $0.00 | | |
| Anthony Macias | | | $0.00 | | | | | | | | $0.00 | | |
| Balfre V. Salgado | | | $0.00 | | | | | | | | $0.00 | | |
| Chad M. Dahm | | | $0.00 | | | | | | | | $0.00 | | |
| County of Ventura - Property Tax | | | $0.00 | | | | | | | | $0.00 | | **$0 per Second Amended Schedules** |
| Cynthia E. Letham | | | $0.00 | | | | | | | | $0.00 | | |
| Daniel E. Smith | | | $0.00 | | | | | | | | $0.00 | | |
| Daniel M. Perdue | | | $0.00 | | | | | | | | $0.00 | | |
| Darin A. Craft | | | $0.00 | | | | | | | | $0.00 | | |
| Dean Austin Vass | | | $0.00 | | | | | | | | $0.00 | | |
| Department of Motor Vehicles | | | $0.00 | | | | | | | | $0.00 | | |
| Devin Marie Colin | | | $0.00 | | | | | | | | $0.00 | | |
| DMV-OL Collections | | | $0.00 | | | | | | | | $0.00 | | |
| Fernando Augusto Lopez | | | $0.00 | | | | | | | | $0.00 | | |
| Franchise Tax Board | | | $0.00 | | | | | | | | $0.00 | | |
| Hector Olivera | | | $0.00 | | | | | | | | $0.00 | | |
| Ian O'Neill | | | $0.00 | | | | | | | | $0.00 | | |
| Janet Rickard | | | $0.00 | | | | | | | | $0.00 | | |
| Jasmine Galindo | | | $0.00 | | | | | | | | $0.00 | | |

THIS CLAIMS CHART IS AN ESTIMATE ONLY AND SHALL NOT BE CONSTRUED AS AN ADMISSION AS TO THE ALLOWABILITY OF ANY CLAIM

| Name | C U D | SCHEDULED CLAIMS | | | FILED CLAIMS | | | | ESTIMATED / ALLOWED CLAIMS | | | | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Secured | Priority | Unsecured | POC | Secured | Priority | Unsecured | Secured | Admin | Priority | Unsecured | |
| Juan Carlos Medina | | | $0.00 | | | | | | | | $0.00 | | |
| Julian M. Ramirez | | | $0.00 | | | | | | | | $0.00 | | |
| Kathy Lynn Aschoff | | | $0.00 | | | | | | | | $0.00 | | |
| Mario Martinez | | | $0.00 | | | | | | | | $0.00 | | |
| Martin E. MacGillonie | | | $0.00 | | | | | | | | $0.00 | | |
| Martin Lee Albanese | | | $0.00 | | | | | | | | $0.00 | | |
| Matthew W. Marrufo | | | $0.00 | | | | | | | | $0.00 | | |
| Orlando C. Herrera | | | $0.00 | | | | | | | | $0.00 | | |
| Paul Andrade | | | $0.00 | | | | | | | | $0.00 | | |
| Philip D. Vass | | | $0.00 | | | | | | | | $0.00 | | |
| Raul Ceme | | | $0.00 | | | | | | | | $0.00 | | |
| Robert E. McNary | | | $0.00 | | | | | | | | $0.00 | | |
| Roy M. Yanez | | | $0.00 | | | | | | | | $0.00 | | |
| Ryan Seuffert | | | $0.00 | | | | | | | | $0.00 | | |
| Sean P. Smilor | | | $0.00 | | | | | | | | $0.00 | | |
| Torek Helson | | | $0.00 | | | | | | | | $0.00 | | |
| Ventura County Tax Collector | | | $0.00 | | | | | | | | $0.00 | | |
| Walter Oliver | | | $0.00 | | | | | | | | $0.00 | | |
| AUTO PURCHASE CONSULTING INC. dba NEW CARS LOWEST PRICE.COM | | | | $500.00 | 24 | | $500.00 | | | | $500.00 | | 507(a)(4) claimed; likely not eligible, but to be PIF |
| State Board of Equalization | | | $0.00 | | 16 | | $723.00 | | | | $723.00 | | 507(a)(8) Gvt. Fee Claim Tire recycling fees |
| Richard Zankan | | | | $1,648.00 | 18 | | $1,624.00 | | | | $1,624.00 | | 507(a)(4) Wages Claim |
| Employment Development Department | | | $2,735.12 | | | | | | | | $2,735.12 | | 507(a)(8) Gvt. Tax Claim |
| Internal Revenue Service | | | $16,638.33 | | 6 | | $11,492.11 | | | | $28,030.44 | | 507(a)(8) Gvt. Tax Claim<br><br>**POC Basis**<br>2014 Corp - Pending Examination $5k<br>2015 Corp - Pending Examination $5k<br>2016 Corp - Not Filed $100<br>2017 WT FICA - $16,683.33<br>2017 Corp - Not Filed $100<br>2017 FUTA - Unassessed Liab. $1,192.11 |
| AFLAC | | | | $0.00 | | | | | | | | $0.00 | |
| Alexandra Gallardo | | | | Unk | | | | | | | | $0.00 | |

THIS CLAIMS CHART IS AN ESTIMATE ONLY AND SHALL NOT BE CONSTRUED AS AN ADMISSION AS TO THE ALLOWABILITY OF ANY CLAIM

| Name | CUD | SCHEDULED CLAIMS | | | FILED CLAIMS | | | | ESTIMATED / ALLOWED CLAIMS | | | | Notes |
|------|-----|--------|----------|-----------|-----|---------|----------|-----------|---------|-------|----------|-----------|-------|
| | | Secured | Priority | Unsecured | POC | Secured | Priority | Unsecured | Secured | Admin | Priority | Unsecured | |
| AMTRUST NORTH AMERICA | | | | $0.00 | | | | | | | | $0.00 | |
| ASSURANT SOLUTIONS | | | | $0.00 | | | | | | | | $0.00 | |
| BYLINE FINANCIAL GROUP | | | | $0.00 | | | | | | | | $0.00 | |
| CALIFORNIA CHOICE | | | | $0.00 | | | | | | | | $0.00 | |
| CHASE VEHICLE EXCHANGE | | | | $0.00 | | | | | | | | $0.00 | |
| CNA NATIONAL WARRANTY | | | | $0.00 | | | | | | | | $0.00 | |
| DOXSEE AND FOSTER | | | | $0.00 | | | | | | | | $0.00 | |
| Fox Capital Group Inc. | D | | | $145,000.00 | 8 | | | $128,933.00 | | | | $0.00 | Per Stip and OE 6/22/17 [Dkt. 135] Claim assigned to Sterling |
| JAGUAR CARS | | | | $0.00 | | | | | | | | $0.00 | |
| LAND ROVER NORTH AMERICA INC | | | | $0.00 | | | | | | | | $0.00 | |
| QUICK START | | | | $0.00 | | | | | | | | $0.00 | |
| REYNOLDS/REYNOLDS | | | | $0.00 | | | | | | | | $0.00 | |
| Rusnak/Pasadena Jaguar | | | | $0.00 | | | | | | | | $0.00 | |
| Veronica Fernandez-Bustamante | D | | | Unk | | | | | | | | $0.00 | |
| PLATINUM TIRE RECOVERY | | | | $35.00 | | | | | | | | $35.00 | |
| ZEST NET | | | | $40.00 | | | | | | | | $40.00 | |
| AIRGAS-WEST | | | | $60.00 | | | | | | | | $60.00 | |
| PLAZA LOCKSMITH | | | | $103.00 | | | | | | | | $103.00 | |
| QUICK START | | | | $108.00 | | | | | | | | $108.00 | |
| JOSEPH CHARLES MYERS CHAZ | | | | $130.00 | | | | | | | | $130.00 | |
| PHONE ON HOLD BY SPECTRIO | | | | $136.00 | | | | | | | | $136.00 | |
| PORTA STORAGE | | | | $145.00 | | | | | | | | $145.00 | |
| VENTURA COUNTY STAR | | | | $150.24 | | | | | | | | $150.24 | |
| ORKIN | | | | $159.57 | | | | | | | | $159.57 | |
| Solar Xpertz | | | | $160.00 | | | | | | | | $160.00 | |
| VERIZON WIRELESS | | | | $180.00 | | | | | | | | $180.00 | |
| HERTZ LOCAL EDITION | | | | $193.05 | | | | | | | | $193.05 | |
| AUTO UPLINK TECH | | | | $200.00 | | | | | | | | $200.00 | |
| BOTANIC DECORS | | | | $210.00 | | | | | | | | $210.00 | |
| AMERICAN SOLUTIONS FOR BUSINESS | | | | $244.87 | 4 | | | $249.31 | | | | $249.31 | |
| Steve Thomas BMW | | | | $272.96 | | | | | | | | $272.96 | |
| SHRED-IT  USA | | | | $281.66 | | | | | | | | $281.66 | |
| FAST UNDERCAR INC | | | | $290.99 | | | | | | | | $290.99 | |
| WORLD PAC | | | | $300.00 | | | | | | | | $300.00 | |
| COAST SELF STORAGE | | | | $0.00 | 36 | | | $304.50 | | | | $304.50 | |
| QUALITY RECONDITIONING SERVICE | | | | $315.00 | | | | | | | | $315.00 | |
| DIRECTV | | | | $322.42 | | | | | | | | $322.42 | |
| COMMAND DELIVERY SYSTEMS | | | | $344.23 | | | | | | | | $344.23 | |
| SANTA BARBARA AUTO GROUP | | | | $368.74 | | | | | | | | $368.74 | |
| Southern California Gas Company | | | | | 7 | | | $476.74 | | | | $476.74 | |
| COUNTY FIRE PROTECTION | | | | $478.29 | | | | | | | | $478.29 | |
| DIAL SECURITY | | | | $498.00 | | | | | | | | $498.00 | |
| LILIA SARZABA | | | | $499.00 | | | | | | | | $499.00 | |
| MANHEIM RIVERSIDE | | | | $500.00 | | | | | | | | $500.00 | |
| AUTO ADVISORY | | | | $530.00 | | | | | | | | $530.00 | |

THIS CLAIMS CHART IS AN ESTIMATE ONLY AND SHALL NOT BE CONSTRUED AS AN ADMISSION AS TO THE ALLOWABILITY OF ANY CLAIM

| Name | C/U/D | SCHEDULED CLAIMS Secured | Priority | Unsecured | FILED CLAIMS POC | Secured | Priority | Unsecured | ESTIMATED / ALLOWED CLAIMS Secured | Admin | Priority | Unsecured | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| HOUSE SANITARY SUPPLY | | | | $542.39 | 12 | | | $542.93 | | | | $542.93 | |
| NAPA AUTO PARTS | | | | $559.46 | | | | | | | | $559.46 | |
| CU DIRECT CORPORATION | | | | $564.00 | | | | | | | | $564.00 | |
| AIRWORKS SOLUTIONS | | | | $585.00 | | | | | | | | $585.00 | |
| WESTERN EHS | | | | $600.00 | | | | | | | | $600.00 | |
| AT&T Corp. | | | | | 32 | | | $633.77 | | | | $633.71 | |
| CILAJET | | | | $696.00 | | | | | | | | $696.00 | |
| THE WINDOW GUY | | | | $700.00 | | | | | | | | $700.00 | |
| SMOGIE'S SMOG SHOP | | | | $686.00 | 19 | | | $735.00 | | | | $735.00 | |
| The Dealers Forum - So. Calif. | | | | $790.00 | | | | | | | | $790.00 | |
| SAFETY-KLEEN | | | | $810.21 | | | | | | | | $810.21 | |
| ADVANTAGE TELECOM | | | | $828.13 | | | | | | | | $828.13 | |
| ANSIRA | | | | $854.32 | | | | | | | | $854.32 | |
| CAR FAX | | | | $890.00 | | | | | | | | $890.00 | |
| SOUTHERN COUNTIES OIL COMPANY | | | | $900.26 | 2 | | | $900.26 | | | | $900.26 | |
| PNC Equipment Finance LLC | | | | $605.07 | 20 | | | $5,698.11 | | | | $935.16 | $935.16 = cure amount as of Petition Date per POC $289.06 mo payment Lease of 2 Panasonic CF-53 Toughbooks and 1 FZ-G Toughbook |
| Ventura Water | | | | $1,748.50 | 10 | | | $956.91 | | | | $956.91 | |
| BENMATT INDUSTRIES | | | | $971.23 | | | | | | | | $971.23 | |
| OE CONNECTION | | | | $1,008.00 | | | | | | | | $1,008.00 | |
| VENTURINE VENTURES DBA WORLDWIDE | | | | $1,047.11 | | | | | | | | $1,047.11 | |
| ADVANCED POWER SYSTEMS INC | | | | $1,197.28 | | | | | | | | $1,197.28 | |
| SAFEGUARD PRODUCTS | | | | $1,282.00 | | | | | | | | $1,282.00 | |
| AIRDRAULICS | | | | $1,366.92 | | | | | | | | $1,366.92 | |
| CBC AUTO BROKERAGE | | | | $1,500.00 | | | | | | | | $1,500.00 | |
| PRODIGY AUTO SALES INC. | | | | $1,500.00 | | | | | | | | $1,500.00 | |
| BASICS, ETC. | | | | $1,529.07 | | | | | | | | $1,529.07 | |
| RELIABLE COMPUTER PRODUCTS | | | | $1,299.06 | 21 | | | $1,544.96 | | | | $1,544.96 | |
| STAPLES ADVANTAGE | | | | $1,657.93 | | | | | | | | $1,657.93 | |
| DENT WORKS | | | | $1,895.00 | | | | | | | | $1,895.00 | |
| KSPN RADIO | | | | $1,900.00 | | | | | | | | $1,900.00 | |
| AT&T Corp. | | | | $2,351.71 | 31 | | | $1,931.55 | | | | $1,931.55 | |
| ALLOY WHEEL REPAIR SPECIALISTS | | | | $2,290.00 | 33 | | | $1,990.00 | | | | $1,990.00 | |
| J.H. SANDERS, INC. | | | | $2,000.00 | | | | | | | | $2,000.00 | |

THIS CLAIMS CHART IS AN ESTIMATE ONLY AND SHALL NOT BE CONSTRUED AS AN ADMISSION AS TO THE ALLOWABILITY OF ANY CLAIM

| Name | C U D | Secured | Priority | Unsecured | POC | Secured | Priority | Unsecured | Secured | Admin | Priority | Unsecured | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | **SCHEDULED CLAIMS** | | | | **FILED CLAIMS** | | | **ESTIMATED / ALLOWED CLAIMS** | | | | |
| SPORTS CAR MANAGEMENT LLC | | | | $2,000.00 | | | | | | | | $2,000.00 | |
| VENTURA AUTO CENTER | | | | $2,048.61 | | | | | | | | $2,048.61 | |
| PAUL HOFER AND SONS | | | | $2,100.00 | 35 | | | $2,100.00 | | | | $2,100.00 | |
| SILVER STAR MOTOR CAR COMPANY | | | | $2,364.89 | | | | | | | | $2,364.89 | |
| EXPRESS SERVICES INC | | | | $2,369.58 | | | | | | | | $2,369.58 | |
| QUICK DISPENSE | | | | $2,446.86 | | | | | | | | $2,446.86 | |
| Devon Renee Bungenstock | | | | $2,485.00 | | | | | | | | $2,485.00 | |
| ICC DEALER SERVICES INC | | | | $2,788.00 | | | | | | | | $2,788.00 | |
| LOJACK CORP | | | | $2,799.00 | | | | | | | | $2,799.00 | |
| AUTOPOINT | | | | $2,880.00 | | | | | | | | $2,880.00 | |
| REVOLUTION PARTS INC | | | | $2,900.00 | | | | | | | | $2,900.00 | |
| TRUECAR, INC | | | | $3,250.00 | | | | | | | | $3,250.00 | |
| West Bank Auto Brokerage | | | | $0.00 | 22 | | $7,575.00 | | | | | $3,400.00 | Per Stip and OE 6/28/17 [Dkt. 144] |
| SALES AND LEASING BY LINDSEY | | | | $3,650.00 | 14 | | | $3,650.00 | | | | $3,650.00 | |
| BP LUBRICANTS | | | | $3,718.47 | | | | | | | | $3,718.47 | |
| 3D OF OXNARD | | | | $4,131.83 | | | | | | | | $4,131.83 | |
| PRUDENTIAL OVERALL SUPPLY | | | | $4,146.07 | | | | | | | | $4,146.07 | |
| AUTOBYLINE | | | | $4,750.00 | | | | | | | | $4,750.00 | |
| DEALER SOCKET, INC | | | | $4,947.00 | | | | | | | | $4,947.00 | |
| DEALER TRACK | | | | $5,000.00 | | | | | | | | $5,000.00 | |
| VENTURA AUTO CENTER DEALERS ASSOC | | | | $4,000.00 | 39 | | | $5,358.36 | | | | $5,358.36 | |
| AUTOMOTIVE WARRANTY | | | | $5,368.00 | | | | | | | | $5,368.00 | |
| BOSCH AUTO SERVICE SOLUTIONS | | | | $5,718.07 | | | | | | | | $5,718.07 | |
| DAVID SCHICK CREATIVE | | | | $6,478.31 | | | | | | | | $6,478.31 | |
| CALIFORNIA CHROME WHEEL INC | | | | $9,050.00 | 26 | | | $6,650.00 | | | | $6,650.00 | |
| Chevron | | | | $6,766.11 | | | | | | | | $6,766.11 | |
| DIGITAL AIR STRIKE | | | | $4,350.00 | 34 | | | $7,060.55 | | | | $7,060.50 | |
| PETROSPECS | | | | $8,103.65 | 9 | | | $8,103.65 | | | | $8,103.65 | |
| ABOVE ALL GLASS | | | | $8,111.00 | | | | | | | | $8,111.00 | |
| CUMULUS OXNARD-VENTURA | | | | $9,000.00 | | | | | | | | $9,000.00 | |
| McQueen & Ashman LLP | | | | $9,437.38 | | | | | | | | $9,437.38 | |
| AUTO ALERT | | | | $9,461.67 | | | | | | | | $9,461.67 | |
| LOS ANGELES TIMES | | | | $9,595.90 | | | | | | | | $9,595.90 | |
| ASPEN MARKETING SERVICES | | | | $10,524.57 | 13 | | | $10,479.54 | | | | $10,479.54 | |
| INTERSTATE BATTERY OF SIERRA MADRE | | | | $10,697.00 | | | | | | | | $10,697.00 | |
| CDK GLOBAL | | | | $17,006.78 | | | | | | | | $11,392.77 | Stip or object to reduce claim to |
| EDMUNDS.COM | | | | $13,522.90 | | | | | | | | $13,522.90 | |
| AUTOBODY INTERNATIONAL | | | | $15,726.64 | | | | | | | | $15,726.64 | |
| AMERICAN EXPRESS BANK, FSB | | | | $19,507.34 | 25 | | | $16,178.51 | | | | $16,178.51 | |

THIS CLAIMS CHART IS AN ESTIMATE ONLY AND SHALL NOT BE CONSTRUED AS AN ADMISSION AS TO THE ALLOWABILITY OF ANY CLAIM

| Name | CUD | SCHEDULED CLAIMS | | | FILED CLAIMS | | | | ESTIMATED / ALLOWED CLAIMS | | | | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Secured | Priority | Unsecured | POC | Secured | Priority | Unsecured | Secured | Admin | Priority | Unsecured | |
| Spectrum Reach-West Region (aka TIME WARNER CABLE MEDIA) | | | | $16,815.98 | 23 | | | $16,815.98 | | | | $16,815.98 | |
| HOFER PROPERTIES | | | | $21,231.98 | | | | | | $0.00 | | $16,893.86 | March Rent Pro Rated b/t Pre-Pet (GUC) and Post-Pet (Admin) Per Stip and OE 6/26/17 [Dkt. 138] Admin amount paid. |
| PLATINUM TOWING | | | | $21,700.00 | 3 - Amended | | | $21,700.00 | | | | $21,700.00 | |
| Reliable Fast Cash LLC | D | | | $69,112.50 | 37 | | | | | | | $23,844.65 | Claim assigned to Sterling |
| AUTOTRADER.COM | | | | $24,700.00 | | | | | | | | $24,700.00 | |
| US BANK DEALER RESERVE | | | | $25,420.59 | | | | | | | | $25,420.59 | |
| LAND ROVER CERRITOS | | | | $41,938.66 | 15 | | | $41,938.66 | | | | $41,938.66 | Claim assigned to Sterling |
| JAGUAR PASADENA | | | | $44,488.56 | | | | | | | | $44,488.56 | Claim assigned to Sterling |
| Loan Me, Inc. | D | | | $72,500.00 | 38 | | | | | | | $76,706.26 | Claim assigned to Sterling |
| ALAN YOUNG | | | | $100,000.00 | | | | | | | | $100,000.00 | |
| Fox Capital Group Inc. | D | | | $145,000.00 | 11 | | | $181,780.89 | | | | $125,000.00 | Per Stip and OE 6/22/17 [Dkt. 135] Claim assigned to Sterling |
| BENTLEY FINANCIAL DEVELOPMENT, LLC | | | | $170,000.00 | 28 | | | $150,690.41 | | | | $150,690.41 | |
| JAGUAR LAND ROVER NORTH AMERICA | | | | $122,558.95 | | | | | | | | $188,298.31 | Amount increased per assertion of claimant that amount exceeds scheduled amount; amount subject to review, reconciliation and adjustment by agreement of the parties. Amount possibly subject to offset for amounts owed to Debtor. |

| Name | CUD | SCHEDULED CLAIMS | | | POC | FILED CLAIMS | | | | ESTIMATED / ALLOWED CLAIMS | | | | Notes |
| | | Secured | Priority | Unsecured | | Secured | Priority | Unsecured | Secured | Admin | Priority | Unsecured | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| THEODORE C AND KATHERINE P BENTLEY | | | | $350,000.00 | 30 | | | $351,610.96 | | | | $351,610.96 | |
| DAVID L PETERSON | | | | $445,712.32 | | | | | | | | $445,712.32 | |
| CLIFTON O SIMONSON | | | | $450,000.00 | | | | | | | | $450,000.00 | |
| CESON FH LLC | | | | $450,000.00 | 27 | | | $452,100.00 | | | | $452,100.00 | |
| Philip Vass | | | | $1,665,412.00 | | | | | | | | $725,000.00 | Balance of $940,412 contributed and waived as part of Vass New Value |
| SPIDER INVESTMENTS LLC | | | | $870,000.00 | 29 | | | $873,912.33 | | | | $873,912.33 | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| TOTAL | | $0.00 | $19,373.45 | $5,541,350.84 | | $1,987.52 | $21,914.11 | $2,295,026.88 | $12,101,987.52 | $0.00 | $33,612.56 | $4,439,058.35 | |
| | | | | | | | | | | | | | |
| | | | | | | | | | Other General Unsecured Claims (Unsecured Claims - Peterson Unsecured | | | $3,993,346.03 | |
| | | | | | | | | | Estimated Non-Prof. Admin., and GUC (other than Peterson) to Be Paid in Full or Funded For on Effective | | | $4,026,958.59 | |
| | | | | | | | | | Plus Estimated $250,000 for Prof. Admin. to Be Paid in Full or Funded For | | | $250,000.00 | |
| | | | | | | | | | Plus $250,000 for First Distribution to Current Minority Equity Holders | | | $250,000.00 | |
| | | | | | | | | | TOTAL ESTIMATED NV CASH CONTRIBUTION / EXIT LOAN FUNDS REQUIRED ON EFFECTIVE DATE | | | $4,526,958.59 | $2 million cash, balance from Exit Loan Funds |
| | | | | | | | | | Plus $750,000 for Second, Third, and Fourth Distribution to Current Minority Equity Holders ($250,000 on Each of the First, Second, and Third Anniversaries of the Effecitve Date) | | | $750,000.00 | |
| | | | | | | | | | TOTAL ESTIMATED NV CASH CONTRIBUTION / EXIT LOAN FUNDS | | | $5,276,958.59 | $2 million cash, balance from Exit Loan Funds |

**\* The Debtor reserves the right to object to any claim on any basis whether or not described herein and even where a claim is listed as an "Estimated / Allowed Claim."**

THIS CLAIMS CHART IS AN ESTIMATE ONLY AND SHALL NOT BE CONSTRUED AS AN ADMISSION AS TO THE ALLOWABILITY OF ANY CLAIM

# EXHIBIT "2"

## SECURED PROMISSORY NOTE

**$2,275,000.00**                                                    **_____ __, 2017**


     FOR VALUE RECEIVED, British Motorcars Ventura, Inc., a California corporation, d/b/a Land Rover Jaguar Ventura ("Maker"), promises to pay to the order of Sterling Motors, Ltd. ("Holder") at 3000 West Coast Hwy, Newport Beach, California 92663, or at such other place as Holder from time to time designates in writing, the principal sum of Two Million Two Hundred and Seventy Five Thousand Dollars and no cents ($2,275,000.00), subject to adjustment as set forth below, together with interest on the unpaid principal balance outstanding from time to time (the "Exit Loan"), all as hereinafter set forth.  Payments of principal and interest shall be paid in lawful money of the United States of America which shall be legal tender in payment of all debts and dues.

     The following terms apply to this promissory note (this "Exit Financing Note"):

     **1.**    **Bankruptcy Court Approval.**   Maker is currently a debtor and debtor in possession in *In re: British Motorcars Ventura, Inc. d/b/a Land Rover Jaguar Ventura* (Case No.: 9:17-bk-10489-PC) (the "Bankruptcy Case") pending in the United States Bankruptcy Court for the Central District of California, Northern Division (the "Bankruptcy Court").  This Exit Financing Note and the funding of the Exit Loan, as well as the Security Interest (as defined below) and other terms provided for herein, are conditioned upon, and shall not become effective, until the Bankruptcy Court enters an order approving this Exit Financing Note, the Exit Loan, the Security Interest, and other terms provided for herein as part of a Chapter 11 plan of reorganization (the "Plan").

     **2.**    **Bankruptcy Plan.**  Maker shall use its commercially reasonable best efforts to prepare, file in the Bankruptcy Case, and obtain entry of an order by the Bankruptcy Court (a) confirming the Plan that includes the terms described in that certain Plan Term Sheet (the "Plan Term Sheet") executed by Maker, Holder, and Wayne Minor, the owner and Chief Executive Officer of Holder and (b) approving, in connection with confirmation of the Plan, this Exit Financing Note, the Exit Loan, the Security Interest, and other terms provided for herein. Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Plan Term Sheet

     **3.**    **Purpose of Exit Loan, Use of Exit Loan, and Exit Loan Amount and Adjustment**.  The Exit Loan under this Exit Financing Note is being made to fund a portion of the amount required for the Maker to exit bankruptcy pursuant to the Plan described in the Plan Term Sheet.

     The Plan Term Sheet estimates that the Maker will require approximately $4,275,000 in funds (the "Initial Plan Funds") on the date the Plan becomes effective (the "Effective Date") to pay, or fund payment, in full, without post-Petition Date interest, the principal amount of all Administrative Claims, Priority Claims, Unsecured Claims, $725,000 of

1

the Unsecured Vass Note Claim, and $250,000 of the $1 million required to repay the Current Minority Equity Holders in full for their capital contributions, which is currently estimated to total $4,275,000 (the "<u>Initial Plan Payments</u>").

Pursuant to the Plan Term Sheet, the Initial Plan Funds will be provided by Sterling in the form of (a) a cash contribution in the amount of $2,000,000 (the Plan Term Sheet provides for an additional $750,000 cash contribution by Sterling after the Effective Date) and (b) the Exit Loan provided for herein in the current estimated amount of $2,275,000.

As set forth in the Plan Term Sheet, due to the fact that, among other things, the Bar Date has not yet passed, the foregoing estimate of required Initial Plan Funds represents the Maker's best estimate of the required Initial Plan Funds to make the Initial Plan Payments, but the ultimate total of required Initial Plan Payments is subject to revision as additional claims are filed.

To the extent the actual Initial Plan Payments are *less* than current estimated Initial Plan Funds, the Exit Loan shall be *reduced* by the difference.

To the extent the actual Initial Plan Payments are *greater* than current estimated Initial Plan Funds, the Exit Loan shall be *increased* by the difference.

**4.**     **Funding.**  Sterling shall transfer the $2,275,000 in funding for the Exit Loan into a segregated trust account maintained by Maker's bankruptcy counsel, Levene, Neale, Bender, Yoo & Brill L.L.P. ("<u>LNBYB</u>"), no later than seven (7) days before the hearing on confirmation of the Plan to assist the Maker in proving the feasibility of the Plan.  If the Bankruptcy Court does not enter an order (a) confirming a Plan with the terms described in the Plan Term Sheet and (b) approving, in connection with confirmation of the Plan, this Exit Financing Note, the Exit Loan, the Security Interest, and other terms provided for herein, LNBYB shall promptly return the Exit Loan funds to Sterling.

**5.**     **Interest.**  Interest on the outstanding principal balance of the Exit Loan shall accrue at the fixed rate of 3% per annum beginning on the first day after all of following conditions have been satisfied: (a) Maker receives the Exit Loan funds, (b) the Exit Loan is approved by an order of the Bankruptcy Court, and (c) the Plan Effective Date has occurred (the "<u>Conditions</u>").

**6.**     **Term.**  The term of this Exit Financing Note is the later of (a) sixty (60) months, commencing on the first day after all of the Conditions have been satisfied and (b) 91 days after the loans under both that certain Floor Planning Loan and Security Agreement, dated as of April 17, 2017, by and between Maker and Comerica Bank, and that certain Master Revolving Note, dated as of April 17, 2017, by and between Maker and Comerica Bank, become due and payable pursuant to demands for payment in full on both such loans (the "<u>Term</u>").

**7.**    **Payment of Principal and Interest.**

a.    Subject to Comerica Bank's consent as set forth in paragraph 11 hereof, interest only payments hereunder shall commence on the fifteenth (15th) day of the first month after all of the Conditions have been satisfied and continue on the fifteenth (15th) day of each subsequent month through the Term.

b.    All unpaid amounts owing under this Exit Financing Note at the end of the Term, including all accrued interest, shall all be due and payable in one balloon payment at the end of the Term.

**8.**    **Prepayment.**  This Exit Financing Note may be prepaid in whole or in part at any time without premium or penalty, provided, however, that each such payment shall be accompanied by payment of all accrued and unpaid interest due as of the date of such prepayment.

**9.**    **Event of Default; Acceleration on Default.**  Maker's failure to make any payment owed and when due pursuant to this Exit Financing Note constitutes an event of default (an "Event of Default").  If there is an Event of Default and a failure to cure within five (5) business' days of written notice of an Event of Default, Holder, at its option, may accelerate and call all unpaid amounts owing under the Exit Financing Note immediately due and payable:

**10.**    **Security Interest.**  This Exit Financing Note is secured by a lien upon, and security interest in, all of Maker's right, title and interest in and to real property, personal property, tangible and intangible property, including "goodwill," now owned or existing or hereafter acquired or arising and wherever located, including all accessions and additions to, all substitutions and replacements for, and proceeds and products of any and all of the foregoing (the "Security Interest").  Upon satisfaction of all of the Conditions, Maker is authorized to file a UCC-1 Financing Statement with a copy of this Exit Financing Note attached to perfect the Security Interest.

**11.**    **Subordination.**  Irrespective of the date of this Exit Financing Note, the date of Bankruptcy Court approval of this Exit Financing Note, and the date Holder files a UCC-1 Financing Statement to perfect the Security Interest, the Security Interest and all amounts owed on the Exit Loan or otherwise due from Maker to Holder shall be subordinate to any liens upon, and security interest in, Maker's assets held by or in favor of Comerica Bank, and any of its affiliates, subsidiaries, successors, and assigns.  The Security Interest shall not be enforced absent Comerica Bank prior written consent, and no payments (including payments of interest or principal) shall be made on this Exit Financing Note to Holder absent Comerica Bank's prior written consent.  If Comerica Bank shall so require, Holder shall enter into a lien and payment subordination agreement on terms and conditions satisfactory to Comerica Bank.

**12.**    **Notice.**  Any notice or demand required or permitted to be made in connection with this Exit Financing Note shall be given by overnight mail, receipt confirmation requested, and by email, per the contact information below, and shall be deemed delivered on mailing,

IF TO MAKER:

      BRITISH MOTORCARS VENTURA, INC.
      Attn: Philip Vass
      3190 Perkin Avenue
      Ventura, CA 93003
      pvass@lrjventura.com

      AND

      MCQUEEN & ASHMAN LLP
      Attn: Phillip Ashman
      19900 MacArthur Boulevard, Suite 1150
      Irvine, California 92612
      pa@mcqueenashman.com

      AND

      LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
      Attn: Martin J. Brill
      10250 Constellation Boulevard, Suite 1700
      Los Angeles, California 90067
      mjb@lnbyb.com and tma@lnbyb.com

IF TO HOLDER:

      STERLING MOTORS LTD.
      Attn: Wayne Minor
      3000 West Coast Highway
      Newport Beach, California 92663
      wmminor@hotmail.com

      AND

      Norman Rasmussen
      11 Golden Shore Dr., Suite 430
      Long Beach, California 9080
      norm_rasmussen@hotmail.com

     **13.**    **Waiver by Maker.**  Maker waives presentment, offset, protest and demand, notice of protest, notice of dishonor and nonpayment of this Exit Financing Note and expressly agrees that this Exit Financing Note and any payment hereunder may be extended from time to time without in any way affecting the liability of Maker.

     **14.**    **Cumulative Remedies; No Waiver by Holder.**  The rights and remedies of Holder hereunder, including, but not limited to, Holder's security interest rights, shall be

cumulative and concurrent and may be pursued singly, successively or together at the sole discretion of Holder, and may be exercised as often as an occasion for exercise shall occur, and the failure to exercise and right to remedy shall in no event be construed as a waiver or release of the same or any other right or remedy.

      **15.**    **Evidence of Indebtedness.**  This Exit Financing Note is given and accepted as evidence of indebtedness only, and not in payment or satisfaction of any indebtedness or obligation.

      **16.**    **Severability.**  If, for any reason any of the terms or provisions (or any part of any provision) of this Exit Financing Note are found to be invalid, illegal, unenforceable or contrary to any other provisions(or any remaining part of any provision) of this Exit Financing Note, the Exit Financing Note shall be construed as if that invalid, illegal or unenforceable provision (or any part of that provision) had never been contained in this Exit Financing Note, and the undersigned agrees that this Exit Financing Note shall still remain in full force and effect subject only to the exclusion of those terms or provisions (and only to the extent to  which those terms or provisions) shall have been found invalid, illegal, unenforceable or contrary to any applicable law.

      **17.**    **Headings.**  The headings used in this Exit Financing Note are for convenience only and are not to be interpreted as a part of this Exit Financing Note.

      **18.**    **Choice of Law and Venue.**  The laws of the State of California shall govern the validity and construction of this Exit Financing Note and any dispute arising out of or relating to this Exit Financing Note, without regard to the principles of conflict of laws.  Maker submits to the jurisdiction of the Bankruptcy Court and the courts of the State of California, as appropriate, and the venue in the Bankruptcy Court or the California Superior Court of Orange County, as appropriate.

      **19.**    **Amendments and Waivers.**  Any term of this Exit Financing Note may be amended only with the written consent of Maker and Holder.

      **20.**    **Corporate Authority.**  Subject to Bankruptcy Court approval, Holder represents and warrants that the individual executing this Exit Financing Note is duly authorized to execute this Exit Financing Note on behalf of the Holder and in his capacity as indicated below.

/ / /

/ / /

/ / /

21.    **Entire Agreement.**    This Exit Financing Note, together with the Plan Term Sheet, constitutes the entire agreement between Maker and Holder pertaining to the subject matter hereof.

WITNESS the hand and seal of Maker as the date and year first above written.

BRITISH MOTORCARS VENTURA, INC., A CALIFORNIA CORPORATION, D/B/A LAND ROVER JAGUAR VENTURA

_____

PHILIP D. VASS, President, Chief Executive Officer, Chief Financial Officer

6

# EXHIBIT "3"

| DESCRIPTION | Oct-17 | Nov-17 | Dec-17 | 4Q 17 TOTAL | Jan-18 | Feb-18 | Mar-18 | Apr-18 | May-18 |
|---|---|---|---|---|---|---|---|---|---|
| **BRITISH MOTORCARS VENTURA - LAND ROVER JAGUAR VENTURA** | | | | | | | | | |
| **BEGINNING CASH** | $ 500,000.00 | $ 438,386.22 | $ 465,645.04 | | $ 504,213.99 | $ 542,704.31 | $ 591,594.63 | $ 640,484.95 | $ 678,175.27 |
| **INCOME** | | | | | | | | | |
| STERLING NV CASH CONTRIBUTION | $ 2,000,000.00 | | | $ 2,000,000.00 | | | | | |
| STERLING EXIT LOAN | $ 2,526,958.59 | | | $ 2,526,958.59 | | | | | |
| **SUB-TOTAL NON-OPERATING INCOME** | $ 4,526,958.59 | $ - | $ - | $ 4,526,958.59 | $ - | $ - | $ - | $ - | $ - |
| | | | | | | | | | |
| OPERATING INCOME - NEW JAGUAR | $ 500,000.00 | $ 500,000.00 | $ 500,000.00 | $ 1,500,000.00 | $ 550,000.00 | $ 550,000.00 | $ 550,000.00 | $ 550,000.00 | $ 550,000.00 |
| OPERATING INCOME - NEW LAND ROVER | $ 3,200,000.00 | $ 3,200,000.00 | $ 3,200,000.00 | $ 9,600,000.00 | $ 3,520,000.00 | $ 3,520,000.00 | $ 3,520,000.00 | $ 3,520,000.00 | $ 3,520,000.00 |
| OPERATING INCOME - PRE-OWNED | $ 355,405.00 | $ 355,405.00 | $ 355,405.00 | $ 1,066,215.00 | $ 390,945.50 | $ 390,945.50 | $ 390,945.50 | $ 390,945.50 | $ 390,945.50 |
| BUSINESS BUILDER | $ 230,000.00 | $ 230,000.00 | $ 230,000.00 | $ 690,000.00 | $ 255,000.00 | $ 255,000.00 | $ 255,000.00 | $ 255,000.00 | $ 255,000.00 |
| **SUB-TOTAL NEW / PRE-OWNED / BB** | $ 4,285,405.00 | $ 4,285,405.00 | $ 4,285,405.00 | $ 12,856,215.00 | $ 4,715,945.50 | $ 4,715,945.50 | $ 4,715,945.50 | $ 4,715,945.50 | $ 4,715,945.50 |
| | | | | | | | | | |
| **F & I INCOME** | $ 60,000.00 | $ 60,000.00 | $ 60,000.00 | $ 180,000.00 | $ 66,000.00 | $ 66,000.00 | $ 66,000.00 | $ 66,000.00 | $ 66,000.00 |
| | | | | | | | | | |
| OPERATING INCOME - SERVICE | $ 95,000.00 | $ 95,000.00 | $ 95,000.00 | $ 285,000.00 | $ 104,500.00 | $ 104,500.00 | $ 104,500.00 | $ 104,500.00 | $ 104,500.00 |
| RAV REPAIR INCOME | $ 12,000.00 | $ 12,000.00 | $ 12,000.00 | $ 36,000.00 | $ 13,200.00 | $ 13,200.00 | $ 13,200.00 | $ 13,200.00 | $ 13,200.00 |
| OPERATING INCOME - PARTS | $ 310,000.00 | $ 310,000.00 | $ 310,000.00 | $ 930,000.00 | $ 341,000.00 | $ 341,000.00 | $ 341,000.00 | $ 341,000.00 | $ 341,000.00 |
| **SUB-TOTAL SERVICE-PARTS** | $ 417,000.00 | $ 417,000.00 | $ 417,000.00 | $ 1,251,000.00 | $ 458,700.00 | $ 458,700.00 | $ 458,700.00 | $ 458,700.00 | $ 458,700.00 |
| **TOTAL INCOME** | $ 9,289,363.59 | $ 4,762,405.00 | $ 4,762,405.00 | 18,814,173.59 | $ 5,240,645.50 | $ 5,240,645.50 | $ 5,240,645.50 | $ 5,240,645.50 | $ 5,240,645.50 |
| **EXPENSES** | | | | | | | | | |
| COMERICA FLOORING LOAN INTEREST | $ 19,400.00 | $ 19,400.00 | $ 19,400.00 | $ 58,200.00 | $ 21,340.00 | $ 21,340.00 | $ 21,340.00 | $ 21,340.00 | $ 21,340.00 |
| COMERICA FLOORING LOANS DUE | $ 3,852,250.00 | $ 3,852,250.00 | $ 3,852,250.00 | 11,556,750.00 | $ 4,238,000.00 | $ 4,238,000.00 | $ 4,238,000.00 | $ 4,238,000.00 | $ 4,238,000.00 |
| COMERICA WORKING CAPITAL LOAN INTEREST | $ 4,734.00 | $ 4,734.00 | $ 4,734.00 | $ 14,202.00 | $ 4,734.00 | $ 4,734.00 | $ 4,734.00 | $ 4,734.00 | $ 4,734.00 |
| STERLING LOAN INTEREST | $ 10,833.00 | $ 10,833.00 | $ 10,833.00 | $ 32,499.00 | $ 10,833.00 | $ 10,833.00 | $ 10,833.00 | $ 10,833.00 | $ 10,833.00 |
| STERLING LOAN BALANCE PAYOFF | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| STERLING EXIT LOAN INTEREST | $ 6,317.40 | $ 6,317.40 | $ 6,317.40 | $ 18,952.20 | $ 6,317.40 | $ 6,317.40 | $ 6,317.40 | $ 6,317.40 | $ 6,317.40 |
| STERLING EXIT LOAN BALANCE PAYOFF | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| **SUB-TOTAL FINANCE / INTEREST EXPENSE** | $ 3,893,534.40 | $ 3,893,534.40 | $ 3,893,534.40 | 11,680,603.20 | $ 4,281,224.40 | $ 4,281,224.40 | $ 4,281,224.40 | $ 4,281,224.40 | $ 4,281,224.40 |
| | | | | | | | | | |
| ADVERTISING FEES - AD GROUP | $ 25,000.00 | $ 25,000.00 | $ 25,000.00 | $ 75,000.00 | $ 33,000.00 | $ 33,000.00 | $ 33,000.00 | $ 33,000.00 | $ 33,000.00 |
| SUB-1B-TOTAL NET ADVERTISING | $ 15,000.00 | $ 15,000.00 | $ 15,000.00 | $ 45,000.00 | $ 16,500.00 | $ 16,500.00 | $ 16,500.00 | $ 16,500.00 | $ 16,500.00 |
| DEMO / COMPANY CAR EXPENSE | $ 6,800.00 | $ 6,800.00 | $ 6,800.00 | $ 20,400.00 | $ 6,800.00 | $ 6,800.00 | $ 6,800.00 | $ 6,800.00 | $ 6,800.00 |
| POLICY ADJUSTMENTS | $ 960.00 | $ 960.00 | $ 960.00 | $ 2,880.00 | $ 1,200.00 | $ 1,200.00 | $ 1,200.00 | $ 1,200.00 | $ 1,200.00 |
| SERVICE LOANER/NET OF REBATES | $ (4,700.00) | $ (4,700.00) | $ (4,700.00) | $ (14,100.00) | $ (4,700.00) | $ (4,700.00) | $ (4,700.00) | $ (4,700.00) | $ (4,700.00) |
| PROMOTIONS | $ 5,769.00 | $ 5,769.00 | $ 5,769.00 | $ 17,307.00 | $ 6,300.00 | $ 6,300.00 | $ 6,300.00 | $ 6,300.00 | $ 6,300.00 |
| LABOR COST OF SALES | $ 30,000.00 | $ 30,000.00 | $ 30,000.00 | $ 90,000.00 | $ 33,000.00 | $ 33,000.00 | $ 33,000.00 | $ 33,000.00 | $ 33,000.00 |
| PARTS COST OF SALES | $ 225,000.00 | $ 225,000.00 | $ 225,000.00 | $ 675,000.00 | $ 247,500.00 | $ 247,500.00 | $ 247,500.00 | $ 247,500.00 | $ 247,500.00 |
| FUEL | $ 9,000.00 | $ 9,000.00 | $ 9,000.00 | $ 27,000.00 | $ 9,900.00 | $ 9,900.00 | $ 9,900.00 | $ 9,900.00 | $ 9,900.00 |
| **SUB-TOTAL OTHER SELL EXP** | $ 312,829.00 | $ 312,829.00 | $ 312,829.00 | $ 938,487.00 | $ 349,500.00 | $ 349,500.00 | $ 349,500.00 | $ 349,500.00 | $ 349,500.00 |
| | | | | | | | | | |
| CEO SALARY (STERLING) | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| GM SALARY (VASS) [1] | $ 25,000.00 | $ 25,000.00 | $ 25,000.00 | $ 75,000.00 | $ 25,000.00 | $ 25,000.00 | $ 25,000.00 | $ 25,000.00 | $ 25,000.00 |
| SALARIES SUPERVISION | $ 27,000.00 | $ 27,000.00 | $ 27,000.00 | $ 81,000.00 | $ 27,000.00 | $ 27,000.00 | $ 27,000.00 | $ 27,000.00 | $ 27,000.00 |
| SALARIES STAFF | $ 70,000.00 | $ 70,000.00 | $ 70,000.00 | $ 210,000.00 | $ 72,000.00 | $ 72,000.00 | $ 72,000.00 | $ 72,000.00 | $ 72,000.00 |
| SALARIES SALES GUIDES | $ 70,000.00 | $ 70,000.00 | $ 70,000.00 | $ 210,000.00 | $ 77,000.00 | $ 77,000.00 | $ 77,000.00 | $ 77,000.00 | $ 77,000.00 |
| TAXES - PAYROLL | $ 56,000.00 | $ 56,000.00 | $ 56,000.00 | $ 168,000.00 | $ 60,000.00 | $ 60,000.00 | $ 60,000.00 | $ 60,000.00 | $ 60,000.00 |
| EMPLOYEE BENEFITS | $ 17,000.00 | $ 17,000.00 | $ 17,000.00 | $ 51,000.00 | $ 19,000.00 | $ 19,000.00 | $ 19,000.00 | $ 19,000.00 | $ 19,000.00 |

| DESCRIPTION | Oct-17 | Nov-17 | Dec-17 | 4Q 17 TOTAL | Jan-18 | Feb-18 | Mar-18 | Apr-18 | May-18 |
|---|---|---|---|---|---|---|---|---|---|
| **BRITISH MOTORCARS VENTURA - LAND ROVER JAGUAR VENTURA** | | | | | | | | | |
| **TOTAL SALARIES / WAGES** | $ 265,000.00 | $ 265,000.00 | $ 265,000.00 | $ 795,000.00 | $ 280,000.00 | $ 280,000.00 | $ 280,000.00 | $ 280,000.00 | $ 280,000.00 |
| | | | | | | | | | |
| OFFICE SUPPLIES/EXPENSE | $ 1,341.00 | $ 1,341.00 | $ 1,341.00 | $ 4,023.00 | $ 1,500.00 | $ 1,500.00 | $ 1,500.00 | $ 1,500.00 | $ 1,500.00 |
| SMALL TOOLS/OTHER SUPPLIES | $ 4,864.00 | $ 4,864.00 | $ 4,864.00 | $ 14,592.00 | $ 4,864.00 | $ 4,864.00 | $ 4,864.00 | $ 4,864.00 | $ 4,864.00 |
| UNIFORM & LAUNDRY | $ 1,600.00 | $ 1,600.00 | $ 1,600.00 | $ 4,800.00 | $ 1,600.00 | $ 1,600.00 | $ 1,600.00 | $ 1,600.00 | $ 1,600.00 |
| TRAVEL / ENTERTAINMENT | $ 2,500.00 | $ 2,500.00 | $ 2,500.00 | $ 7,500.00 | $ 2,500.00 | $ 2,500.00 | $ 2,500.00 | $ 2,500.00 | $ 2,500.00 |
| OUTSIDE SERVICES | $ 5,500.00 | $ 5,500.00 | $ 5,500.00 | $ 16,500.00 | $ 5,500.00 | $ 5,500.00 | $ 5,500.00 | $ 5,500.00 | $ 5,500.00 |
| MEMBER/DUES/DUES&SUBSCRIPTION | $ 2,300.00 | $ 2,300.00 | $ 2,300.00 | $ 6,900.00 | $ 2,300.00 | $ 2,300.00 | $ 2,300.00 | $ 2,300.00 | $ 2,300.00 |
| NON-BKLEGAL/AUDIT EXPENSE | $ 5,000.00 | $ 5,000.00 | $ 5,000.00 | $ 15,000.00 | $ 5,000.00 | $ 5,000.00 | $ 5,000.00 | $ 5,000.00 | $ 5,000.00 |
| DATA PROCESSING EXP | 13,739.00 | 13,739.00 | 13,739.00 | 41,217.00 | 13,739.00 | 13,739.00 | 13,739.00 | 13,739.00 | 13,739.00 |
| EMPLOYEE TRAINING | 2,000.00 | 2,000.00 | 2,000.00 | 6,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 |
| BANK AND CREDIT CARD FEES | 6,237.00 | 6,237.00 | 6,237.00 | 18,711.00 | 6,860.00 | 6,860.00 | 6,860.00 | 6,860.00 | 6,860.00 |
| FREIGHT & EXPRESS | 4,500.00 | 4,500.00 | 4,500.00 | 13,500.00 | 4,950.00 | 4,950.00 | 4,950.00 | 4,950.00 | 4,950.00 |
| MISCELLANEOUS EXP | 5,000.00 | 5,000.00 | 5,000.00 | 15,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 |
| | | | | | | | | | |
| **TOTAL SEMI-FIXED EXP** | $ 54,581.00 | $ 54,581.00 | $ 54,581.00 | $ 163,743.00 | $ 55,813.00 | $ 55,813.00 | $ 55,813.00 | $ 55,813.00 | $ 55,813.00 |
| | | | | | | | | | |
| RENT | $ 22,089.65 | $ 22,089.65 | $ 22,089.65 | $ 66,268.95 | $ 22,089.65 | $ 22,089.65 | $ 22,089.65 | $ 22,089.65 | $ 22,089.65 |
| REPAIR & MAINTENANCE- R.E. | $ 2,500.00 | $ 2,500.00 | $ 2,500.00 | $ 7,500.00 | $ 2,500.00 | $ 2,500.00 | $ 2,500.00 | $ 2,500.00 | $ 2,500.00 |
| TAXES - REAL ESTATE | $ 2,100.00 | $ 2,100.00 | $ 2,100.00 | $ 6,300.00 | $ 2,100.00 | $ 2,100.00 | $ 2,100.00 | $ 2,100.00 | $ 2,100.00 |
| INSURANCE-BUILDING/IMPROVE | $ 7,726.00 | $ 7,726.00 | $ 7,726.00 | $ 23,178.00 | $ 7,726.00 | $ 7,726.00 | $ 7,726.00 | $ 7,726.00 | $ 7,726.00 |
| UTILITIES | $ 8,080.00 | $ 8,080.00 | $ 8,080.00 | $ 24,240.00 | $ 8,200.00 | $ 8,200.00 | $ 8,200.00 | $ 8,200.00 | $ 8,200.00 |
| LEASEHOLD IMPROVEMENT [2] | | | | | | | | | |
| | | | | | | | | | |
| **SUB-TOTAL - OCCUPANCY** | $ 42,495.65 | $ 42,495.65 | $ 42,495.65 | $ 127,486.95 | $ 42,615.65 | $ 42,615.65 | $ 42,615.65 | $ 42,615.65 | $ 42,615.65 |
| | | | | | | | | | |
| INSURANCE - OTHER | $ 4,274.00 | $ 4,274.00 | $ 4,274.00 | $ 12,822.00 | $ 4,700.00 | $ 4,700.00 | $ 4,700.00 | $ 4,700.00 | $ 4,700.00 |
| TAXES - OTHER INCLUDING CORPORATE TAX ON CONVERSION TO C CORP | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 800.00 | $ - |
| REPAIR/MAINT - EQUIPMENT | $ 550.00 | $ 550.00 | $ 550.00 | $ 1,650.00 | $ 1,000.00 | $ 1,000.00 | $ 1,000.00 | $ 1,000.00 | $ 1,000.00 |
| EQUIPMENT RENTAL | $ 372.00 | $ 372.00 | $ 372.00 | $ 1,116.00 | $ 372.00 | $ 372.00 | $ 372.00 | $ 372.00 | $ 372.00 |
| SALES TAX | $ 125,000.00 | $ 125,000.00 | $ 125,000.00 | $ 375,000.00 | 137,500.00 | 137,500.00 | 137,500.00 | 137,500.00 | 137,500.00 |
| DMV FEES | $ 25,200.00 | $ 25,200.00 | $ 25,200.00 | $ 75,600.00 | 27,720.00 | 27,720.00 | 27,720.00 | 27,720.00 | 27,720.00 |
| | | | | | | | | | |
| **SUB-TOTAL FIXED EXPENSE** | $ 155,396.00 | $ 155,396.00 | $ 155,396.00 | $ 466,188.00 | $ 171,292.00 | $ 171,292.00 | $ 171,292.00 | $ 172,092.00 | $ 171,292.00 |
| | | | | | | | | | |
| UNSECURED PETERSON NOTE CURE PAYMENT | $ 90,481.04 | | | $ 90,481.04 | | | | | |
| UNSECURED PETERSON NOTE CLAIM PAYMENT | | $ 11,310.13 | | $ 11,310.13 | 11,310.13 | 11,310.13 | 11,310.13 | 11,310.13 | 11,310.13 |
| PROF. ADMIN., NON-PROF ADMIN., PRIORITY, GENERAL UNSECURED CLAIMS, AND FIRST $250,000 PAYMENT TO CURRENT MINORITY EQUITY HOLDERS | $ 4,523,660.28 | | | $ 4,523,660.28 | | | | | |
| $250,000 PAYMENTS TO CURRENT MINORITY EQUITY HOLDERS ON FIRST, SECOND, AND THIRD ANNIVERSARIES OF EFFECTIVE DATE | | | | $ - | | | | | |
| U.S. TRUSTEE FEES | $ 13,000.00 | | | $ 13,000.00 | 10,400.00 | | | $ 10,400.00 | |
| | | | | | | | | | |
| **SUB-TOTAL BK AND PLAN EXPENSES** | $ 4,627,141.32 | $ 11,310.13 | $ - | $ 4,638,451.45 | $ 21,710.13 | $ 11,310.13 | $ 11,310.13 | $ 21,710.13 | $ 11,310.13 |
| | | | | | | | | | |
| **TOTAL EXPENSES** | $ 9,350,977.37 | $ 4,735,146.18 | $ 4,723,836.05 | 18,809,959.60 | $ 5,202,155.18 | $ 5,191,755.18 | $ 5,191,755.18 | $ 5,202,955.18 | $ 5,191,755.18 |
| | | | | | | | | | |
| **ENDING CASH:** | $ 438,386.22 | $ 465,645.04 | $ 504,213.99 | | $ 542,704.31 | $ 591,594.63 | $ 640,484.95 | $ 678,175.27 | $ 727,065.59 |

[1] Plus quarterly performance based bonus TBD

[2] The Debtor is required by its agreements with JLRNA to obtain certain improvements to the leasehold location.  Those improvements, which will likely be completed before December 2018, will have a cost of between $2-3 million, which will be funded from a new loan and/or equity contribution.

| DESCRIPTION | Jun-18 | Jul-18 | Aug-18 | Sep-18 | Oct-18 | Nov-18 | Dec-18 | 2018 TOTAL | 1Q 2019 |
|---|---|---|---|---|---|---|---|---|---|
| **BEGINNING CASH** | $ 727,065.59 | $ 775,955.91 | $ 814,446.23 | $ 863,336.55 | $ 912,226.87 | $ 1,200,717.19 | $ 999,607.51 | | $ 1,048,497.83 |
| **INCOME** | | | | | | | | | |
| STERLING NV CASH CONTRIBUTION | | | | | $ 250,000.00 | | | $ 250,000.00 | |
| STERLING EXIT LOAN | | | | | | | | $ - | |
| **SUB-TOTAL NON-OPERATING INCOME** | $ - | $ - | $ - | $ - | $ 250,000.00 | $ - | $ - | $ 250,000.00 | $ - |
| | | | | | | | | | |
| OPERATING INCOME - NEW JAGUAR | $ 550,000.00 | $ 550,000.00 | $ 550,000.00 | $ 550,000.00 | $ 550,000.00 | $ 550,000.00 | $ 550,000.00 | $ 6,600,000.00 | 1,815,000.00 |
| OPERATING INCOME - NEW LAND ROVER | $ 3,520,000.00 | $ 3,520,000.00 | $ 3,520,000.00 | $ 3,520,000.00 | $ 3,520,000.00 | $ 3,520,000.00 | $ 3,520,000.00 | 42,240,000.00 | 11,616,000.00 |
| OPERATING INCOME - PRE-OWNED | $ 390,945.50 | $ 390,945.50 | $ 390,945.50 | $ 390,945.50 | $ 390,945.50 | $ 390,945.50 | $ 390,945.50 | $ 4,691,346.00 | 1,290,120.00 |
| BUSINESS BUILDER | $ 255,000.00 | $ 255,000.00 | $ 255,000.00 | $ 255,000.00 | $ 255,000.00 | $ 255,000.00 | $ 255,000.00 | $ 3,060,000.00 | 840,000.00 |
| | | | | | | | | | |
| **SUB-TOTAL NEW / PRE-OWNED / BB** | $ 4,715,945.50 | $ 4,715,945.50 | $ 4,715,945.50 | $ 4,715,945.50 | 4,715,945.50 | 4,715,945.50 | 4,715,945.50 | 56,591,346.00 | 15,561,120.00 |
| | | | | | | | | | |
| **F& I INCOME** | $ 66,000.00 | $ 66,000.00 | $ 66,000.00 | $ 66,000.00 | $ 66,000.00 | $ 66,000.00 | $ 66,000.00 | $ 792,000.00 | $ 217,800.00 |
| | | | | | | | | | |
| OPERATING INCOME - SERVICE | $ 104,500.00 | $ 104,500.00 | $ 104,500.00 | $ 104,500.00 | $ 104,500.00 | $ 104,500.00 | $ 104,500.00 | $ 1,254,000.00 | 344,850.00 |
| RAV REPAIR INCOME | $ 13,200.00 | $ 13,200.00 | $ 13,200.00 | $ 13,200.00 | $ 13,200.00 | $ 13,200.00 | $ 13,200.00 | $ 158,400.00 | 43,560.00 |
| OPERATING INCOME - PARTS | $ 341,000.00 | $ 341,000.00 | $ 341,000.00 | $ 341,000.00 | $ 341,000.00 | $ 341,000.00 | $ 341,000.00 | $ 4,092,000.00 | 1,125,300.00 |
| | | | | | | | | | |
| **SUB-TOTAL SERVICE-PARTS** | $ 458,700.00 | $ 458,700.00 | $ 458,700.00 | $ 458,700.00 | $ 458,700.00 | $ 458,700.00 | $ 458,700.00 | $ 5,504,400.00 | 1,513,710.00 |
| | | | | | | | | | |
| **TOTAL INCOME** | $ 5,240,645.50 | $ 5,240,645.50 | $ 5,240,645.50 | $ 5,240,645.50 | $ 5,490,645.50 | $ 5,240,645.50 | $ 5,240,645.50 | 63,137,746.00 | 17,292,630.00 |
| | | | | | | | | | |
| **EXPENSES** | | | | | | | | | |
| COMERICA FLOORING LOAN INTEREST | $ 21,340.00 | $ 21,340.00 | $ 21,340.00 | $ 21,340.00 | $ 21,340.00 | $ 21,340.00 | $ 21,340.00 | $ 256,080.00 | $ 70,200.00 |
| COMERICA FLOORING LOANS DUE | $ 4,238,000.00 | $ 4,238,000.00 | $ 4,238,000.00 | $ 4,238,000.00 | $ 4,238,000.00 | $ 4,238,000.00 | $ 4,238,000.00 | 50,856,000.00 | 13,986,000.00 |
| COMERICA WORKING CAPITAL LOAN INTEREST | $ 4,734.00 | $ 4,734.00 | $ 4,734.00 | $ 4,734.00 | $ 4,734.00 | $ 4,734.00 | $ 4,734.00 | $ 56,808.00 | 14,202.00 |
| STERLING LOAN INTEREST | $ 10,833.00 | 10,833.00 | 10,833.00 | 10,833.00 | 10,833.00 | 10,833.00 | 10,833.00 | $ 129,996.00 | 32,499.00 |
| STERLING LOAN BALANCE PAYOFF | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| STERLING EXIT LOAN INTEREST | $ 6,317.40 | 6,317.40 | 6,317.40 | 6,317.40 | 6,317.40 | 6,317.40 | 6,317.40 | $ 75,808.80 | 18,952.20 |
| STERLING EXIT LOAN BALANCE PAYOFF | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | | | | | | |
| **SUB-TOTAL FINANCE / INTEREST EXPENSE** | $ 4,281,224.40 | $ 4,281,224.40 | $ 4,281,224.40 | $ 4,281,224.40 | $ 4,281,224.40 | $ 4,281,224.40 | $ 4,281,224.40 | 51,374,692.80 | 14,121,853.20 |
| | | | | | | | | | |
| ADVERTISING FEES - AD GROUP | $ 33,000.00 | $ 33,000.00 | $ 33,000.00 | $ 33,000.00 | $ 33,000.00 | $ 33,000.00 | $ 33,000.00 | $ 396,000.00 | 117,600.00 |
| SUB-TOTAL NET ADVERTISING | $ 16,500.00 | $ 16,500.00 | $ 16,500.00 | $ 16,500.00 | $ 16,500.00 | $ 16,500.00 | $ 16,500.00 | $ 198,000.00 | 54,450.00 |
| DEMO / COMPANY CAR EXPENSE | $ 6,800.00 | $ 6,800.00 | $ 6,800.00 | $ 6,800.00 | $ 6,800.00 | $ 6,800.00 | $ 6,800.00 | $ 81,600.00 | 20,400.00 |
| POLICY ADJUSTMENTS | $ 1,200.00 | $ 1,200.00 | $ 1,200.00 | $ 1,200.00 | $ 1,200.00 | $ 1,200.00 | $ 1,200.00 | $ 14,400.00 | 3,960.00 |
| SERVICE LOANER/NET OF REBATES | $ (4,700.00) | (4,700.00) | (4,700.00) | (4,700.00) | (4,700.00) | (4,700.00) | (4,700.00) | $ (56,400.00) | (14,100.00) |
| PROMOTIONS | $ 6,300.00 | $ 6,300.00 | $ 6,300.00 | $ 6,300.00 | $ 6,300.00 | $ 6,300.00 | $ 6,300.00 | $ 75,600.00 | 18,900.00 |
| LABOR COST OF SALES | $ 33,000.00 | $ 33,000.00 | $ 33,000.00 | $ 33,000.00 | $ 33,000.00 | $ 33,000.00 | $ 33,000.00 | $ 396,000.00 | 108,900.00 |
| PARTS COST OF SALES | $ 247,500.00 | $ 247,500.00 | $ 247,500.00 | $ 247,500.00 | $ 247,500.00 | $ 247,500.00 | $ 247,500.00 | $ 2,970,000.00 | 816,750.00 |
| FUEL | $ 9,900.00 | $ 9,900.00 | $ 9,900.00 | $ 9,900.00 | $ 9,900.00 | $ 9,900.00 | $ 9,900.00 | $ 118,800.00 | 32,670.00 |
| | | | | | | | | | |
| **SUB-TOTAL OTHER SELL EXP** | $ 349,500.00 | $ 349,500.00 | $ 349,500.00 | $ 349,500.00 | $ 349,500.00 | $ 349,500.00 | $ 349,500.00 | $ 4,194,000.00 | 1,159,530.00 |
| | | | | | | | | | |
| CEO SALARY (STERLING) | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| GM SALARY (VASS) [1] | $ 25,000.00 | $ 25,000.00 | $ 25,000.00 | $ 25,000.00 | $ 25,000.00 | $ 25,000.00 | $ 25,000.00 | $ 300,000.00 | 75,000.00 |
| SALARIES SUPERVISION | $ 27,000.00 | $ 27,000.00 | $ 27,000.00 | $ 27,000.00 | $ 27,000.00 | $ 27,000.00 | $ 27,000.00 | $ 324,000.00 | 81,000.00 |
| SALARIES STAFF | $ 72,000.00 | $ 72,000.00 | $ 72,000.00 | $ 72,000.00 | $ 72,000.00 | $ 72,000.00 | $ 72,000.00 | $ 864,000.00 | 222,000.00 |
| SALARIES SALES GUIDES | $ 77,000.00 | $ 77,000.00 | $ 77,000.00 | $ 77,000.00 | $ 77,000.00 | $ 77,000.00 | $ 77,000.00 | $ 924,000.00 | 254,100.00 |
| TAXES - PAYROLL | $ 60,000.00 | $ 60,000.00 | $ 60,000.00 | $ 60,000.00 | $ 60,000.00 | $ 60,000.00 | $ 60,000.00 | $ 720,000.00 | 198,000.00 |
| EMPLOYEE BENEFITS | $ 19,000.00 | $ 19,000.00 | $ 19,000.00 | $ 19,000.00 | $ 19,000.00 | $ 19,000.00 | $ 19,000.00 | $ 228,000.00 | 63,000.00 |

| DESCRIPTION | Jun-18 | Jul-18 | Aug-18 | Sep-18 | Oct-18 | Nov-18 | Dec-18 | 2018 TOTAL | 1Q 2019 |
|---|---|---|---|---|---|---|---|---|---|
| TOTAL SALARIES / WAGES | $ 280,000.00 | $ 280,000.00 | $ 280,000.00 | $ 280,000.00 | $ 280,000.00 | $ 280,000.00 | $ 280,000.00 | $ 3,360,000.00 | $ 893,100.00 |
| | | | | | | | | | |
| OFFICE SUPPLIES/EXPENSE | $ 1,500.00 | $ 1,500.00 | $ 1,500.00 | $ 1,500.00 | $ 1,500.00 | $ 1,500.00 | $ 1,500.00 | $ 18,000.00 | $ 5,100.00 |
| SMALL TOOLS/OTHER SUPPLIES | $ 4,864.00 | $ 4,864.00 | $ 4,864.00 | $ 4,864.00 | $ 4,864.00 | $ 4,864.00 | $ 4,864.00 | $ 58,368.00 | $ 16,500.00 |
| UNIFORM & LAUNDRY | $ 1,600.00 | $ 1,600.00 | $ 1,600.00 | $ 1,600.00 | $ 1,600.00 | $ 1,600.00 | $ 1,600.00 | $ 19,200.00 | $ 4,800.00 |
| TRAVEL / ENTERTAINMENT | $ 2,500.00 | $ 2,500.00 | $ 2,500.00 | $ 2,500.00 | $ 2,500.00 | $ 2,500.00 | $ 2,500.00 | $ 30,000.00 | $ 7,500.00 |
| OUTSIDE SERVICES | $ 5,500.00 | $ 5,500.00 | $ 5,500.00 | $ 5,500.00 | $ 5,500.00 | $ 5,500.00 | $ 5,500.00 | $ 66,000.00 | $ 16,500.00 |
| MEMBER/DUES/DUES&SUBSCRIPTION | $ 2,300.00 | $ 2,300.00 | $ 2,300.00 | $ 2,300.00 | $ 2,300.00 | $ 2,300.00 | $ 2,300.00 | $ 27,600.00 | $ 6,900.00 |
| NON-BKLEGAL/AUDIT EXPENSE | $ 5,000.00 | $ 5,000.00 | $ 5,000.00 | $ 5,000.00 | $ 5,000.00 | $ 5,000.00 | $ 5,000.00 | $ 60,000.00 | $ 15,000.00 |
| DATA PROCESSING EXP | $ 13,739.00 | $ 13,739.00 | $ 13,739.00 | $ 13,739.00 | $ 13,739.00 | $ 13,739.00 | $ 13,739.00 | $ 164,868.00 | $ 41,217.00 |
| EMPLOYEE TRAINING | $ 2,000.00 | $ 2,000.00 | $ 2,000.00 | $ 2,000.00 | $ 2,000.00 | $ 2,000.00 | $ 2,000.00 | $ 24,000.00 | $ 6,000.00 |
| BANK AND CREDIT CARD FEES | $ 6,860.00 | $ 6,860.00 | $ 6,860.00 | $ 6,860.00 | $ 6,860.00 | $ 6,860.00 | $ 6,860.00 | $ 82,320.00 | $ 22,620.00 |
| FREIGHT & EXPRESS | $ 4,950.00 | $ 4,950.00 | $ 4,950.00 | $ 4,950.00 | $ 4,950.00 | $ 4,950.00 | $ 4,950.00 | $ 59,400.00 | $ 16,335.00 |
| MISCELLANEOUS EXP | $ 5,000.00 | $ 5,000.00 | $ 5,000.00 | $ 5,000.00 | $ 5,000.00 | $ 5,000.00 | $ 5,000.00 | $ 60,000.00 | $ 15,000.00 |
| | | | | | | | | | |
| TOTAL SEMI-FIXED EXP | $ 55,813.00 | $ 55,813.00 | $ 55,813.00 | $ 55,813.00 | $ 55,813.00 | $ 55,813.00 | $ 55,813.00 | $ 669,756.00 | $ 173,472.00 |
| | | | | | | | | | |
| RENT | $ 22,089.65 | $ 22,089.65 | $ 22,089.65 | $ 22,089.65 | $ 22,089.65 | $ 22,089.65 | $ 22,089.65 | $ 265,075.80 | $ 66,268.95 |
| REPAIR & MAINTENANCE- R.E. | $ 2,500.00 | $ 2,500.00 | $ 2,500.00 | $ 2,500.00 | $ 2,500.00 | $ 2,500.00 | $ 2,500.00 | $ 30,000.00 | $ 7,500.00 |
| TAXES - REAL ESTATE | $ 2,100.00 | $ 2,100.00 | $ 2,100.00 | $ 2,100.00 | $ 2,100.00 | $ 2,100.00 | $ 2,100.00 | $ 25,200.00 | $ 6,300.00 |
| INSURANCE-BUILDING/IMPROVE | $ 7,726.00 | $ 7,726.00 | $ 7,726.00 | $ 7,726.00 | $ 7,726.00 | $ 7,726.00 | $ 7,726.00 | $ 92,712.00 | $ 23,178.00 |
| UTILITIES | $ 8,200.00 | $ 8,200.00 | $ 8,200.00 | $ 8,200.00 | $ 8,200.00 | $ 8,200.00 | $ 8,200.00 | $ 98,400.00 | $ 25,200.00 |
| LEASEHOLD IMPROVEMENT [2] | | | | | | | | | |
| | | | | | | | | | |
| SUB-TOTAL - OCCUPANCY | $ 42,615.65 | $ 42,615.65 | $ 42,615.65 | $ 42,615.65 | $ 42,615.65 | $ 42,615.65 | $ 42,615.65 | $ 511,387.80 | $ 128,446.95 |
| | | | | | | | | | |
| INSURANCE - OTHER | $ 4,700.00 | $ 4,700.00 | $ 4,700.00 | $ 4,700.00 | $ 4,700.00 | $ 4,700.00 | $ 4,700.00 | $ 56,400.00 | $ 15,510.00 |
| TAXES - OTHER INCLUDING CORPORATE TAX ON CONVERSION TO C CORP | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 800.00 | $ - |
| REPAIR/MAINT - EQUIPMENT | $ 1,000.00 | $ 1,000.00 | $ 1,000.00 | $ 1,000.00 | $ 1,000.00 | $ 1,000.00 | $ 1,000.00 | $ 12,000.00 | 3,600.00 |
| EQUIPMENT RENTAL | $ 372.00 | $ 372.00 | $ 372.00 | $ 372.00 | $ 372.00 | $ 372.00 | $ 372.00 | $ 4,464.00 | $ 1,116.00 |
| SALES TAX | $ 137,500.00 | $ 137,500.00 | $ 137,500.00 | $ 137,500.00 | $ 137,500.00 | $ 137,500.00 | $ 137,500.00 | $ 1,650,000.00 | 453,750.00 |
| DMV FEES | $ 27,720.00 | $ 27,720.00 | $ 27,720.00 | $ 27,720.00 | $ 27,720.00 | $ 27,720.00 | $ 27,720.00 | $ 332,640.00 | $ 91,500.00 |
| | | | | | | | | | |
| SUB-TOTAL FIXED EXPENSE | $ 171,292.00 | $ 171,292.00 | $ 171,292.00 | $ 171,292.00 | $ 171,292.00 | $ 171,292.00 | $ 171,292.00 | $ 2,056,304.00 | $ 565,476.00 |
| | | | | | | | | | |
| UNSECURED PETERSON NOTE CURE PAYMENT | | | | | | | | | |
| UNSECURED PETERSON NOTE CLAIM PAYMENT | $ 11,310.13 | $ 11,310.13 | $ 11,310.13 | $ 11,310.13 | $ 11,310.13 | $ 11,310.13 | $ 11,310.13 | $ 135,721.56 | $ 33,930.39 |
| PROF. ADMIN., NON-PROF ADMIN., PRIORITY, GENERAL UNSECURED CLAIMS, AND FIRST $250,000 PAYMENT TO CURRENT MINORITY EQUITY HOLDERS | | | | | | | | $ - | |
| $250,000 PAYMENTS TO CURRENT MINORITY EQUITY HOLDERS ON FIRST, SECOND, AND THIRD ANNIVERSARIES OF EFFECTIVE DATE | | | | | | $ 250,000.00 | | $ 250,000.00 | |
| U.S. TRUSTEE FEES | | $ 10,400.00 | | | $ 10,400.00 | | | $ 41,600.00 | $ 10,400.00 |
| | | | | | | | | | |
| SUB-TOTAL BK AND PLAN EXPENSES | $ 11,310.13 | $ 21,710.13 | $ 11,310.13 | $ 11,310.13 | $ 21,710.13 | $ 261,310.13 | $ 11,310.13 | $ 427,321.56 | $ 44,330.39 |
| | | | | | | | | | |
| TOTAL EXPENSES | $ 5,191,755.18 | $ 5,202,155.18 | $ 5,191,755.18 | $ 5,191,755.18 | $ 5,202,155.18 | $ 5,441,755.18 | $ 5,191,755.18 | 62,593,462.16 | 17,086,208.54 |
| | | | | | | | | | |
| ENDING CASH: | $ 775,955.91 | $ 814,446.23 | $ 863,336.55 | $ 912,226.87 | $ 1,200,717.19 | $ 999,607.51 | $ 1,048,497.83 | | $ 1,254,919.29 |

[1] Plus quarterly performance based bonus TBD

[2] The Debtor is required by its agreements with JLRNA to obtain certain improvements to the lea... between $2-$3 million, which will be funded from a new loan and/or equity contribution.

| DESCRIPTION | 2Q 2019 | 3Q 2019 | 4Q 2019 | 2019 TOTAL | 1Q 2020 | 2Q 2020 | 3Q 2020 | 4Q 2020 | 2020 TOTAL |
|---|---|---|---|---|---|---|---|---|---|
| BEGINNING CASH | $ 1,254,919.29 | $ 1,460,540.75 | $ 1,666,962.21 | | $ 1,873,383.67 | $ 2,176,554.63 | $ 2,478,925.59 | $ 2,782,096.55 | |
| **INCOME** | | | | | | | | | |
| STERLING NV CASH CONTRIBUTION | | | $ 250,000.00 | $ 250,000.00 | | | | $ 250,000.00 | $ 250,000.00 |
| STERLING EXIT LOAN | | | | $ - | | | | | $ - |
| SUB-TOTAL NON-OPERATING INCOME | $ - | $ - | $ 250,000.00 | $ 250,000.00 | $ - | $ - | $ - | $ 250,000.00 | $ 250,000.00 |
| | | | | | | | | | |
| OPERATING INCOME - NEW JAGUAR | $ 1,815,000.00 | $ 1,815,000.00 | $ 1,815,000.00 | $ 7,260,000.00 | $ 1,996,500.00 | $ 1,996,500.00 | $ 1,996,500.00 | $ 1,996,500.00 | $ 7,986,000.00 |
| OPERATING INCOME - NEW LAND ROVER | $ 11,616,000.00 | $ 11,616,000.00 | $ 11,616,000.00 | $ 46,464,000.00 | $ 12,777,600.00 | $ 12,777,600.00 | $ 12,777,600.00 | $ 12,777,600.00 | $ 51,110,400.00 |
| OPERATING INCOME - PRE-OWNED | $ 1,290,120.00 | $ 1,290,120.00 | $ 1,290,120.00 | $ 5,160,480.00 | $ 1,419,132.00 | $ 1,419,132.00 | $ 1,419,132.00 | $ 1,419,132.00 | $ 5,676,528.00 |
| BUSINESS BUILDER | $ 840,000.00 | $ 840,000.00 | $ 840,000.00 | $ 3,360,000.00 | $ 930,000.00 | $ 930,000.00 | $ 930,000.00 | $ 930,000.00 | $ 3,720,000.00 |
| | | | | | | | | | |
| SUB-TOTAL NEW / PRE-OWNED / BB | 15,561,120.00 | 15,561,120.00 | 15,561,120.00 | 62,244,480.00 | 17,123,232.00 | 17,123,232.00 | 17,123,232.00 | 17,123,232.00 | 68,492,928.00 |
| | | | | | | | | | |
| F&I INCOME | $ 217,800.00 | $ 217,800.00 | $ 217,800.00 | $ 871,200.00 | $ 239,580.00 | $ 239,580.00 | $ 239,580.00 | $ 239,580.00 | $ 958,320.00 |
| | | | | | | | | | |
| OPERATING INCOME - SERVICE | $ 344,850.00 | $ 344,850.00 | $ 344,850.00 | $ 1,379,400.00 | $ 379,335.00 | $ 379,335.00 | $ 379,335.00 | $ 379,335.00 | $ 1,517,340.00 |
| RAV REPAIR INCOME | $ 43,560.00 | $ 43,560.00 | $ 43,560.00 | $ 174,240.00 | $ 47,916.00 | $ 47,916.00 | $ 47,916.00 | $ 47,916.00 | $ 191,664.00 |
| OPERATING INCOME - PARTS | $ 1,125,300.00 | $ 1,125,300.00 | $ 1,125,300.00 | $ 4,501,200.00 | $ 1,237,830.00 | $ 1,237,830.00 | $ 1,237,830.00 | $ 1,237,830.00 | $ 4,951,320.00 |
| | | | | | | | | | |
| SUB-TOTAL SERVICE-PARTS | $ 1,513,710.00 | $ 1,513,710.00 | $ 1,513,710.00 | $ 6,054,840.00 | $ 1,665,081.00 | $ 1,665,081.00 | $ 1,665,081.00 | $ 1,665,081.00 | $ 6,660,324.00 |
| | | | | | | | | | |
| TOTAL INCOME | 17,292,630.00 | 17,292,630.00 | 17,542,630.00 | 69,420,520.00 | 19,027,893.00 | 19,027,893.00 | 19,027,893.00 | 19,277,893.00 | 76,361,572.00 |
| | | | | | | | | | |
| **EXPENSES** | | | | | | | | | |
| COMERICA FLOORING LOAN INTEREST | $ 70,200.00 | $ 70,200.00 | $ 70,200.00 | $ 280,800.00 | $ 77,220.00 | $ 77,220.00 | $ 77,220.00 | $ 77,220.00 | $ 308,880.00 |
| COMERICA FLOORING LOANS DUE | 13,986,000.00 | 13,986,000.00 | 13,986,000.00 | 55,944,000.00 | 15,381,450.00 | 15,381,450.00 | 15,381,450.00 | 15,381,450.00 | 61,525,800.00 |
| COMERICA WORKING CAPITAL LOAN INTEREST | $ 14,202.00 | $ 14,202.00 | $ 14,202.00 | $ 56,808.00 | $ 14,202.00 | $ 14,202.00 | $ 14,202.00 | $ 14,202.00 | $ 56,808.00 |
| STERLING LOAN INTEREST | $ 32,499.00 | $ 32,499.00 | $ 32,499.00 | $ 129,996.00 | $ 32,499.00 | $ 32,499.00 | $ 32,499.00 | $ 32,499.00 | $ 129,996.00 |
| STERLING LOAN BALANCE PAYOFF | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| STERLING EXIT LOAN INTEREST | $ 18,952.20 | $ 18,952.20 | $ 18,952.20 | $ 75,808.80 | $ 18,952.20 | $ 18,952.20 | $ 18,952.20 | $ 18,952.20 | $ 75,808.80 |
| STERLING EXIT LOAN BALANCE PAYOFF | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | | | | | | |
| SUB-TOTAL FINANCE / INTEREST EXPENSE | 14,121,853.20 | 14,121,853.20 | 14,121,853.20 | 56,487,412.80 | 15,524,323.20 | 15,524,323.20 | 15,524,323.20 | 15,524,323.20 | 62,097,292.80 |
| | | | | | | | | | |
| ADVERTISING FEES - AD GROUP | $ 117,600.00 | $ 117,600.00 | $ 117,600.00 | $ 470,400.00 | $ 129,000.00 | $ 129,000.00 | $ 129,000.00 | $ 129,000.00 | $ 516,000.00 |
| SUB-TOTAL NET ADVERTISING | $ 54,450.00 | $ 54,450.00 | $ 54,450.00 | $ 217,800.00 | $ 59,895.00 | $ 59,895.00 | $ 59,895.00 | $ 58,895.00 | $ 238,580.00 |
| DEMO / COMPANY CAR EXPENSE | $ 20,400.00 | $ 20,400.00 | $ 20,400.00 | $ 81,600.00 | $ 20,400.00 | $ 20,400.00 | $ 20,400.00 | $ 20,400.00 | $ 81,600.00 |
| POLICY ADJUSTMENTS | $ 3,960.00 | $ 3,960.00 | $ 3,960.00 | $ 15,840.00 | $ 4,356.00 | $ 4,356.00 | $ 4,356.00 | $ 4,356.00 | $ 17,424.00 |
| SERVICE LOANER/NET OF REBATES | $ (14,100.00) | $ (14,100.00) | $ (14,100.00) | $ (56,400.00) | $ (14,100.00) | $ (14,100.00) | $ (14,100.00) | $ (14,100.00) | $ (56,400.00) |
| PROMOTIONS | $ 18,900.00 | $ 18,900.00 | $ 18,900.00 | $ 75,600.00 | $ 18,900.00 | $ 18,900.00 | $ 18,900.00 | $ 18,900.00 | $ 75,600.00 |
| LABOR COST OF SALES | $ 108,900.00 | $ 108,900.00 | $ 108,900.00 | $ 435,600.00 | $ 119,790.00 | $ 119,790.00 | $ 119,790.00 | $ 119,790.00 | $ 479,160.00 |
| PARTS COST OF SALES | $ 816,750.00 | $ 816,750.00 | $ 816,750.00 | $ 3,267,000.00 | $ 898,425.00 | $ 898,425.00 | $ 898,425.00 | $ 898,425.00 | $ 3,593,700.00 |
| FUEL | $ 32,670.00 | $ 32,670.00 | $ 32,670.00 | $ 130,680.00 | $ 35,937.00 | $ 35,937.00 | $ 35,937.00 | $ 35,937.00 | $ 143,748.00 |
| | | | | | | | | | |
| SUB-TOTAL OTHER SELL EXP | $ 1,159,530.00 | $ 1,159,530.00 | $ 1,159,530.00 | $ 4,638,120.00 | $ 1,272,603.00 | $ 1,272,603.00 | $ 1,272,603.00 | $ 1,271,603.00 | $ 5,089,412.00 |
| | | | | | | | | | |
| CEO SALARY (STERLING) | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| GM SALARY (VASS) [1] | $ 75,000.00 | $ 75,000.00 | $ 75,000.00 | $ 300,000.00 | $ 75,000.00 | $ 75,000.00 | $ 75,000.00 | $ 75,000.00 | $ 300,000.00 |
| SALARIES SUPERVISION | $ 81,000.00 | $ 81,000.00 | $ 81,000.00 | $ 324,000.00 | $ 81,000.00 | $ 81,000.00 | $ 81,000.00 | $ 81,000.00 | $ 324,000.00 |
| SALARIES STAFF | $ 222,000.00 | $ 222,000.00 | $ 222,000.00 | $ 888,000.00 | $ 228,000.00 | $ 228,000.00 | $ 228,000.00 | $ 228,000.00 | $ 912,000.00 |
| SALARIES SALES GUIDES | $ 254,100.00 | $ 254,100.00 | $ 254,100.00 | $ 1,016,400.00 | $ 279,510.00 | $ 279,510.00 | $ 279,510.00 | $ 279,510.00 | $ 1,118,040.00 |
| TAXES - PAYROLL | $ 198,000.00 | $ 198,000.00 | $ 198,000.00 | $ 792,000.00 | $ 217,800.00 | $ 217,800.00 | $ 217,800.00 | $ 217,800.00 | $ 871,200.00 |
| EMPLOYEE BENEFITS | $ 63,000.00 | $ 63,000.00 | $ 63,000.00 | $ 252,000.00 | $ 69,000.00 | $ 69,000.00 | $ 69,000.00 | $ 69,000.00 | $ 276,000.00 |

| DESCRIPTION | 2Q 2019 | 3Q 2019 | 4Q 2019 | 2019 TOTAL | 1Q 2020 | 2Q 2020 | 3Q 2020 | 4Q 2020 | 2020 TOTAL |
|---|---|---|---|---|---|---|---|---|---|
| **TOTAL SALARIES / WAGES** | $ 893,100.00 | $ 893,100.00 | $ 893,100.00 | $ 3,572,400.00 | $ 950,310.00 | $ 950,310.00 | $ 950,310.00 | $ 950,310.00 | $ 3,801,240.00 |
| | | | | | | | | | |
| OFFICE SUPPLIES/EXPENSE | $ 5,100.00 | $ 5,100.00 | $ 5,100.00 | $ 20,400.00 | $ 5,610.00 | $ 5,610.00 | $ 5,610.00 | $ 5,610.00 | $ 22,440.00 |
| SMALL TOOLS/OTHER SUPPLIES | 16,500.00 | 16,500.00 | 16,500.00 | $ 66,000.00 | 18,150.00 | 18,150.00 | 18,150.00 | 18,150.00 | $ 72,600.00 |
| UNIFORM & LAUNDRY | 4,800.00 | 4,800.00 | 4,800.00 | $ 19,200.00 | 4,800.00 | 4,800.00 | 4,800.00 | 4,800.00 | $ 19,200.00 |
| TRAVEL / ENTERTAINMENT | 7,500.00 | 7,500.00 | 7,500.00 | $ 30,000.00 | 7,500.00 | 7,500.00 | 7,500.00 | 7,500.00 | $ 30,000.00 |
| OUTSIDE SERVICES | 16,500.00 | 16,500.00 | 16,500.00 | $ 66,000.00 | 16,500.00 | 16,500.00 | 16,500.00 | 16,500.00 | $ 66,000.00 |
| MEMBER/DUES/DUES&SUBSCRIPTION | 6,900.00 | 6,900.00 | 6,900.00 | $ 27,600.00 | 6,900.00 | 6,900.00 | 6,900.00 | 6,900.00 | $ 27,600.00 |
| NON-BKLEGAL/AUDIT EXPENSE | 15,000.00 | 15,000.00 | 15,000.00 | $ 60,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | $ 60,000.00 |
| DATA PROCESSING EXP | 41,217.00 | 41,217.00 | 41,217.00 | $ 164,868.00 | 41,217.00 | 41,217.00 | 41,217.00 | 41,217.00 | $ 164,868.00 |
| EMPLOYEE TRAINING | 6,000.00 | 6,000.00 | 6,000.00 | $ 24,000.00 | 6,000.00 | 6,000.00 | 6,000.00 | 6,000.00 | $ 24,000.00 |
| BANK AND CREDIT CARD FEES | 22,620.00 | 22,620.00 | 22,620.00 | $ 90,480.00 | 24,882.00 | 24,882.00 | 24,882.00 | 24,882.00 | $ 99,528.00 |
| FREIGHT & EXPRESS | 16,335.00 | 16,335.00 | 16,335.00 | $ 65,340.00 | 17,968.50 | 17,968.50 | 17,968.50 | 17,968.50 | $ 71,874.00 |
| MISCELLANEOUS EXP | 15,000.00 | 15,000.00 | 15,000.00 | $ 60,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | $ 60,000.00 |
| | | | | | | | | | |
| **TOTAL SEMI-FIXED EXP** | $ 173,472.00 | $ 173,472.00 | $ 173,472.00 | $ 693,888.00 | $ 179,527.50 | $ 179,527.50 | $ 179,527.50 | $ 179,527.50 | $ 718,110.00 |
| | | | | | | | | | |
| RENT | $ 66,268.95 | $ 66,268.95 | $ 66,268.95 | $ 265,075.80 | $ 66,268.95 | $ 66,268.95 | $ 66,268.95 | $ 66,268.95 | $ 265,075.80 |
| REPAIR & MAINTENANCE- R.E. | 7,500.00 | 7,500.00 | 7,500.00 | $ 30,000.00 | 8,250.00 | 8,250.00 | 8,250.00 | 8,250.00 | $ 33,000.00 |
| TAXES - REAL ESTATE | 6,300.00 | 6,300.00 | 6,300.00 | $ 25,200.00 | 6,300.00 | 6,300.00 | 6,300.00 | 6,300.00 | $ 25,200.00 |
| INSURANCE-BUILDING/IMPROVE | 23,178.00 | 23,178.00 | 23,178.00 | $ 92,712.00 | 23,178.00 | 23,178.00 | 23,178.00 | 23,178.00 | $ 92,712.00 |
| UTILITIES | 25,200.00 | 25,200.00 | 25,200.00 | $ 100,800.00 | 27,720.00 | 27,720.00 | 27,720.00 | 27,720.00 | $ 110,880.00 |
| LEASEHOLD IMPROVEMENT [2] | | | | | | | | | |
| | | | | | | | | | |
| **SUB-TOTAL - OCCUPANCY** | $ 128,446.95 | $ 128,446.95 | $ 128,446.95 | $ 513,787.80 | $ 131,716.95 | $ 131,716.95 | $ 131,716.95 | $ 131,716.95 | $ 526,867.80 |
| | | | | | | | | | |
| INSURANCE - OTHER | $ 15,510.00 | $ 15,510.00 | $ 15,510.00 | $ 62,040.00 | $ 17,060.00 | $ 17,060.00 | $ 17,060.00 | $ 17,060.00 | $ 68,240.00 |
| TAXES - OTHER INCLUDING CORPORATE TAX ON CONVERSION TO C CORP | 800.00 | - | - | $ 800.00 | - | 800.00 | - | - | $ 800.00 |
| REPAIR/MAINT - EQUIPMENT | 3,600.00 | 3,600.00 | 3,600.00 | $ 14,400.00 | 3,960.00 | 3,960.00 | 3,960.00 | 3,960.00 | $ 15,840.00 |
| EQUIPMENT RENTAL | 1,116.00 | 1,116.00 | 1,116.00 | $ 4,464.00 | 1,116.00 | 1,116.00 | 1,116.00 | 1,116.00 | $ 4,464.00 |
| SALES TAX | 453,750.00 | 453,750.00 | 453,750.00 | $ 1,815,000.00 | 499,125.00 | 499,125.00 | 499,125.00 | 499,125.00 | $ 1,996,500.00 |
| DMV FEES | 91,500.00 | 91,500.00 | 91,500.00 | $ 366,000.00 | 100,650.00 | 100,650.00 | 100,650.00 | 100,650.00 | $ 402,600.00 |
| | | | | | | | | | |
| **SUB-TOTAL FIXED EXPENSE** | $ 566,276.00 | $ 565,476.00 | $ 565,476.00 | $ 2,262,704.00 | $ 621,911.00 | $ 622,711.00 | $ 621,911.00 | $ 621,911.00 | $ 2,488,444.00 |
| | | | | | | | | | |
| UNSECURED PETERSON NOTE CURE PAYMENT | | | | | | | | | |
| UNSECURED PETERSON NOTE CLAIM PAYMENT | $ 33,930.39 | $ 33,930.39 | $ 33,930.39 | $ 135,721.56 | $ 33,930.39 | $ 33,930.39 | $ 33,930.39 | $ 11,310.13 | $ 113,101.30 |
| PROF. ADMIN., NON-PROF ADMIN., PRIORITY, GENERAL UNSECURED CLAIMS, AND FIRST $250,000 PAYMENT TO CURRENT MINORITY EQUITY HOLDERS | | | | $ - | | | | | $ - |
| $250,000 PAYMENTS TO CURRENT MINORITY EQUITY HOLDERS ON FIRST, SECOND, AND THIRD ANNIVERSARIES OF EFFECTIVE DATE | | | 250,000.00 | $ 250,000.00 | | | | 250,000.00 | $ 250,000.00 |
| U.S. TRUSTEE FEES | 10,400.00 | 10,400.00 | 10,400.00 | $ 41,600.00 | 10,400.00 | 10,400.00 | 10,400.00 | 10,400.00 | $ 41,600.00 |
| | | | | | | | | | |
| **SUB-TOTAL BK AND PLAN EXPENSES** | $ 44,330.39 | $ 44,330.39 | $ 294,330.39 | $ 427,321.56 | $ 44,330.39 | $ 44,330.39 | $ 44,330.39 | $ 271,710.13 | $ 404,701.30 |
| | | | | | | | | | |
| **TOTAL EXPENSES** | 17,087,008.54 | 17,086,208.54 | 17,336,208.54 | 68,595,634.16 | 18,724,722.04 | 18,725,522.04 | 18,724,722.04 | 18,951,101.78 | 75,126,067.90 |
| | | | | | | | | | |
| **ENDING CASH:** | $ 1,460,540.75 | $ 1,666,962.21 | $ 1,873,383.67 | | $ 2,176,554.63 | $ 2,478,925.59 | $ 2,782,096.55 | $ 3,108,887.77 | |

[1] Plus quarterly performance based bonus TBD

[2] The Debtor is required by its agreements with JLRNA to obtain certain improvements to the lea
between $2-$3 million, which will be funded from a new loan and/or equity contribution.

| DESCRIPTION | GRAND TOTAL |
|---|---|
| | |
| **BEGINNING CASH** | |
| | |
| **INCOME** | |
| STERLING NV CASH CONTRIBUTION | $ 2,750,000.00 |
| STERLING EXIT LOAN | $ 2,526,958.59 |
| | |
| **SUB-TOTAL NON-OPERATING INCOME** | $ 5,276,958.59 |
| | |
| OPERATING INCOME - NEW JAGUAR | $ 23,346,000.00 |
| OPERATING INCOME - NEW LAND ROVER | $ 149,414,400.00 |
| OPERATING INCOME - PRE-OWNED | $ 16,594,569.00 |
| BUSINESS BUILDER | $ 10,830,000.00 |
| | |
| **SUB-TOTAL NEW / PRE-OWNED / BB** | $ 200,184,969.00 |
| | |
| F& I INCOME | $ 2,801,520.00 |
| | |
| OPERATING INCOME - SERVICE | $ 4,435,740.00 |
| RAV REPAIR INCOME | $ 560,304.00 |
| OPERATING INCOME - PARTS | $ 14,474,520.00 |
| | |
| **SUB-TOTAL SERVICE-PARTS** | $ 19,470,564.00 |
| | |
| **TOTAL INCOME** | $ 227,734,011.59 |
| | |
| **EXPENSES** | |
| COMERICA FLOORING LOAN INTEREST | $ 903,960.00 |
| COMERICA FLOORING LOANS DUE | $ 179,882,550.00 |
| COMERICA WORKING CAPITAL LOAN INTEREST | $ 184,626.00 |
| STERLING LOAN INTEREST | $ 422,487.00 |
| STERLING LOAN BALANCE PAYOFF | $ - |
| STERLING EXIT LOAN INTEREST | $ 246,378.60 |
| STERLING EXIT LOAN BALANCE PAYOFF | $ - |
| | |
| **SUB-TOTAL FINANCE / INTEREST EXPENSE** | $ 181,640,001.60 |
| | |
| ADVERTISING FEES - AD GROUP | $ 1,457,400.00 |
| SUB-TOTAL NET ADVERTISING | $ 699,380.00 |
| DEMO / COMPANY CAR EXPENSE | $ 265,200.00 |
| POLICY ADJUSTMENTS | $ 50,544.00 |
| SERVICE LOANER/NET OF REBATES | $ (183,300.00) |
| PROMOTIONS | $ 244,107.00 |
| LABOR COST OF SALES | $ 1,400,760.00 |
| PARTS COST OF SALES | $ 10,505,700.00 |
| FUEL | $ 420,228.00 |
| | |
| **SUB-TOTAL OTHER SELL EXP** | $ 14,860,019.00 |
| | |
| CEO SALARY (STERLING) | $ - |
| GM SALARY (VASS) [1] | $ 975,000.00 |
| SALARIES SUPERVISION | $ 1,053,000.00 |
| SALARIES STAFF | $ 2,874,000.00 |
| SALARIES SALES GUIDES | $ 3,268,440.00 |
| TAXES - PAYROLL | $ 2,551,200.00 |
| EMPLOYEE BENEFITS | $ 807,000.00 |

| DESCRIPTION | GRAND TOTAL |
|---|---|
| **TOTAL SALARIES / WAGES** | $ 11,528,640.00 |
| | |
| OFFICE SUPPLIES/EXPENSE | $ 64,863.00 |
| SMALL TOOLS/OTHER SUPPLIES | $ 211,560.00 |
| UNIFORM & LAUNDRY | $ 62,400.00 |
| TRAVEL / ENTERTAINMENT | $ 97,500.00 |
| OUTSIDE SERVICES | $ 214,500.00 |
| MEMBER/DUES/DUES&SUBSCRIPTION | $ 89,700.00 |
| NON-BKLEGAL/AUDIT EXPENSE | $ 195,000.00 |
| DATA PROCESSING EXP | $ 535,821.00 |
| EMPLOYEE TRAINING | $ 78,000.00 |
| BANK AND CREDIT CARD  FEES | $ 291,039.00 |
| FREIGHT & EXPRESS | $ 210,114.00 |
| MISCELLANEOUS EXP | $ 195,000.00 |
| | |
| **TOTAL SEMI-FIXED EXP** | $ 2,245,497.00 |
| | |
| RENT | $ 861,496.35 |
| REPAIR & MAINTENANCE- R.E. | $ 100,500.00 |
| TAXES - REAL ESTATE | $ 81,900.00 |
| INSURANCE-BUILDING/IMPROVE | $ 301,314.00 |
| UTILITIES | $ 334,320.00 |
| LEASEHOLD IMPROVEMENT [2] | |
| | |
| **SUB-TOTAL - OCCUPANCY** | $ 1,679,530.35 |
| | |
| INSURANCE - OTHER | $ 199,502.00 |
| TAXES - OTHER INCLUDING CORPORATE TAX ON CONVERSION TO C CORP | $ 2,400.00 |
| REPAIR/MAINT - EQUIPMENT | $ 43,890.00 |
| EQUIPMENT RENTAL | $ 14,508.00 |
| SALES TAX | $ 5,836,500.00 |
| DMV FEES | $ 1,176,840.00 |
| | |
| **SUB-TOTAL FIXED EXPENSE** | $ 7,273,640.00 |
| | |
| UNSECURED PETERSON NOTE CURE PAYMENT | $ 90,481.04 |
| UNSECURED PETERSON NOTE CLAIM PAYMENT | $ 395,854.55 |
| PROF. ADMIN., NON-PROF ADMIN., PRIORITY, GENERAL UNSECURED CLAIMS, AND FIRST $250,000 PAYMENT TO CURRENT MINORITY EQUITY HOLDERS | $ 4,523,660.28 |
| $250,000 PAYMENTS TO CURRENT MINORITY EQUITY HOLDERS ON FIRST, SECOND, AND THIRD ANNIVERSARIES OF EFFECTIVE DATE | $ 750,000.00 |
| U.S. TRUSTEE FEES | $ 137,800.00 |
| | |
| **SUB-TOTAL BK AND PLAN EXPENSES** | $ 5,897,795.87 |
| | $        - |
| **TOTAL EXPENSES** | $ 225,125,123.82 |
| | |
| **ENDING CASH:** | |

[1] Plus quarterly performance based bonus TBD
[2] The Debtor is required by its agreements with JLRNA to obtain certain improvements to the lea
between $2-$3 million, which will be funded from a new loan and/or equity contribution.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 10250 Constellation Boulevard, Suite 1700, Los Angeles, CA 90067

A true and correct copy of the foregoing document entitled: **DISCLOSURE STATEMENT DESCRIBING DEBTOR'S PLAN OF REORGANIZATION DATED JUNE 28, 2017; DECLARATION IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **June 28, 2017**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Bret G Anderson    banderson@fcoplaw.com**
- **Todd M Arnold    tma@lnbyb.com**
- **Phillip Ashman    mgolod@mcqueenashman.com, pashman@mcqueenashman.com;bkumamoto@mcqueenashman.com**
- **William C Beall    will@beallandburkhardt.com, carissa@beallandburkhardt.com**
- **Martin J Brill    mjb@lnbrb.com**
- **William S Brody    wbrody@buchalter.com, dbodkin@buchalter.com;IFS_filing@buchalter.com**
- **Brian C Engelhardt    brian.engelhardt@susquehanna.net**
- **Robert Eugene Feyder    robert.feyder@hoganlovells.com, scott.golden@hoganlovells.com;LADocketing@hoganlovells.com**
- **Brian D Fittipaldi    brian.fittipaldi@usdoj.gov**
- **M Douglas Flahaut    flahaut.douglas@arentfox.com**
- **Kim P. Gage    kgage@cookseylaw.com**
- **Alan Craig Hochheiser    ahochheiser@mauricewutscher.com, arodriguez@mauricewutscher.com**
- **Garrick A Hollander    ghollander@winthropcouchot.com, pj@winthropcouchot.com;vcorbin@winthropcouchot.com**
- **Howard N Madris    hmadris@madrislaw.com**
- **Randall P Mroczynski    randym@cookseylaw.com**
- **Aram Ordubegian    ordubegian.aram@arentfox.com**
- **Lindsey L Smith    lls@lnbyb.com, lls@ecf.inforuptcy.com**
- **United States Trustee (ND)    ustpregion16.nd.ecf@usdoj.gov**
- **Johnny White    JWhite@wrslawyers.com, aparisi@wrslawyers.com**

**2.  SERVED BY UNITED STATES MAIL**: On **June 28, 2017**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

The Hon. Peter H. Carroll
United States Bankruptcy Court
1415 State Street, Suite 230 / Courtroom 201
Santa Barbara, California 93101-2511

☒ *Service information continued on attached page*

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                **F 9013-3.1.PROOF.SERVICE**

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **June 28, 2017**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| June 28, 2017 | Lourdes Cruz | /s/ Lourdes Cruz |
|---|---|---|
| Date | Type Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012

**F 9013-3.1.PROOF.SERVICE**

RSN, SEC
In re British Motorcars Ventura, Inc.
File No. 8173
Served by US Mail or NEF if marked with
an *

U.S. Trustee
United States Trustee (ND)
915 Wilshire Blvd, Suite 1850
Los Angeles, CA 90017

Brian D Fittipaldi
United States Trustee
1415 STATE STREET
Santa Barbara, CA 93101

U.S. Securities and Exchange Commission
Attn: Bankruptcy Counsel
444 South Flower Street, Suite 900
Los Angeles, CA 90071-9591

<u>Debtor</u>
British Motorcars Ventura, Inc.
3190 Perkin Avenue
Ventura, CA 93003

**REQUESTS FOR SPECIAL NOTICE:**

<u>Counsel for Jaguar Land Rover North
America, LLC</u>
Hogan Lovells US LLP
Scott A. Golden, Esq. **NEF***
875 Third Avenue
New York, NY 10022

<u>Counsel for Secured Party</u>
<u>JP Morgan Chase Bank, N.A.</u>
Kim Gage, Esq. **NEF***
Cooksey, Toolen, Gage, Duffy & Woog
535 Anton Boulevard, Tenth Floor
Costa Mesa, CA 92626-1977

<u>Counsel for Jaguar Land Rover North
America, LLC</u>
Hogan Lovells US LLP
Robert E. Feyder, Esq. **NEF***
1999 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067

<u>Counsel for AmTrust North America</u>
Alan C. Hochheiser, Esq. **NEF***
Maurice Wutscher
2000 Auburn Drive, Suite 200
One Chagrin Highlands
Beachwood, OH 44122